**1**

```
 1                 UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3     IN RE:                      )   MDL 2303
                                   )   11 C 9308 and
 4     INNOVATIO IP VENTURES, L.L.C. ) related cases
                                   )
 5     PATENT LITIGATION.          )   Chicago, Illinois
                                   )   April 10, 2012
 6                                 )   9:58 o'clock a.m.

 7
                        TRANSCRIPT OF PROCEEDINGS
 8           BEFORE THE HONORABLE JAMES F. HOLDERMAN
           AND THE HONORABLE SIDNEY I. SCHENKIER, MAGISTRATE
 9

10     APPEARANCES:

11     For the Plaintiff      NIRO, HALLER & NIRO, LTD.
       Innovatio IP Ventures, BY:  MR. MATTHEW G. McANDREWS
12     L.L.C.:                     MR. GABRIEL I. OPATKEN
                                 181 West Madison Street, Suite 4600
13                               Chicago, Illinois  60602-4515
                                 (312) 236-0733
14
       For Plaintiff           KRAUS FLAMING, L.L.C.
15     SonicWALL, Inc.:        BY:  MR. TODD H. FLAMING
                                 20 South Clark Street, Suite 2620
16                               Chicago, Illinois  60603
                                 (312) 447-7217
17
       For Plaintiffs Cisco    KIRKLAND & ELLIS, L.L.P.
18     Systems, Motorola,      BY:  MR. ADAM R. ALPER
       and NETGEAR; and a       555 California Street
19     number of               San Francisco, California  94104
       hotel defendants:        (415) 439-1876
20
                               KIRKLAND & ELLIS, L.L.P.
21                             BY:  MR. GIANNI L. CUTRI
                                    MR. JASON M. WEJNERT
22                               300 North LaSalle Street
                                 Chicago, Illinois  60654
23                               (312) 862-2000

24

25
```

1    APPEARANCES (Continued):

2    For 29 Marriott           ROTHSCHILD, BARRY & MYERS, LLP
     Defts.(in 11 C 6478):     BY:  MS. ROBIN KORMAN POWERS
3                              55 West Monroe Street, Suite 3900
                               Chicago, Illinois  60603-5012
4                              (312) 372-2345

5    For 13 Courtyard and      HOEPPNER, WAGNER & EVANS, L.L.P.
     other Defts.              BY:  MR. F. JOSEPH JASKOWIAK
6    (in 11 C 6478):           1000 East 80th Place, 6th Floor South
                               Merrillville, Indiana  46410
7                              (219) 769-6552

8    For 21 hotel              ECKERT SEAMANS CHERIN & MELLOTT, LLC
     Defendants:               BY:  MR. SANDY GARFINKEL
9                                   MR. ERIC J. SCHWALB
                               600 Grant Street, 44th Floor
10                             Pittsburgh, Pennsylvania  15219
                               (412) 566-6868
11
     For Defendant Sage        CAMPBELL KILLIN BRITTAN & RAY, L.L.C.
12   Client 300, LLC:          BY:  MR. WILLIAM C. BRITTAN
                               270 St. Paul Street, Suite 200
13                             Denver, Colorado  80206
                               (303) 322-3400
14
     For Defendant Chicago     GREENBERG TRAURIG, L.L.P.
15   Marriott Northwest:       BY:  MR. KEVIN J. O'SHEA
                               77 West Wacker Drive
16                             Chicago, Illinois  60601
                               (312) 456-8400
17
     For Defendants            LAW OFFICES OF JOHN C. MARTIN
18   Howard Johnson Chicago,   BY:  MR. JOHN C. MARTIN
     Howard Johnson Elk Grove  30 North LaSalle Street
19   (O'Hare), Days Inn        Suite 3400
     Oglesby/Starved Rock,     Chicago, Illinois  60602
20   among others:             (312) 368-9000

21   For Defendant             MANDELL MENKES, L.L.C.
     Dominick's:               BY:  MR. STEVEN P. MANDELL
22                             One North Franklin Street, Suite 3600
                               Chicago, Illinois  60606
23                             (312) 251-1000

24

25

```
1    APPEARANCES (Continued):

2

3    For Counter-Claimants        OGLETREE, DEAKINS, NASH, SMOAK
     Panera Bread and            & STEWART, P.C.
     Caribou Coffee:             BY:  DANIEL O. CANALES
4                                155 North Wacker Drive, Suite 4300
                                 Chicago, Illinois  60606
5                                (312) 558-1422

6    For Counter-Claimants        HOLLAND & KNIGHT, L.L.P.
     Meijer, Inc. and            BY:  MR. ROBERT D. DONOGHUE
7    Accor North America:              MR. DANIEL L. FARRIS
                                 131 South Dearborn Street, 30th Floor
8                                Chicago, Illinois  60603
                                 (312) 578-6553
9
     For Defendant Emerson        LEVENFELD PEARLSTEIN, L.L.C.
10   Skokie Partners, L.L.C.     BY:  MR. MICHAEL P. PADDEN
     d/b/a Comfort Inn Skokie:   Two North LaSalle Street, Suite 1300
11                               Chicago, Illinois  60602
                                 (312) 346-8380
12
     For 5 Comfort Inn            JOHNSON WESTRA BROECKER WHITTAKER
13   Defendants:                 & NEWITT, P.C.
                                 BY:  MR. JOHN J. WESTRA
14                               380 South Schmale Road
                                 Carol Stream, Illinois  60188
15                               (630) 665-9600

16   For Hewlett Packard          BRACEWELL & GIULIANI, L.L.P.
     Company:                    BY:  MR. BARRY K. SHELTON
17                               11 Congress Avenue, Suite 2300
                                 Austin, Texas  78701
18                               (512) 472-3693

19

20

21

22
                COLLEEN M. CONWAY, CSR, RMR, CRR
23                  Official Court Reporter
          219 South Dearborn Street, Room 2524-A
24               Chicago, Illinois  60604
                      (312) 435-5594
25            colleen_conway@ilnd.uscourts.gov
```

1          (Proceedings heard in open court:)

2          THE CLERK:  11 C 9308, In Re:  Innovatio, for

3    scheduling.

4          MR. McANDREWS:  Good morning, Your Honor.

5          On behalf of the Plaintiff Innovatio, Matt McAndrews.

6          THE COURT:  All right.  Good morning.

7          And I will ask each counsel to identify themselves as

8    well as the party that they represent, and that would assist my

9    court reporter who's going to be making what she calls a

10   dictionary and counsel each a designation of some sort.  It's a

11   quick-handed way of presenting this.  So -- all right.

12         MR. OPATKEN:  Gabriel Opatken, O-p-a-t-k-e-n, also

13   for Innovatio.

14         MR. BRITTAN:  William Brittan, B-r-i-t-t-a-n, for

15   Sage Client 300, L.L.C.

16         MR. GARFINKEL:  Sandy Garfinkel, from Eckert Seamans

17   in Pittsburgh, representing 21 separate hotel defendants.

18         I can give you a written list of those, if that will

19   be helpful.

20         THE COURT:  That actually would be helpful, if you

21   could file the list of clients that you represent, so that we

22   have it clear exactly in the record.  Thank you.

23         MR. GARFINKEL:  Sure.

24         MR. SCHWALB:  Eric Schwalb, Eckert Seamans, same

25   attorney, same firm, and same hotels.

1          THE COURT:  Thank you very much.

2          MR. PADDEN:  Mike Padden, Levenfeld Pearlstein, for

3    Emerson Skokie Partners, L.L.C.  They're in case number 6481.

4          THE COURT:  All right.  Thank you.  We will work our

5    way, then, south starting at the podium.

6          MR. FLAMING:  Good morning, Judge.

7          Todd Flaming for SonicWALL.

8          THE COURT:  Good morning.

9          MR. O'SHEA:  Good morning, Your Honor.

10         Kevin O'Shea for Chicago Marriott Northwest.

11         THE COURT:  Good morning.

12         MR. ALPER:  Good morning, Your Honor.

13         Adam Alper for Cisco Systems, Motorola, and NETGEAR,

14   and then a number of the hotel defendants, and we'll provide

15   your clerk with a list.

16         THE COURT:  If you would, that would be helpful.

17         MR. CUTRI:  Gianni Cutri for that same list of

18   defendants.

19         MR. SHELTON:  Good morning, Your Honor.

20         Barry Shelton and Bracewell & Giuliani, and I

21   represent a party that's not even here yet but will be

22   transferred today, and that is Hewlett Packard Company.

23         THE COURT:  All right.  And where is that pending

24   now?

25         MR. SHELTON:  That is pending in the Northern

1    District of California, Your Honor.

2            THE COURT:  All right.

3            MR. SHELTON:  And that case number is 12 CV 1076.

4    And the conditional transfer order from the MDL panel, in MDL

5    number 2303, will take effect today.

6            THE COURT:  Okay.

7            MR. SHELTON:  That will be transferred today.

8            MR. McANDREWS:  Not opposed?

9            MR. SHELTON:  It will be not opposed by anybody.

10           THE COURT:  All right.

11           MR. SHELTON:  Thank you, Your Honor.

12           THE COURT:  Thank you.

13           MR. WESTRA:  Good morning, Judge.

14           John Westra, W-e-s-t-r-a.  I represent five Comfort

15   Inns.

16           THE COURT:  All right.  And if you could, Mr. Westra,

17   file the same statement -- or, well, let's call it -- I want to

18   make sure the docket will properly reflect it, so let's call

19   it -- use your name and your law firm and then, possessive,

20   Statement Identifying Clients.

21           MR. WESTRA:  I will, Judge.  Thank you.

22           THE COURT:  All right?  And then it will all be clear

23   on the record.  If you could use that same format, that would

24   be helpful.  Go ahead.

25           MR. WEJNERT:  Good morning, Your Honor.

7

1          Jason Wejnert, W-e-j-n-e-r-t, of Kirkland & Ellis,

2     same list as that of Adam Alper and Gianni Cutri.

3               THE COURT:  All right.

4               MR. MANDELL:  Good morning, Your Honor.

5               THE COURT:  We have covered everybody over here.  Now

6     we will work our way south.

7               MR. MANDELL:  Good morning, Your Honor.

8               Steven Mandell on behalf of Dominick's grocery

9     stores.

10              THE COURT:  Good morning.

11              MR. DONOGHUE:  Good morning, Your Honor.

12              David Donoghue, D-o-n-o-g-h-u-e, on behalf of Meijer,

13     Incorporated and Accor North America.

14              THE COURT:  Good morning.

15              MR. FARRIS:  Good morning, Your Honor.

16              Daniel Farris for the same Meijer and Accor

17     defendants.

18              THE COURT:  All right.  Thank you.

19              MR. JASKOWIAK:  Good morning, Your Honor.

20              Joe Jaskowiak, J-a-s-k-o-w-i-a-k, for 13 hotel

21     defendants in cause 6478.

22              THE COURT:  All right.  And if you could file --

23              MR. JASKOWIAK:  Yes, Your Honor.

24              THE COURT:  -- the same described format, that would

25     be helpful.  Thank you.

1          MS. POWERS:  Good morning, Your Honor.

2          Robin Powers on behalf of 29 different Marriott

3    hotels in this same case, 6478.

4          THE COURT:  All right.  And if you could also file

5    the same format, that would be helpful --

6          MS. POWERS:  Sure.

7          THE COURT:  -- in the record.

8          MR. MARTIN:  Good morning, Your Honor.

9          John Martin on behalf of the Howard Johnson Chicago,

10   Howard Johnson Elk Grove (O'Hare), and the Days Inn

11   Oglesby/Starved Rock.

12         THE COURT:  All right.  Good morning.

13         MR. CANALES:  Good morning, Your Honor.

14         Daniel Canales, C-a-n-a-l-e-s, on behalf of Panera

15   Bread Company and Caribou Coffee.

16         THE COURT:  All right.  Good morning.

17         MR. CANALES:  Good morning.

18         THE COURT:  Have we covered everybody?  Is there

19   anybody who's here who has not yet identified themselves for my

20   court reporter and for the record?

21         All right.  Thank you.  I appreciate very much your

22   attendance today and your organization.

23         I have reviewed the Form 52, and I appreciate the

24   time and effort that you have put in.  I want to say that I

25   appreciate your resolving a number of issues.

1    Upon the review of almost a hundred pages of

2    materials that you filed, I believe you have narrowed down

3    disagreements to approximately eight.  At least that's what I

4    identified.

5    And let me say this.  I know when I was a counsel in

6    MDL cases more than a quarter of a century ago, sometimes these

7    hearings took a long time.  I am not going to try to delay it.

8    But if anybody needs to sit down, feel comfortable doing that,

9    you have permission.

10   What I'd like to do is identify those eight areas

11   that I think you have disagreement on and then the objective

12   would be for me to assist you in resolving those areas today.

13   And then what I'd like counsel to do is prepare a proposed

14   pretrial order number 3, which would be the scheduling order

15   using the format that we have.  Pretrial order number 3 would

16   encompass not only the agreements that you have reached with

17   regard to scheduling, but also the resolutions we are going to

18   reach this morning, to the extent we can.

19   The first issue that I identified, but I am happy to

20   hear from any counsel on this at any point, is the phasing of

21   the case.  Both sides agree that all parties will participate

22   in all proceedings, to the extent they desire, through the

23   claim construction determination in the case.

24   MR. GARFINKEL:  Your Honor, if I may?

25   THE COURT:  If you could just repeat your name.

1          MR. GARFINKEL:  Sure.

2          THE COURT:  My court reporter is, in my opinion, the

3    best in the country, but she has not immediately memorized

4    everybody's name, but she will before the proceedings are over

5    at some point.  Go ahead.

6          MR. GARFINKEL:  Certainly.  Your Honor, Sandy

7    Garfinkel.  Again, I represent 21 separate hotels that were

8    named in some of the captions of these cases that are now in

9    the MDL.

10          THE COURT:  Yes.

11          MR. GARFINKEL:  I think it's worthy of note, Your

12    Honor, that not every defendant joined in the Form 52

13    submissions submitted by some of the defendants.

14          THE COURT:  Okay.

15          MR. GARFINKEL:  And this issue, phasing, is one of

16    the main items that cause some defendants not to join.  At

17    least from our perspective, our defendants didn't want to join.

18          I think a view that is not represented in either of

19    the Form 52s that were submitted is a different approach to

20    phasing which would not require the end user defendants

21    necessarily to participate in the discovery and proceedings

22    leading up to trial.

23          My clients would dearly like to avoid having to

24    respond to discovery until the main issues involving liability

25    under the patents are resolved, and we're hoping that that view

1 | will be considered by Your Honor in addition to what's been

2 | submitted to you in the two Form 52s.

3 | THE COURT: All right. Well, let me say this.

4 | That's why I had the little proviso on the end of my remark.

5 | All parties will participate to the extent they desire.

6 | MR. GARFINKEL: Okay.

7 | THE COURT: If you desire not to participate in the

8 | discovery, and a discovery -- I mean, if you desire not to

9 | obtain discovery, you can certainly hold off on that, but it

10 | seems to me that perhaps you may have information, your clients

11 | may have information that's reasonably calculated to lead to

12 | the discovery of admissible evidence in the case involving

13 | other parties. It's possible.

14 | MR. GARFINKEL: Okay.

15 | THE COURT: And so, to some extent, if you want to

16 | posture yourself really as kind of a non-party to the case

17 | until liability or what you call the main issues are resolved,

18 | that's something you can do, if you desire. But it's going to

19 | basically be a one-way street from your standpoint because you

20 | are going to be providing discovery but not obtaining

21 | discovery.

22 | MR. GARFINKEL: Okay. Well, obviously, Your Honor,

23 | it's the "providing" part that we're trying to avoid. We

24 | certainly do not --

25 | THE COURT: Well, yes, you'd like to not be sued, and

1    you can do that by settling.

2               MR. GARFINKEL:  Okay.

3               THE COURT:  But without that, it seems to me if you

4    have information that's reasonably calculated to lead to the

5    discovery of admissible evidence, we can't do anything about

6    it.

7               MR. GARFINKEL:  Right.  And --

8               THE COURT:  I mean, I believe that it would perhaps

9    disrupt, certainly disrupt the concept of the multi-district

10   litigation of getting discovery dealt with in one court, one

11   proceeding to the extent we possibly can.

12              So I understand your position.  I understand your

13   desire on the part of your clients.  It will be up to you,

14   though.

15              MR. GARFINKEL:  Okay.

16              THE COURT:  You get to decide.

17              MR. GARFINKEL:  Okay.  I understand.  Thank you, Your

18   Honor.

19              THE COURT:  Okay?  All right.

20              All right.  Well, back to phasing.  And I realize

21   this is kind of a key issue.  And, to some extent, it is hard

22   for me, at the outset of this litigation, to think about case

23   phasing.  And so what I'd like to do -- and I know that some

24   people might be disappointed.  What I'd like to do is work the

25   case up to and including a claim construction determination and

1    then make an evaluation.

2           Now, what harm will anyone suffer if we do that?
3    Plaintiff?

4           MR. McANDREWS:  I think on behalf of plaintiff, Your
5    Honor, there are a couple of issues with respect to tiering
6    that plaintiff would be willing to compromise on.  But to --

7           THE COURT:  All right.

8           MR. McANDREWS:  -- your direct question, I think,
9    speaking just on behalf of Innovatio, my client would like the
10   certainty, heading up through the claim construction phase, as
11   to what precisely -- what case they're going to be preparing as
12   they go into that first trial, which would be what we've
13   referred to as the tier I --

14          THE COURT:  Yes.

15          MR. McANDREWS:  -- class of litigants.  And you have
16   seen the two competing proposals.  Most of the defendants have
17   proposed that that first trial involve only the manufacturers.

18          THE COURT:  Right.

19          MR. McANDREWS:  And our argument, of course, is that
20   that can't be.  Because for the majority of the claims that
21   have been asserted so far, and that we will assert through
22   trial, the only direct infringers are the network operators or,
23   as Mr. Garfinkel --

24          THE COURT:  Sure.

25          MR. McANDREWS:  -- referred to them, the end users.

1    THE COURT:  Well, let me just ask you about that

2    point.  Even though the direct infringers are the end users,

3    these declaratory judgment actions brought by Cisco, Motorola,

4    SonicWALL, and --

5            MR. McANDREWS:  NETGEAR.

6            THE COURT:  -- NETGEAR -- and I was just commenting,

7    SonicWALL, the "WALL" is all caps; is that correct?  Who's the

8    SonicWALL lawyer?

9            MR. FLAMING:  I am, Your Honor.  That's correct,

10   Sonic and W-A-L-L.

11           THE COURT:  It is all one word.  I am helping my

12   court reporter as she makes her dictionary.  All right.

13           MR. SHELTON:  Your Honor, if I could interrupt you?

14   I apologize.  Barry Shelton again.

15           And Hewlett Packard also filed its declaratory

16   judgment action, and we would be a manufacturer.

17           THE COURT:  Okay.  You are coming in.  You are

18   joining us today.

19           MR. SHELTON:  Yes, Your Honor.

20           THE COURT:  All right.  Even though the direct

21   infringers are the end users, if those manufacturers have

22   created products that do not infringe or created services that

23   do not infringe, aren't we done?

24           MR. McANDREWS:  We're not done, Your Honor.

25           THE COURT:  Okay.

1      MR. McANDREWS:  That's a very good question.  You

2  have different classes or categories of claims.  And I know

3  we're not wired for video today, but I have a demonstrative,

4  but I think I can perhaps explain it verbally.

5      THE COURT:  Okay.

6      MR. McANDREWS:  There are claims that are certainly

7  directed to the access points, and those are the little units

8  that you see in the corner of the office with the antenna into

9  it.

10      THE COURT:  Right.

11      MR. McANDREWS:  The wireless access points that

12  facilitate a wireless network in an office environment or a

13  coffee shop or a hotel.

14      There are Innovatio claims directed to access points,

15  but there are also Innovatio claims directed to what we call

16  generically terminal devices.  That will be -- an example will

17  be Your Honor's iPad or my Sony Vaio laptop or a Smartphone

18  that has wi-fi capability when you're in a wi-fi-accessible

19  zone.

20      THE COURT:  Okay.  Well, let me -- I actually don't

21  have an iPad yet, although the Clerk's providing it.  We tested

22  iPads among some of the judges, and others of us are going to

23  get them.

24      But let me ask you, when I am on my iPad in Panera

25  Bread, am I infringing?

1          MR. McANDREWS:  It depends.  For some of the claims,

2     you can be an infringer, yes.  But there is also a system --

3          THE COURT:  Maybe I shouldn't get an iPad.

4     (Laughter.)

5          MR. McANDREWS:  I've got mine in my bag.

6          THE COURT:  Okay.  Well, I am not infringing with my

7     BlackBerry, right?  Because that's what I've got.

8          MR. McANDREWS:  Do you have wi-fi capability on the

9     phone?

10          THE COURT:  Yeah.

11          MR. McANDREWS:  All right.  What we're focusing on --

12     this goes to an important point.  It's the nature of the

13     infringement that Innovatio is pursuing in this case.

14          THE COURT:  Okay.

15          MR. McANDREWS:  And it's relevant to the issue of

16     damages and the specific type of infringement.

17          THE COURT:  Okay.

18          MR. McANDREWS:  So we've got our access points.

19          THE COURT:  Okay.  Let me just pause for a moment.

20          MR. McANDREWS:  Sure.

21     (Court conferring with his law clerk.)

22          THE COURT:  I apologize.  I pulled out my BlackBerry

23     and realized that I had to address something else.  That's the

24     problem of being Chief Judge.  And that was the reason for the

25     delay.  You get on these administrative things and --

1    MR. McANDREWS:  I thought perhaps your clerk was
2  helping you configure your wi-fi.
3    THE COURT:  No, no, no, no.
4    (Laughter.)
5    THE COURT:  Although, he is very adept, as are all
6  the young people seated over here, some of whom are externs,
7  some of whom are clerks.
8    MR. McANDREWS:  All right.  So, to finish the
9  thought, you've got access point claims, you've got terminal
10  device claims, and then, as importantly, and perhaps in many
11  instances more importantly, you've got system claims which are
12  directed to the actual network itself and the operation and
13  configuration of that network.
14    And it is entirely possible to have a claim where you
15  might have one or two elements of an access point that are met
16  by limitations of a system claim, you might have one or two
17  discrete elements of a terminal device claim; but, again, these
18  are claims that are directed to something less than an entire
19  access point or less than an entire terminal device, but as a
20  whole, they're directed to the network system.
21    And to answer your original question, under those
22  circumstances, non-infringement as to the access point claims
23  or even perhaps the terminal device claims would not mean
24  non-infringement as to the system claims.
25    THE COURT:  All right.  Okay.  Well, that's helpful,

1    and I appreciate that.

2            Does anybody else want to comment on that?  Any

3    disagreement with the general description of the various

4    categories of claims that we are dealing with with regard to

5    the allegations that have been made by -- I guess I have been

6    mispronouncing this name -- Innovatio?

7            MR. McANDREWS:  Innovatio.

8            THE COURT:  Innovatio.  Thank you.  I will get it in

9    a few days.

10            MR. ALPER:  Yes, Your Honor.  Adam Alper for some of

11    the suppliers of the products, and it's actually Cisco,

12    Motorola, and NETGEAR.

13            THE COURT:  Okay.

14            MR. ALPER:  If I may, I'd like just to give you our

15    perspective on what this case is about, and I might just

16    address some of the things that Mr. McAndrews said.

17            THE COURT:  Please do, as we are -- with the focus on

18    the case phasing.  It is your desire to basically charge up

19    front and get the issues that you have set out in the

20    declaratory judgment not only out on the table but perhaps

21    resolved.

22            MR. ALPER:  Yes.  Maybe I can just give you our take

23    on what the case is about --

24            THE COURT:  Please.

25            MR. ALPER:  -- and then I'll spin back around and

1    connect that up with the case phasing issue --

2              THE COURT:  All right.

3              MR. ALPER:  -- and then ultimately address your

4    proposal that we essentially see things go and then deal with

5    -- you know, address this around the *Markman* time.

6              THE COURT:  All right.  Go ahead.

7              MR. ALPER:  So we have a little bit of background on

8    what this case is about from the first-filed ABP action,

9    because that action, you know, got off to a start and we were

10   able to get infringement contentions from the plaintiff in that

11   case on all 17 patents, so we had an opportunity to see what

12   the plaintiff says this case is ultimately going to be about.

13             And when we look at their infringement contentions,

14   what we see is that every element of every claim is applied to

15   a standard called 802.11, and that's also known as wi-fi.

16   That's the wi-fi standard.

17             And if we look at the technologies that every element

18   of every claim are being applied to, what we see is that

19   they're being applied to the creation, the organization, and

20   the timing of wi-fi signals and the actual implementation -- or

21   the actual, rather, production of the signals themselves.

22             And what we know is that the creation and

23   organization and timing of these wi-fi signals are implemented

24   on wi-fi microchips.  And, in fact, not the entire chip, but a

25   portion of the microchip.  And those things are made by third

1  parties, and they're purchased by the suppliers in this action

2  and they're put into these access point boxes, and other wi-fi

3  products.

4           THE COURT:  And where are they made?

5           MR. ALPER:  They are made in various places around

6  the world.

7           THE COURT:  Are any made in the United States?

8           MR. ALPER:  I'm not sure about the chips --

9           THE COURT:  Okay.

10          MR. ALPER:  -- since those aren't my clients.

11  Actually, I'm not sure if the chips are made in the U.S. or

12  not.

13          THE COURT:  Okay.

14          MR. ALPER:  I would guess that -- I would just take a

15  wild guess that they're made all over the place.

16          THE COURT:  Okay.  Made all over the place but not

17  necessarily in the United States.

18          MR. ALPER:  Not necessarily in the United States.

19          THE COURT:  Okay.

20          MR. ALPER:  I'd have to look into that.

21          THE COURT:  All right.  Thank you.

22          MR. ALPER:  I think it depends on the supplier.

23          THE COURT:  Sure.

24          MR. ALPER:  So, from our perspective, because the

25  liability is focused on these wi-fi signals that are within the

1    boxes, that seems to us to be the focal point of the case.

2         Now, it is true that there are apparatus claims,

3    there are system claims, and there are method claims at issue;

4    but regardless of what types of claims are at issue, the focal

5    point of the claims are on these wi-fi technologies that are

6    implemented within these boxes.

7         So that's kind of point one that I wanted to make.  I

8    think there's a second important point to address specifically

9    some of the -- one of the issues that Mr. McAndrews raised.

10   Because he said, well, you know, there are some apparatus

11   claims that are directed at access points and then there are

12   other ones that are directed at terminal devices.  And while

13   that may be true -- and I can't right now tell you what the

14   breakdown in terms of numbers is, which go to which one.

15        THE COURT:  Yes.

16        MR. ALPER:  I mean, there's also ones, like Mr.

17   McAndrews says, that go to combinations of access points and

18   terminals, and there's some that talk about methods and so

19   forth.  While all that may be true, we have to look at that in

20   the context of this litigation.

21        So what's accused when it comes to the end user

22   defendants in this litigation are their provision of wi-fi

23   service, right?  So they're not being accused of infringing, or

24   at least in large part not being accused of infringing, because

25   they go into one of their own stores and use a BlackBerry.

1    They're being accused of infringement for their use of access

2    points.

3              So what this case is really about, even though you

4    have a number of different claims, this case, the liability

5    that is being pointed at by Innovatio when it comes to the end

6    users is the --

7              THE COURT:  You have mispronounced it, too, I guess,

8    but that's all right.

9              MR. ALPER:  Oh, sorry.  I'm sorry.  I apologize.

10             THE COURT:  I try very hard when I can to pronounce

11   it correctly, but we will all have to start pronouncing it

12   Innovatio.

13             MR. ALPER:  Innovatio.

14             MR. McANDREWS:  Innovatio.  Yeah, the client picked

15   the Latin pronunciation.  We're certainly not insulted by

16   Innovatio.  We've heard enough of it.  But it's -- by the

17   client's choice, it's Innovatio.

18             THE COURT:  Okay.

19             MR. ALPER:  Innovatio.

20             THE COURT:  Moving on.

21             MR. ALPER:  I apologize.

22             MR. McANDREWS:  No.  That's okay.

23             MR. ALPER:  So what's actually being accused by

24   Innovatio is the use of these access points and the offerings

25   of wi-fi to the public by the end users.  And so, although

1    there are some claims that may -- you may.  I can't think of

2    one offhand.  But let's just say we have a claim that's

3    directed to a terminal device.  As applied against the

4    defendants, the end user defendants would, therefore, be

5    indirect infringers of some sort, I imagine, because they're

6    providing a wi-fi service to yet another end user down the

7    chain.

8             THE COURT:  Right.

9             MR. ALPER:  So, at the end of the day, what that --

10   what does that tell -- what's the takeaway?  At the end of the

11   day, the takeaway -- or takeaways.  There are a couple things.

12            Number one, the end users are not doing anything

13   other than using these products that have these wi-fi chips in

14   them, which are the focus of the actual technical case.

15            THE COURT:  Yeah.

16            MR. ALPER:  Right?  Number two, when it comes to

17   claims, like method claims and system claims and claims that

18   may be directed at terminal devices, in the context of this

19   case, the focal point is still going to be the access points,

20   because that's what the bakeries and cafes and hotels are

21   purchasing and offering to the -- service through -- to the

22   public.

23            So, from our perspective, given all that, all this

24   kind of rolls up to the product suppliers, and we believe that

25   if you resolve the liability with respect to the product

1    suppliers, that you're going to resolve liability or at least

2    substantially impact the liability of everyone else in the

3    case.

4         And so what I -- I mentioned a moment ago that I was

5    going to kind of flip this back around to the case phasing

6    concept, and I'd like to do that now and then address Your

7    Honor's proposal.

8         The question -- we all agree that after *Markman*, we

9    should try to figure out a subset of defendants to focus on

10   because we've got so many parties, and that would be an

11   efficient thing to do.

12        And I think we would all agree, or at least it's our

13   position, that the subset of defendants we should pick are the

14   ones that have the greatest, most substantial impact on the

15   rest of the defendants once we resolve their claims.  Right?

16   That would be the most logical thing to do is let's pick the

17   subset; that if we bring them through expert discovery, bring

18   them through dispositive motions, and then ultimately trial,

19   that is going to have the greatest impact on everyone else.

20        It may not resolve every claim, it may not end the

21   case as a whole, but we want to pick the set that's going to

22   be -- have the most substantial impact, and the only set of

23   defendants that will have a substantial impact on everyone else

24   are the manufacturers or the suppliers.

25        And here's why I say that.  Because if you resolve

1  the liability of these standardized products and you resolve

2  liability with respect to these access points, then that is

3  going to cut across every single one of the asserted claims

4  because of the way -- of the context of this case, because

5  that's what the end users are offering, is this access point

6  service.  And so at least we will touch on everyone.

7           If we instead focus on a subset of end users,

8  although, you know, there may be collateral estoppel issues if

9  things go a certain way, the fact of the matter is we are only

10 resolving the case as -- we are really focusing on, rather, the

11 case as to those end users, and you won't have that widespread

12 effect that you have with the suppliers who, by the way, have a

13 much greater incentive to see this thing through, to actually

14 get that substantial impact, than end users who are, you know,

15 one off hotels, one off bakeries who would much prefer to

16 settle this and even, you know, buy another -- you know, go to

17 some other platform or even not offer the service.

18           So that's why we think that the manufacturers are

19 really the only logical choice.  Now, that said, Your Honor's

20 proposal does make some sense, because you have me up here

21 telling you that it's all about the suppliers.  You have Mr.

22 McAndrews talking about -- I mean, there's some 340 asserted

23 claims, and, you know, he's talking about a bunch of different

24 asserted claims.  And I could personally see that Your Honor

25 would -- you know, may like to see how this develops and, you

1    know, and see additional information.

2    Now, it's our position nothing will change between

3    now and *Markman* to change the fact that the only parties that

4    will have a substantial impact are the suppliers, and I don't

5    think that there's anything that could be said today that will

6    change that fact as compared to the end users.  But, of course,

7    if Your Honor would be more comfortable waiting to address this

8    at a later time, we are amenable to that.

9    THE COURT:  Well, that was my initial proposal.  I

10   had not thought that Mr. McAndrews would be opposed to that.

11   But what you want, Mr. McAndrews, is to basically

12   have a focus with regard to that first trial resolution?

13   MR. McANDREWS:  Well, I think that was what both

14   sides had contemplated when they referred to tiering --

15   THE COURT:  Yes.

16   MR. McANDREWS:  -- in respect to Form 52 proposals.

17   I think -- and you hit on the point with Mr.

18   Garfinkel -- as long as discovery is open with respect to all

19   the parties -- and there's certainly no reason that it

20   shouldn't be -- you know, my sense is that Innovatio is going

21   to have access to the information that it needs from all of the

22   defendants.

23   THE COURT:  You are.

24   MR. McANDREWS:  Yeah, of course, right.

25   THE COURT:  As long as it's reasonably calculated to

1    --

2         MR. McANDREWS:  Yeah, that's right.

3         THE COURT:  -- lead to the discovery of admissible

4    evidence.

5         MR. McANDREWS:  That's right, that's right.

6         THE COURT:  All right.  Well, can we do that, then?

7    Can we --

8         MR. McANDREWS:  Yeah.  I simply -- provided that

9    we're not foreclosing, we're not deciding anything right now on

10   what that tier I will be.

11        THE COURT:  We are not foreclosing it --

12        MR. McANDREWS:  Yeah.

13        THE COURT:  -- but I have to say, Mr. Garfinkel's

14   idea of the nothing's going to change the fact that the

15   greatest impact will be a resolution of your allegations with

16   regard to the manufacturer --

17        MR. McANDREWS:  Yeah.  I don't agree on that point.

18        THE COURT:  Okay.

19        MR. McANDREWS:  And whether or not that bears on Your

20   Honor's decision or not.  This isn't just about the 802.11

21   standard.  Mr. Alper correctly referred to claims within the

22   Innovatio portfolio, the asserted claims that are directed to

23   what you would call standard essential operation or

24   functionality.

25        THE COURT:  Yes, yes.

1    MR. McANDREWS:  There are also many, many claims,

2    more than half of them that are what we call standard

3    non-essential.

4    THE COURT:  Okay.

5    MR. McANDREWS:  And so any proofs that they might

6    offer with respect to the standard have nothing to do with the

7    underlying infringement.

8    It also for the same reason is certainly not just

9    about the access point.  Again, we have method claims,

10   apparatus claims --

11   THE COURT:  Yes.

12   MR. McANDREWS:  -- terminal device claims, and system

13   claims.  And if you've got a network operator that is the only

14   direct infringer, it doesn't make any sense, in my mind, that

15   you would proceed with a trial without that party as a named

16   litigant or a party-in-interest.

17   THE COURT:  No, and I understand that.  The MDL

18   concept is that there would be a consolidation of pretrial

19   proceedings and then the cases would basically spin off to

20   their various locales that they came from for trial.  And I

21   understand from the Form 52s that these manufacturers who filed

22   primarily in Delaware -- I know you had the one, additional

23   one -- Hewlett's coming, joining us from the Northern District

24   of California -- are willing to try that case here.

25   Is that your position?

1           MR. ALPER:  It's -- Adam Alper for Cisco, NETGEAR,

2    and Motorola.

3           THE COURT:  Yes.

4           MR. ALPER:  We are willing to --

5           THE COURT:  Mr. Alper.

6           MR. ALPER:  -- have our cases tried here before Your

7    Honor.

8           THE COURT:  All right.

9           MR. FLAMING:  Your Honor, this is Todd Flaming for

10   SonicWALL.

11          Our client has not officially given us authorization,

12   but we should get that very soon.

13          THE COURT:  Okay.

14          MR. SHELTON:  Your Honor, Barry Shelton for Hewlett

15   Packard.

16          Since we're not even yet officially here, we are

17   considering that, and it is going to be my recommendation to my

18   client to do so.

19          THE COURT:  Yes, I am not trying to force it on you,

20   but it seems to me if that is the situation, that is a factor

21   as to the tiering, simply because there has to be tiering.

22   Everybody agrees with this.  We can't put a jury in the box

23   over here to the south side of the courtroom and say:  Okay.

24   There are 17 patents.  We've got how many claims.  We've got

25   more parties than you can basically consider, and we are going

1  to try the case.  So we do need to focus.  And there may be a

2  further focus, Mr. McAndrews, on a particular manufacturer if

3  that would assist in the resolution of others.

4         All right.  Bearing in mind, then, that there will be

5  no foreclosure of discovery up to the claim construction

6  determination, and we are going to follow our local rule

7  pattern which allows for the reopening of discovery, to the

8  extent it is necessary, after a claim construction

9  determination, it seems to me that we will tend toward the

10 concept of perhaps proceeding with the tier I trial against one

11 or more manufacturers without today resolving that question.

12         Can you live with that, Mr. McAndrews?

13         MR. McANDREWS:  I can.  But let me raise another

14 issue --

15         THE COURT:  Okay.

16         MR. McANDREWS:  -- that may play into this.

17         THE COURT:  Go ahead.

18         MR. McANDREWS:  Currently, we have pending -- various

19 pending motions to dismiss --

20         THE COURT:  Yes.

21         MR. McANDREWS:  -- the DJ actions.

22         THE COURT:  Right.

23         MR. McANDREWS:  Of course, those have all been

24 consolidated.  But, technically, those motions are still at

25 bar, still need to be resolved.

1    What my team had considered in the past few days is

2  simply filing an omnibus motion to dismiss that will crystalize

3  all of these issues.  And, of course, the jurisdictional issues

4  are no longer -- will no longer be part of the motions.

5    THE COURT:  Right.

6    MR. McANDREWS:  But we do want to talk about the

7  other issues, you know, the first to file, the fact that

8  resolution against the manufacturers will not -- necessarily

9  will not resolve all the issues against the direct infringers,

10  the network operators.

11    THE COURT:  We understand that.

12    MR. McANDREWS:  Can we set a briefing schedule on

13  that?

14    THE COURT:  Yes, let's do that.  I was going to ask

15  you to see if we can consolidate it.  Let's call it a

16  consolidated --

17    MR. McANDREWS:  Consolidated, sure.

18    THE COURT:  -- as opposed to omnibus.  Let's call it

19  a consolidated response.

20    That's really what you are considering, right?

21    MR. McANDREWS:  It is.  A consolidated response,

22  particularly in light of HP's arrival on the scene now with the

23  conditional transfer order.

24    THE COURT:  Okay.  When -- if in that consolidated

25  response you can make docket entry and case number references,

1    so we can look precisely at things that you are referring to,

2    that would be helpful, so you don't have to hunt through the

3    record.  When would you want to file the consolidated response?

4              MR. McANDREWS:  We work on seven-day cycles, right?

5    So --

6              THE COURT:  That's what our new Federal Rules of

7    Civil Procedure require, yes.

8              MR. McANDREWS:  21 days.

9              THE COURT:  21 days is just fine.  Can your team put

10   it together in 21 days, which would be the 1st of May?

11             MR. McANDREWS:  Yes, we can, Your Honor.

12             THE COURT:  All right.  All right.  Now, can we

13   organize the defendants to have a consolidated reply?

14             MR. ALPER:  Yes, Your Honor, I'm sure we can.

15             THE COURT:  All right.  And Hewlett Packard --

16             MR. SHELTON:  Yes, Your Honor.

17             THE COURT:  -- is agreeable to that and every other

18   defense counsel?

19             MR. FLAMING:  Yes, Your Honor.

20             MR. SHELTON:  Although, Your Honor -- Barry Shelton.

21             THE COURT:  See, my court reporter has already got

22   names down already.  Mr. Flaming didn't have to even state his

23   name.

24             MR. SHELTON:  Your Honor, I'm a little bit confused,

25   though, because there are pending motions to dismiss, and so

1    the response would really be from what you're calling the

2    defendants nominally declaratory judgment plaintiffs.

3              THE COURT:  Correct.

4              MR. SHELTON:  And so the reply then would be for

5    Innovatio.

6              THE COURT:  Okay.  Let me back up a second.

7              Yes, it is a consolidated motion to dismiss.

8              MR. McANDREWS:  I'm sorry.  Yeah.

9              THE COURT:  Yes, that's -- well, I got off track.

10             MR. McANDREWS:  If I said "response," I apologize.

11             THE COURT:  I keep looking at you as plaintiff, and,

12   in fact, you are not with regard to these.

13             So it's a consolidated motion to dismiss in 21 days,

14   which would be May 1, and then a response by what date?

15             MR. ALPER:  Two weeks is fine.

16             THE COURT:  Two weeks would be May 15.  And then how

17   much time for reply?

18             MR. McANDREWS:  Given the number of defendants, if we

19   could have two weeks, Your Honor?

20             THE COURT:  Two weeks would be the 29th of May.  I

21   will rule electronically as promptly as possible.

22             And what I intend to do, since we have resolved the

23   case phasing/tier I trial indicating a tendency but not

24   necessarily making a determination, what I intend to do,

25   starting on June 7th, is to follow your recommendation of once

1    a month having a status report unless you all agree that a

2    status report is not necessary.

3         You had made that suggestion.  Actually, it was

4    Innovatio that made the suggestion, and there was no response

5    from the defendants.  Innovatio suggested the first Thursday.

6    I would suggest the second Thursday.

7         MR. ALPER:  Your Honor, if that's amenable to you,

8    that's fine with us.  At least for --

9         MR. SHELTON:  Sure, that's fine.

10        MR. ALPER:  For, as far as I know, us.

11        THE COURT:  Well, from a planning standpoint, again,

12   starting in June, we would have -- our first status report --

13   the second Thursday of each month -- would be June 14.  Then

14   we'd move to July 12, August 9, September 13, October 11,

15   November 8, December 13 to exhaust 2012.

16        But what I want to do -- I mean, here in the Northern

17   District of Illinois, we have status reports.  You see the

18   judge more often than in some other districts.  But if we are

19   not going to accomplish anything, I don't want to waste your

20   clients' money having you all come in.  Actually, I am also

21   going to consider the resources that the court has and to try

22   to set up a telephonic/video hookup that would allow counsel to

23   remain in their respective locations, if they desire, and still

24   participate in this.

25        So let me ask you about that concept.  Is that all

1  right?

2          MR. ALPER:  Yes, Your Honor.

3          MR. McANDREWS:  It -- on behalf of plaintiff --

4          THE COURT:  I don't know if I will have a ruling to

5  you by June 14th with the briefing completed on May 29th, but I

6  will do my best.  And I may have to cancel one or two as well.

7          All right.  Resolving those two, what I consider to

8  be two of the eight points -- so basically we are reserving on

9  the determination of the tier I trial or tier I resolution at

10  this time, but with an indication that there may be focus on

11  the issues to be resolved with regard to the manufacturers.

12          The next item that I saw that was a difference is the

13  damages contentions.  Several defendants suggested that the

14  parties file a full round of initial contentions, initial

15  responses, final contentions, final responses with regard to

16  damages prior to the close of discovery, followed by a damages

17  hearing to resolve disputed matters.  Innovatio said that would

18  be prejudicial to Innovatio.  Although, I have to say from a

19  discovery standpoint, I always like to have some concept of

20  what's at stake in the case.

21          So I will turn back to Innovatio and ask you, what's

22  at stake in this case?

23          MR. McANDREWS:  From a damages perspective?

24          THE COURT:  From a damages perspective.

25          MR. McANDREWS:  From a damages perspective -- and

1     this, again, goes back to the concept of tiering and direct

2     infringers and indirect infringers.

3            THE COURT:  I understand.

4            MR. McANDREWS:  The damages that Innovatio seeks are

5     based on the use by the network operators who derive the most

6     immediate and substantial and, in many cases, profitable

7     benefit out of the infringement.  We're not simply talking

8     about, as Mr. Alper suggested, a tiny little portion of a radio

9     chip or a microprocessor.  And that necessarily will require

10    discovery of the network operators, of the marketing plans that

11    they have, the value that they have assigned to wi-fi.

12           I'm sure Your Honor sees the free wi-fi signs in the

13    coffee shops or the restaurants that you walk into.  In fact,

14    it's hard to find a place these days that doesn't offer that

15    service.

16           Many of the defendants of record right now in this

17    case actually upcharge for the wi-fi service.  Some of the

18    higher-end hotels charge $11 or $14 a night for that service.

19    And all of that is --

20           THE COURT:  Did some of you stay in such a hotel last

21    night?  Mr. Alper?

22           MR. ALPER:  It was completely free wi-fi.

23           THE COURT:  Okay.  All right.  Go ahead.

24           MR. McANDREWS:  Yeah.  And even with respect to the

25    ones that offer it for free, they're doing that.  They're doing

1    that for a reason.  There have been some recent articles, in

2    fact, in the Chicago Tribune and other publications, that talk

3    about the -- that being the number one draw for guests who are

4    staying at economy-level hotels.  And even the ones who stay at

5    the upscale hotels are clicking on that radio button on their

6    laptop or their iPad, and they're paying the $14 a night.  That

7    is a necessary component to Innovatio's damages story in this

8    case.

9              And what the defendants have proposed in terms of

10   this extra phasing, not just in the discovery phase with

11   respect to contentions, but also an entirely separate briefing

12   stage, is, in my view, precisely what the local patent rules

13   and our local rules beyond that were designed to avoid, which

14   is the hopeless morass of needless motion practice and

15   additional unnecessary steps in the discovery process.  And

16   this is discovery that would ordinarily and necessarily come

17   out anyway as the case unfolds.

18             THE COURT:  Mr. Alper or anybody else on this point?

19             MR. ALPER:  Maybe I'll -- I can say a few words to

20   the damages contentions point.

21             I think for the reasons that Mr. McAndrews was

22   describing when we -- you know, damages contentions will be

23   very helpful in this case.  And so I could just give one or two

24   examples of the issues that I think we're going to be

25   addressing here --

1      THE COURT:  Okay.

2      MR. ALPER:  -- that really suggest that damages

3  contentions will help us, you know, not only focus damages

4  positions, but actually have an overall impact on the structure

5  of the case.

6      So one of them has to do with what is the appropriate

7  sales base in the case.  Because the parties are really -- from

8  what I can tell, from what Mr. McAndrews has said here and in

9  previous status conferences and other discussions that we've

10  had, we're really in two separate worlds.

11      Like I was saying before, we've looked at the

12  infringement contentions that we received in the ABP case, and

13  we see the focal point of the claims going to technologies that

14  are buried within this access point box on this chip.  And so

15  it seems logical to us that the focal point as a result of

16  damages should be -- or at least the sales base should be on

17  those products.  And so that's where we're coming from.

18      Innovatio, on the other hand, proposes that instead

19  of looking at the products, we look at the end user revenues.

20  So these end users are bakeries and cafes and hotels and so

21  forth.

22      And to give Your Honor a sense for what that really

23  means, let me describe this by way of example.  I can use one

24  of our end user clients as Cosi.  And Your Honor may be

25  familiar with Cosi.  They're a sandwich shop.  They have a

1   chain of sandwich shops.  They sell sandwiches and coffee and
2   soda and chips and so forth.
3            And despite the fact that the claims are being
4   applied to technologies within these access point boxes that
5   create and produce the wi-fi signals, and despite the fact that
6   Cosi has no independent revenue stream associated with wi-fi,
7   Innovatio wants a percentage off the top of every sandwich, cup
8   of coffee, bag of chips, and soda that Cosi sells regardless of
9   how it relates to wi-fi, and we believe that the Federal
10  Circuit has looked at those type of entire market value
11  theories and expressly rejected them.
12           But we don't have to decide that here today.  All we
13  have to do is recognize that there are over 200 end users in
14  this case; and from what we can tell, the primary reason that
15  they're even here is based on that damages theory.
16           And so, to us, we believe damages contentions provide
17  a couple things.  One, the end users who are -- some are solo
18  owners of hotels and are now subject to a suit on 17 patents,
19  they're entitled to know the metes and bounds of why they're
20  here, and they are entitled to know in a formalized fashion
21  what that theory is that is actually pulling them into this
22  case.  So that's one thing.  The second -- and to have a form
23  of process for disclosure so we don't -- we necessarily can't
24  avoid that, since it's such a core issue in this proceeding,
25  the MDL proceedings, is important.

1          Another thing that it allows us to do is to --

2    through the -- is through investigation, we have disclosure,

3    preliminary disclosure.  Just like infringement contentions

4    lead up to a *Markman* and you, you know, really frame the core

5    issues on liability in the case and, you know, then are able to

6    present refined specific focus issues to the Court for

7    decision, the initial damages contentions followed by a

8    discovery period, followed by -- so that Innovatio gets all the

9    information that they need to provide meaningful final damages

10   contentions, so we really understand the metes and bounds of

11   that theory, that will allow us to raise narrow, focused,

12   decidable issues to the Court in the follow-on proceeding that

13   we propose, which is a short proceeding -- it's not going to

14   take long -- for either resolution or, at a minimum, guidance

15   as to the types of legal arguments and evidence that the

16   parties will be permitted to rely on going forward.

17          And so it's very important, A, for us to see what

18   those theories are, because they have such a substantial impact

19   on this case; and, B, be able to refine them to present them to

20   Your Honor for a decision; and, C, do it before we get to

21   expert discovery.  Because if we wait for expert discovery,

22   then it's going to be like ships passing in the night.  They're

23   going to have an expert disclosure that shoots at end user

24   revenues.  We're going to have an expert disclosure that goes

25   in a different direction.  And the next time we will hear about

1   it is right before trial when we deal with *Daubert*.  And in

2   this way, we can find out what our guidelines are going to be

3   in terms of these -- kind of, like I said, two different worlds

4   that we're in, and focus expert discovery in a meaningful

5   manner.

6          So that's why, just like all the reasons that you'd

7   have infringement contentions and responses to infringement

8   contentions, in a case like this where it has such a

9   substantial impact on all the parties, especially the over 200

10  end users, we think it's appropriate.

11         And there's other reasons.  I just -- I know I've

12  been speaking for a while.  I'll just give Your Honor one other

13  just exemplary reason.  We believe that one of the chip makers,

14  at least one of the makers of the wi-fi chips has license to

15  the patents, and obviously --

16         THE COURT:  And who is that?  Who do you believe has

17  license?

18         MR. ALPER:  We believe that ▮▮▮▮▮ has license to

19  the patents.  They're one of the chip makers and a substantial

20  chip maker.  And as a result, obviously if they're licensed,

21  then anyone who uses a ▮▮▮▮▮ product through exhaustion and

22  license principles would be licensed.

23         THE COURT:  Well, can we find that out right away,

24  the licensing of ▮▮▮▮▮?

25         MR. McANDREWS:  We've disclosed that information

1    under the protective order, Your Honor.

2              THE COURT:  Okay.

3              MR. McANDREWS:  Yeah.

4              THE COURT:  So they are licensed?

5              MR. ALPER:  It appears they are licensed.  I didn't

6    want to --

7              MR. McANDREWS:  I just wanted to be --

8              MR. ALPER:  Okay.  I didn't want to --

9              MR. McANDREWS:  -- careful on the open record.  We

10   have produced that information to the defendants under the

11   protective order.

12             THE COURT:  Let's do this.  Let me ask my court

13   reporter, then, starting with the disclosure of the ████████,

14   you can stop with Mr. Alper's comment, "We believe one of the

15   chip makers is licensed," and then you can have my question,

16   who is that, and then from that point forward until right now,

17   we are going to be under seal.

18             THE COURT REPORTER:  Would you rather, Judge, that I

19   just redact the name?

20             THE COURT:  Yes.

21             THE COURT REPORTER:  Okay.

22             THE COURT:  Redact just the name.

23             The existence of the licensee, that's not a problem,

24   is it?  The existence of a licensee, Mr. McAndrews?

25             MR. McANDREWS:  No, that's not a problem.

1    THE COURT:  All right.  Then we will just redact the

2    name.  That's easier.  Thank you.

3    MR. SHELTON:  Your Honor, may I be heard briefly for

4    Hewlett Packard on this issue?

5    THE COURT:  Sure.

6    MR. SHELTON:  Hewlett Packard, number one, I totally

7    agree with Mr. Alper's remarks, and we join in the motion -- or

8    in the Form 52 submission on this issue of damages contentions.

9         And I wanted to just bring up one new point, Your

10   Honor, and that is that the damages contentions will further

11   underscore that the tiered approach to having the manufacturers

12   in a first trial makes an awful lot of sense, because what the

13   damages contentions will show quite clearly is that a trial

14   with just the manufacturers will be able to address all the

15   infringement issues.  Because every single claim, whether it's

16   a method, apparatus, or system, is all based on the provision

17   of certain features of that IEEE 802.11 standard.

18        And Mr. McAndrews said, well, some are not required,

19   but they're still part of that standard, and the standard is

20   embodied in the chips within the products.  And so there's not

21   a single claim out of the 343 in this case that can't be

22   decided by looking at the objects that are manufactured by the

23   manufacturers and then used by the end users.  There's not a

24   single claim in the case that says use of a wireless network in

25   a supermarket or a coffee shop or a sandwich shop.  And so the

1    issue of justiciability of all the claims can be squarely

2    addressed by the declaratory judgment complaints that will be

3    before Your Honor.  Thank you.

4         THE COURT:  All right.  Well, Mr. McAndrews, I

5    understand your hesitation to have this heard, is that at this

6    point, without knowing what added value the end users think the

7    wi-fi feature provides, you can't really evaluate your damages,

8    right?

9         MR. McANDREWS:  That's right.  I mean, I can read the

10   Chicago Tribune article and generally agree with the principle

11   that there's incredible value placed on this.  But this is

12   ordinarily the type of stuff, especially when it is this

13   critical to our damages case -- and at the end of the day,

14   that's what this is all about, it's about damages -- that's

15   ordinarily the type of stuff you glean during the discovery

16   process.  And then if defendants feel strongly about license or

17   exhaustion, that's what dispositive motion practice is for.

18   And it would seem to me that that would fit in at that portion

19   of this case.  Otherwise, we're talking about front-end-loading

20   an awful lot of -- well, Innovatio's left in the position where

21   it's shooting in the dark --

22        THE COURT:  Yes.

23        MR. McANDREWS:  -- on perhaps the most relevant

24   portion of this case.

25        THE COURT:  Yes.

1      MR. ALPER:   Your Honor, if -- just one further
2  comment.
3          It's those concerns, those types of concerns were the
4  very same types of concerns that were raised before the
5  infringement contentions and other patent rules were put into
6  effect, and it was exactly for that reason that we have the
7  contentions.  It's to provide an orderly structure for parties
8  to exchange positions.
9          And if you look at the proposal that we've made, it's
10  not just final contentions in the next two months and then
11  Innovatio is done.  It's initial contention -- just like the
12  infringement contentions, it's initial contentions followed by
13  a period of substantial -- the discovery period, just like
14  infringement contentions -- or initial contentions and then
15  responsive contentions, initial contentions, and then followed
16  by the discovery period leading up to final contentions.  So
17  that concern is addressed and built into the proposal.
18          And I would -- it is our belief that because we
19  can -- we have addressed that concern, the great benefits that
20  we will have from damages contentions in this case are
21  absolutely justified.
22      MR. McANDREWS:  Your Honor, if I may?
23          Proceeding with the defendants' approach also leaves
24  open the possibility, if not the likelihood, that Innovatio is
25  going to be at least informally foreclosed from advancing, you

1  know, its most important damages theory, if it later discovers

2  something, you know, that right now we have no idea about at

3  the front end.  I mean, it's front-end-loading the most

4  relevant issue in the case.

5           MR. ALPER:  I mean, we can address that the same way

6  you would with infringement contentions, of course.  It's for

7  good cause, if Innovatio needs to amend, for instance, you

8  know, genuinely, you know, good faith discovery of evidence

9  later in the case.

10          THE COURT:  Specifically, it's the defendants'

11 position -- some of the defendants' proposal that Innovatio

12 provide its initial damages contentions by June 5.  Boy, that

13 seems to be a difficult task.

14          Well, all right.  Let me ask Innovatio, Mr.

15 McAndrews, what do you intend to do, then, with regard to

16 damages?  If I don't follow the defendants' proposal, what do

17 you intend to provide?

18          MR. McANDREWS:  Well, I --

19          THE COURT:  Or do you want to hold off until we get

20 the *Markman* determination?

21          MR. McANDREWS:  Well, I think we would gather

22 discovery, just as the defendants will be doing during this

23 pre-*Markman* phase, and we will be crafting our --

24          THE COURT:  All right.

25          MR. McANDREWS:  -- damages theory during that period

1 and working on parallel tracks with our technical experts.

2 We'll be working with our damages experts during that period,

3 as we would in other patent cases.

4         THE COURT:  All right.

5         MR. ALPER:  If the date issue --

6         THE COURT:  Go ahead.

7         MR. ALPER:  -- is a problem, we are absolutely

8 amenable to a different date.  I think it's the concept --

9 because we fear that Innovatio will -- it will be difficult to

10 get Innovatio's actual position -- actually, Innovatio said

11 this in their statement.  They said that their actual position

12 is going to come in their expert reports.  We think that that

13 is too late when the damages issues are just as significant as

14 the infringement issues for which we have disclosures.

15         And so we are fine moving the date back if that June

16 5th date creates discomfort.  What's important for us is to

17 have some process in place, and it should be a very fair

18 process.  And we are interested in being forthcoming with the

19 information that Innovatio needs in order to prepare its case.

20 But we feel there should be a formal process in place, and

21 we've provided a very simple proposal.

22         MR. McANDREWS:  Your Honor, Your Honor, after expert

23 disclosures is precisely the time that this information allows

24 for significant narrowing of issues, if not dispositive issues,

25 and, you know, that's the summary judgment phase.  It puts us

1  through a much, much more difficult task if we're to

2  front-end-load this in any way.

3           THE COURT:  Well, let me ask you.  You say after the

4  disclosures of the expert.  Would you be amenable, Mr.

5  McAndrews, to having initial damage contention disclosures and

6  a following of disclosures with initial response to damages

7  contentions, et cetera, on a track that commences the --

8  following a procedure that commences after you have sufficient

9  information that you feel comfortable you can provide your

10 initial damages contentions?

11          I guess what I am saying is do you have any problem

12 with the damages contentions scenario of contentions, response,

13 et cetera?

14          MR. McANDREWS:  I think right now, I do.

15          THE COURT:  Okay.

16          MR. McANDREWS:  Because I don't know exactly what

17 we'll get from the defendants --

18          THE COURT:  Right.  Okay.

19          MR. McANDREWS:  -- in the way of discovery.

20          THE COURT:  Okay.

21          MR. McANDREWS:  Whether there is going to be motion

22 practice and we're going to be in front of Judge Schenkier on

23 motions, I don't know.

24          THE COURT:  Okay.

25          MR. McANDREWS:  I would add, the parties have

1    cooperated very well so far.

2              THE COURT:  Right.

3              MR. McANDREWS:  I think we intend to do that moving

4    forward.  But it's burdensome, as we say.  We don't mind hard

5    work, obviously.  We've got our --

6              THE COURT:  Let me speak with my clerk --

7              MR. McANDREWS:  Yeah.

8              THE COURT:  -- for a second.

9         (Court conferring with his clerk.)

10             THE COURT:  Judge Schenkier, since you mentioned

11   him -- I know you were supposed to see him.

12             MR. McANDREWS:  I was going to mention that we --

13             THE COURT:  You know what?  Why don't we do this.

14   Invite Judge Schenkier to join me.

15             THE CLERK:  Okay.

16             THE COURT:  We will bring another chair up on the

17   bench.  And we won't make you go to another courtroom.

18             MR. McANDREWS:  We forgot we were --

19             THE COURT:  Yes.

20             MR. McANDREWS:  -- 15 minutes late.  I was going to

21   mention it.

22             THE COURT:  I forgot, too.  He called, and I'm glad

23   he did, and we are going to bring up another chair and we are

24   going to deal with his issues as well and you don't have to go

25   address them.

1           Here's what I am thinking.  And I will wait for Judge

2    Schenkier before I make a final determination.  But here's what

3    I am thinking.  We are going to proceed with the infringement

4    invalidity, the typical issues dealing with those aspects,

5    holding off with damages contentions.  We will allow damages

6    discovery to go forward, because I think both sides really need

7    that, through the usual interrogatory/document request

8    proposals.  But there will come a point in time where -- and we

9    will ask you, Mr. McAndrews, are you ready now?  Since we are

10   going to have these monthly meetings and we are going to ask

11   for a prediction.  I am thinking that we may want to crystalize

12   through the contention/response process the damages theory,

13   but, like you said, you feel you are shooting in the dark right

14   now.  You don't know why they think -- why, the end users,

15   think it is so valuable to have wi-fi other than the fact that

16   we all have this -- I mean, we living in this day and time, the

17   communication age, all have this idea:  I need to have that

18   information.  I need to have that access.

19          I mean, that's the problem we have with jurors and

20   young people.  I mean, I've got a three-year-old, a

21   three-year-old granddaughter who just wants the information --

22   and she can't really read yet, but she wants the information --

23   that's available instantaneously on one of these machines.

24          So what value is that?  What value to each sandwich,

25   how many sandwiches, how many -- I understand the Federal

1    Circuit's determinations about the entire market rule and

2    there's got to be a focus on the infringing aspect of the

3    product or service, but obviously the end users put some value

4    on this so they wouldn't do it, they wouldn't pay money to do

5    it, and you should have the benefit, you, plaintiff's counsel,

6    should have the benefit of what value they put on it before you

7    have to say:  Okay.  This is how much we think the infringement

8    that they are engaging in, assuming that you prove your case,

9    is worth to them and, therefore, should be paid to us.  Right?

10            MR. McANDREWS:  That's correct.

11            THE COURT:  You are nodding in affirmance, but --

12            MR. McANDREWS:  That's right, Your Honor.

13            THE COURT:  Okay.  All right.  So that's how we are

14   going to handle that.  Okay?

15            MR. McANDREWS:  All right.

16            THE COURT:  It may happen at some point.  We will put

17   you down that funnel of damages contentions, responses down the

18   line, but not now.

19            All right.  The next issue -- and I assume Judge

20   Schenkier is on his way up, and this -- and I didn't quite

21   understand, but the initial discovery that Innovatio is looking

22   for, Innovatio wants a chart of the network equipment used in

23   each of these 200 end users.  Mr. Alper said there's 200 end

24   users.  I don't quite understand what you are desiring there.

25            MR. McANDREWS:  What this allows us to do, Your

1    Honor, is quantify and take a look at the architecture of the

2    wireless network and equipment on each of the accused premises.

3    And based on discovery that we've already received, it's my

4    understanding that almost universally, whether you're talking

5    about hotel locations or coffee shops or Cosi, the sandwich

6    shops, the IS people have information that will allow us to

7    fill out these charts.

8              THE COURT:  I'm sorry.  The IS people?

9              MR. McANDREWS:  The information services or the IT,

10   information technology, staff for each of the hotel brands or

11   the coffee shops or the restaurants or the retailers.  They've

12   got information.

13             THE COURT:  And is this information available at the

14   franchisor level?  I assume a lot of these places are

15   franchises, aren't they?

16             MR. McANDREWS:  I think most of them are --

17             THE COURT:  Yeah, most of them.

18             MR. McANDREWS:  -- franchises.

19             THE COURT:  Yes.

20             MR. McANDREWS:  Yeah.  In many instances, that

21   information is available at the franchisor level.  In some

22   instances, it's not.  But the exercise of collecting this

23   information is not terribly burdensome.

24             THE COURT:  Couldn't you get the same information on

25   a document request?

1               MR. McANDREWS:  We can get some of the information in

2       a document request, but it doesn't provide -- if you take a

3       look at the format that we have provided --

4               THE COURT:  Yeah.

5               MR. McANDREWS:  -- there's additional information.

6       And, incidentally, we have received this type of information

7       through document requests and interrogatories in the initial

8       go-around.

9               THE COURT:  Well, and my -- I guess my question is

10      then why can't you get it in the normal course of discovery?

11      The defendants don't contend it is not discoverable.  They are

12      not saying this is outside the ballpark so that it does not

13      lead to the discovery of admissible evidence.  But why can't

14      normal course of discovery assist you?

15              MR. McANDREWS:  I think if we press on it, Your

16      Honor, that should be sufficient.

17              I want to point out that we kind of tied this request

18      to the one that we just resolved.  And that is if --

19              THE COURT:  Yes.

20              MR. McANDREWS:  -- we are to do these contentions, at

21      a bare minimum, we would have to -- but, again, it illustrates

22      the point that it would be perhaps overly complicating things

23      at the front end.

24              THE COURT:  Okay.

25              MR. McANDREWS:  But we will press for this, of

1    course, and we anticipate that it will be produced.

2              THE COURT:  Well, and --

3              MR. ALPER:  If I may, Your Honor?

4              THE COURT:  Yes.

5              MR. ALPER:  In the ABP action, just by way of

6    background, when we received requests for this information in

7    the ordinary course of interrogatories and requests for

8    production, we were able to provide the information.  I think

9    there was one round of meet-and-confers.  We got the remaining

10   stuff that they wanted, and we got it all worked out.

11             So I think our main concern was that we just are able

12   to preserve objections.  You know, to the extent that they're

13   asking for stuff that is in our possession, custody, or

14   control, we are not waiving anything.

15             THE COURT:  Right.

16             MR. ALPER:  And I truly believe that if we get a

17   round of interrogatories, we can just handle it just like we

18   did before and it will work out fine.  So however the Court

19   prefers to handle it is fine with us.

20             THE COURT:  Well, it seems to me that -- let's follow

21   that route at this point.  And, Mr. McAndrews, you can press on

22   with normal discovery on this.  And, as you said, since we kind

23   of dealt with the other -- the way we have dealt with it, we

24   will use this normal methodology --

25             MR. McANDREWS:  Right.

1    THE COURT:  -- to get that done.

2    MR. McANDREWS:  And to be clear, each side has

3    ongoing discovery disputes that aren't resolved.

4    THE COURT:  Yes.

5    MR. McANDREWS:  But we will handle that moving

6    forward.

7    THE COURT:  Yes.  All right.  The other item -- or

8    not the other item, there are a couple more -- and that's the

9    final date to seek a stay pending reexamination.

10   Innovatio, you don't want any reexaminations at all.

11   The date you suggested has come and gone.  But why not follow

12   our usual local patent rule suggestion of a deadline for

13   reexamination should be the same for that of the final

14   non-infringement enforceability and validity contentions which,

15   by the calculation that the defendants suggest, is November 13,

16   2012?

17   MR. McANDREWS:  I think we'd be agreeable to that,

18   Judge.  What we were doing is we were tying --

19   (Magistrate Schenkier entered proceedings.)

20   THE COURT:  All rise.  Judge Schenkier is entering

21   the courtroom.

22   How are you?  Thank you for coming up.  We all

23   apologize for being tardy here.  To some extent, time got away

24   from us and --

25   MAGISTRATE SCHENKIER:  Well, time flies when you're

1    having fun.

2              THE COURT:  Yes, right.  And so we have resolved some

3    issues in the Form 52s, but I thought that perhaps we could

4    just jointly work on some of the remaining points.  And rather

5    than spend the time counsel trekking down to your chambers, we

6    could just go ahead.

7              MAGISTRATE SCHENKIER:  Sure.

8              THE COURT:  And if you have additional things, we can

9    go ahead and deal with those things right here, since I am now

10   back on the 25th floor --

11             MAGISTRATE SCHENKIER:  Here you are.

12             THE COURT:  -- in my large courtroom.  I know you

13   were one of the first judges to enjoy the spaciousness of the

14   10th floor.

15             MAGISTRATE SCHENKIER:  Yes.

16             THE COURT:  And so we are back.

17             Right now, we are in the process of resolving, and I

18   think we probably have resolved, the question -- one of the

19   issues, which was the date to seek a stay pending

20   reexamination.  Mr. McAndrews was speaking as you came in --

21             MAGISTRATE SCHENKIER:  Okay.

22             THE COURT:  -- and he was saying he could live with

23   it, of November 13, 2012.

24             MR. McANDREWS:  Yeah, provided that the date of

25   joinder of claims and parties is also extended.  That's really

1    what we had done.

2                THE COURT:  Right.

3                MR. McANDREWS:  In our view, the defendants can't

4    have it both ways.  You can't apply the amendment and joinder

5    date of the original ABP action without applying that March

6    29th -- I think that was the date that we included for --

7                THE COURT:  That was the date, yes.

8                MR. McANDREWS:  Which, of course, was here and gone.

9                THE COURT:  Right.

10                MR. McANDREWS:  But that was our point.  So if we

11   get -- if we likewise extend out that joinder date, which

12   should not be a problem --

13                THE COURT:  Okay.

14                MR. McANDREWS:  -- I don't think we have a problem.

15                THE COURT:  And you want to extend that to the same

16   day?  What day?

17                MR. McANDREWS:  In terms of joinder for the -- what I

18   guess we'd call the tier I or the ABP action --

19                THE COURT:  Yes.

20                MR. McANDREWS:  -- May 21st, perhaps.

21                THE COURT:  May 21st?

22                MR. McANDREWS:  Yeah.

23                THE COURT:  Of 2012?

24                MR. McANDREWS:  2012, yeah.

25                THE COURT:  Okay.  Can everybody live with that?

1    MR. ALPER:  Yes, Your Honor.

2    MR. SHELTON:  Yes.

3    THE COURT:  Who else are you thinking might --

4    MR. McANDREWS:  Well, we're thinking, as we've been

5    discussing --

6    THE COURT:  What other targets are out there?

7    MR. McANDREWS:  Well, I got to be careful.  I will

8    speak generically.

9    THE COURT:  Yes.  Okay.  Yes, speak generically, or

10   we will have to go under seal again, yes.

11   MR. McANDREWS:  No, no.  To the point that I have

12   been making this morning, Your Honor, other relevant players

13   that really leverage wi-fi in their business operations.

14   Hotels are a really good example.  It is not exclusive to that.

15   You see it in retail operation.

16   THE COURT:  Well, it doesn't include any hotel that

17   Mr. Alper stays at.

18   MR. ALPER:  Not any hotel, just --

19   THE COURT:  Not any hotel.  Just not last night.

20   MR. ALPER:  Just last night.

21   THE COURT:  Just last night.

22   MR. McANDREWS:  Free wi-fi.  So wi-fi is everywhere.

23   But I would say generally we'd be looking at relevant

24   players --

25   THE COURT:  Okay.

1           MR. McANDREWS:  -- with a view toward that damage

2    model that we're talking about.

3           THE COURT:  All right.  May 21, 2012.

4           All right.  Moving on, then, to the fact depositions.

5    Innovatio was saying that it would be subject to 75 hours of

6    depositions.  Each manufacturer, 75 hours of depositions.  Each

7    end user subject to 14 hours of depositions.  Or if a network

8    operator owns multiple locations, like Caribou Coffee, then

9    Innovatio would take no more than 14 hours per location, and no

10   more than a total of 50 hours, total, for a network operator at

11   all locations.

12          The defendants' contention is Innovatio be subject to

13   175 hours of depositions, with each manufacturer subject to 29

14   hours of depositions, and each end user subject to 14 hours of

15   depositions.

16          What do you anticipate -- I am asking both sides now.

17   What do you anticipate -- when we get rolling with the

18   depositions, how does Innovatio anticipate proceeding?  And

19   while you are thinking about that answer, let me speak with my

20   clerk.

21       (Court conferring with his staff.)

22          THE COURT:  We are just going to take a quick, short

23   recess, and let me talk to Judge Schenkier, and you can think

24   about that, how you anticipate getting rolling and what, I

25   guess, thought process went into your fact deposition position,

1   both sides.  Okay?

2              MR. McANDREWS:  Sure.

3              MR. ALPER:  Yes, Your Honor.

4              THE COURT:  All right.  Thank you.  A short recess.

5        (Recess from 11:20 a.m. until 11:32 a.m.)

6              THE COURT:  My court reporter was chatting with me

7   about the fact that some of you need to go to other

8   obligations, and I fully understand that.  I am not offended in

9   any way if you have to leave, although I am hoping we are going

10  to be able to wrap this up relatively shortly.

11             But if you have to leave, go ahead, please feel free

12  to do so.

13             All right.  Back to the point that we were talking

14  about, and that's the fact depositions.

15             Further resolution during the break?

16             MR. McANDREWS:  No, no stipulation on that.

17             Look, Innovatio, to the extent possible, and by

18  necessity, we want to streamline the discovery that we take of

19  the defendants.

20             You had asked, Your Honor, what we anticipate doing

21  over the course of a deposition.  We are going to need basic

22  information, hopefully much of which we will glean from

23  documentary and interrogatory discovery, about network

24  operation, about the infrastructure, the actual equipment that

25  is used, and the manner in which it is used.

1          There are many claims in the Innovatio portfolio that

2     go to network configuration, and that's information that's

3     going to be uniquely in the possession of the network operators

4     or, as my colleagues refer to them, the end users, the

5     restaurants and hotels and whatnot.

6          One of the things that my team is able to do, using

7     over-the-air network analysis software, is collect some of this

8     information, but we're also dealing with some brand names that

9     have hundreds of locations.  And, in total, we're talking about

10    many thousands of locations.

11         THE COURT:  All right.  Let me just pause for a

12    moment.

13         MR. McANDREWS:  Sure.

14         THE COURT:  Because of the concept that you

15    mentioned, over-the-air network analysis software.

16         MR. McANDREWS:  Yes.

17         THE COURT:  What does that do?

18         MR. McANDREWS:  Well, what it does is it allows an

19    agent or a person to go into a location that offers wi-fi --

20         THE COURT:  And capture information about it?

21         MR. McANDREWS:  And capture public information, sure.

22    If you think about a coffee shop -- a Starbucks is a really

23    popular example.

24         THE COURT:  Okay.  All right.

25         MR. McANDREWS:  When I go into a --

1    THE COURT: Who represents Starbucks here? Anybody
2    represent Starbucks? Starbucks is unrepresented here.
3    MR. McANDREWS: Not yet. But if I walk --
4    THE COURT: Well, let's use Caribou Coffee, then.
5    They are represented.
6    MR. McANDREWS: Well, sure, sure.
7    THE COURT: They can respond. Okay.
8    MR. McANDREWS: Sure. If I go into Caribou, I can
9    turn on the wi-fi feature on my Smartphone --
10   THE COURT: Yes.
11   MR. McANDREWS: -- and I will see a signal that's
12   broadcast. So I'm obtaining their projecting certain
13   information about their network. They're allowing me to join
14   that network.
15   THE COURT: Right.
16   MR. McANDREWS: There is software that's available
17   for free or for purchase -- and there are levels of
18   sophistication of this analysis software that you can buy. I
19   think one that we have is a $700 package. Use it on a laptop
20   computer with a special antenna, and you are able to obtain
21   certain information concerning network configuration and radio
22   bandwidth and --
23   THE COURT: Just by walking in, having a cup of
24   coffee, using and employing the software in a coffee shop on
25   your laptop?

1       MR. McANDREWS:  Some of the information, yes.  Not
2   all of it.  That's right.
3           THE COURT:  Okay.
4           MR. McANDREWS:  Yeah.
5           THE COURT:  Okay.
6           MR. McANDREWS:  Now, what we are not talking about is
7   cracking into encrypted packets, which, of course, is a
8   whole --
9           THE COURT:  Yes.
10          MR. McANDREWS:  That's not what we are interested in
11  doing.  That's not what we are going to do.  You're getting
12  into privacy issues there.  But what we're talking about is
13  publicly available --
14          THE COURT:  Okay.  All right.
15          MR. McANDREWS:  -- through this analysis.  And I
16  would also add that it's perhaps something that we want to
17  contemplate in the order of the protective order if it's going
18  to streamline the process.  The alternative is we turn around
19  and say, "Give this to us."
20          THE COURT:  Yes.
21          MR. McANDREWS:  And what we want to do is we want to
22  put in place protocols that allow us to very efficiently
23  analyze this type of data and reach stipulation with the
24  defendants, to the extent that we can.
25          THE COURT:  Well, and it seems to me those folks

1    representing the end users, they want to minimize their expense

2    in providing discovery would be cooperative on this point.

3               MR. McANDREWS:  I would hope so.

4               THE COURT:  Okay.  Wouldn't you?

5               MR. GARFINKEL:  Yes.  As long as there are some very

6    clear protections on what data can be obtained through this

7    process.  I mean, this is not typical --

8               THE COURT:  Well, what data can be obtained is

9    anything that's publicly available --

10              MR. GARFINKEL:  That should be available through

11   wi-fi, yeah.

12              THE COURT:  -- by this over-the-air software that's

13   available for purchase.  So you are basically every day -- as

14   long as your wi-fi is operating, you are providing underlying

15   information about your wi-fi and its network and its support, I

16   assume.

17              MR. McANDREWS:  Configuration.

18              THE COURT:  Your configuration.

19              MR. McANDREWS:  Yeah.

20              MR. GARFINKEL:  I understand, Your Honor.  I don't

21   know anything about this software that counsel is referring to.

22   I don't know what --

23              THE COURT:  I didn't either.  That's why I asked.

24              MR. GARFINKEL:  Right.  It's fascinating.

25              THE COURT:  Yes.

1    MR. GARFINKEL:  But I would want any protective order

2    to very clearly circumscribe what data can be obtained through

3    this process, even if the software is capable of doing more.

4    THE COURT:  Well, you guys work out the protective

5    order.  It seems to me that if you are basically publicly

6    advertising, "We've got this.  We've got that.  We're in this

7    configuration," by just providing the service out there, it

8    seems to me there isn't any privacy in connection with that if

9    it's publicly available.

10    MR. McANDREWS:  No.  I do think the parties ought to

11    get together on that, though.

12    THE COURT:  Yes, yes.

13    MR. McANDREWS:  Because, you know, in the ether, what

14    gets sent back and forth sometimes is a matter of degree or

15    type.  For example, you may have a packet that is encrypted.

16    THE COURT:  Sure.

17    MR. McANDREWS:  And you could argue that's publicly

18    available, but you're not entitled to it.  So I think we ought

19    to get with the defendants --

20    THE COURT:  Yes.

21    MR. McANDREWS:  -- and work out an appropriate

22    protocol and let them know what information we intend to seek

23    through our over-the-air analysis efforts.

24    THE COURT:  Can you disclose now whether you have

25    done this already?

1           MR. McANDREWS:  We have done some sampling without
2    waiver.
3           THE COURT:  Okay.  That's good.
4           MR. McANDREWS:  Yeah.
5           THE COURT:  Okay.  Go ahead.  I apologize for the
6    interruption, but I think it was helpful.
7           MR. McANDREWS:  No.
8           THE COURT:  It certainly enlightened me.  Go ahead.
9           MR. McANDREWS:  Yeah.  So to the extent possible,
10   what we are proposing here are the outer bounds, hopefully, for
11   what we'd be talking about in terms of deposing any particular
12   network operator location.  In many instances, we are going to
13   be dealing with the information technology designee --
14           THE COURT:  Sure.
15           MR. McANDREWS:  -- or officer at a, you know, at a
16   Cosi or at a hotel.
17           THE COURT:  Yes.
18           MR. McANDREWS:  And that should significantly
19   streamline the process.  For the other information that we'd be
20   seeking during depositions discovery and 30(b)(6), of course
21   issues going to the value that these various defendants place
22   on wi-fi.
23           THE COURT:  Sure.  Because some day we are going to
24   make you make a contention --
25           MR. McANDREWS:  One of these days.

1          THE COURT:  -- of damages.

2          MR. McANDREWS:  That's right.

3          THE COURT:  Yes.  So go ahead.

4          MR. McANDREWS:  While we're at one of our status

5     conferences.

6          THE COURT:  Yes.

7          MR. McANDREWS:  And yeah, I -- Your Honor, I don't

8     think anything out of the ordinary.  It's a complex case, there

9     are several moving parts, but at the end of the day, I think we

10    are going to have a very streamlined and straightforward

11    process for the depositions themselves.

12          THE COURT:  Yes.

13          MR. McANDREWS:  You know, I would point out we've

14    cooperated to date.  We've had a great relationship with Mr.

15    Alper and his colleagues.  But 22 days of depositions for one

16    representative at Innovatio, that just seems to push beyond the

17    spirit of the letter of the --

18          THE COURT:  Okay.  Well --

19          MR. McANDREWS:  And I understand we're compromising

20    here.  We're going over the -- you know, we're going over

21    recommended limits as well, but we've got a reason for that.

22          THE COURT:  All right.  Well, let me hear why 175

23    deposition hours of Innovatio.

24          MR. ALPER:  Sure, Your Honor.  Actually, if I may

25    begin by addressing the defendants' side of the deposition

```
 1    picture --
 2             THE COURT:  Sure, go ahead, go ahead.
 3             MR. ALPER:  -- and then I will come back around?
 4    Because the Innovatio side is probably a little easier.
 5             So I actually think the parties are relatively close
 6    on deposition hours.  We're suggesting 28 hours per supplier
 7    and 14 hours per end user defendant.  I think we have some more
 8    flexibility on the supplier side because we do believe that's
 9    where the action is going to be at when it comes to liability
10    and damages issues in this case.
11             THE COURT:  Well, yes, that's your position,
12    especially if we are going to follow your proposal, which is to
13    have that be the tier I --
14             MR. ALPER:  Yeah, absolutely.
15             THE COURT:  -- evaluation and determination.
16             MR. ALPER:  Absolutely.  And so -- and we do want to
17    provide Innovatio with the discovery that it needs.  Because I
18    think above all, our focus is to get the case -- get the issues
19    out there and focus.
20             So if 28 hours is too little with respect to
21    suppliers, we are amenable to a -- to additional hours, if
22    those are necessary.
23             When it comes to the end users, a lot of these folks
24    are -- you know, some of them are solo owners of hotels and,
25    you know, they're real small businesses.  It sounds like, from
```

1    what we heard Mr. McAndrews say, when it comes to discovery

2    that he's interested in, it is a lot of stuff that we can

3    provide in response to that chart.

4              THE COURT:  Right.

5              MR. ALPER:  Right?  Which, like I said earlier, we

6    want to do.  We did it in the ABP action.  We were able to

7    resolve any issues without appearing before Judge Schenkier.

8    That was six months ago.  We haven't heard complaints since

9    then.  So I have a lot of confidence that we are going to be

10   able to get that information out there.

11             And, actually, we have an incentive to do it because,

12   as Your Honor noted, if we can get that to them, then we can

13   get on the path for those damages contentions.

14             So it seems like we can do a lot with that type of

15   discovery.  And given how small the end user defendants are,

16   that's where we came up with 14 hours for the depositions per

17   party.  And if for some reason 14 hours doesn't cut it, then we

18   can meet and confer over additional time for a particular

19   party.  But we felt like that would be sort of a reasonable

20   cutoff for -- given the size of those defendants and how much

21   we can accomplish in other sort of discovery mechanisms.

22             THE COURT:  Okay.

23             MR. ALPER:  So that's our position on the defense

24   side.  On Innovatio's side, I guess the -- you know, what Mr.

25   McAndrews said is they have one corporate representative.

1           (Judges conferring.)

2               THE COURT:  Go ahead.

3               MR. ALPER:  They will have one corporate

4    representative.  We don't have sufficient information about

5    Innovatio yet to make a determination as to what the -- what

6    their role in all of this is, whether it's going to be -- is

7    Innovatio one person who just has a deed to the patents or is

8    it a more sophisticated organization?  Are we going to be going

9    to third parties and so forth?

10          (Judges conferring.)

11              THE COURT:  Go ahead.

12              MR. ALPER:  And so we picked a number of hours that

13   could accommodate a larger amount of discovery if it turned out

14   that Innovatio as a party was a more complicated, you know,

15   entity versus the smaller number of hours that Mr. McAndrews

16   proposed.

17              And I think I could just say we don't intend to abuse

18   the right to depose Innovatio.  We just don't want to end up

19   agreeing to something in advance and then it turns out, once we

20   learn a little bit more about Innovatio, we end up getting

21   eclipsed.

22              THE COURT:  Okay.

23              MR. ALPER:  And I guess, you know, we then looked at

24   the massive disparity in hours between defendants and

25   plaintiffs when we saw, you know, just thousands -- we add it

1    all up, even under our proposal, it's hundreds of thousands of

2    hours on the defense side, and we're just asking for 175.

3           THE COURT:  How sophisticated is your client?

4           MR. McANDREWS:  Our client is not terribly

5    sophisticated.  He's a very bright guy, our client

6    representative.

7           THE COURT:  Yes.

8           MR. McANDREWS:  But I don't anticipate a great deal

9    of complexity in deposing Innovatio on a 30(b)(6) basis or an

10   individual basis, for that matter.

11          THE COURT:  Okay.

12          MR. McANDREWS:  Genuinely.  I mean, I can't possibly

13   fathom that it couldn't be accomplished in fewer than, you

14   know, the ten days that we're proposing.

15          And I think perhaps the better approach would be to

16   enter an order that has restraint with the understanding that

17   as needed, the parties will cooperate and ask the Court for

18   relief, if that's called for and warranted in the future.

19          THE COURT:  Okay.  All right.  You are together with

20   regard to the end users.  What I am going to do on this one,

21   rather than force you for further compromise, is I am going to

22   adopt Innovatio's proposal with that understanding that was

23   proposed by Mr. McAndrews; that, frankly, once you get into it,

24   you are going to see how much is going to be necessary.  But

25   Innovatio, 75 hours of depositions will be the limit.  And the

1   other proposals that the plaintiff made, those will be the

2   limits at this point, but that's a loose limit.  I am going to

3   authorize Judge Schenkier to adjust those limits, if necessary,

4   in connection with the discovery so as to minimize disputes on

5   this point.

6          But let me also say, too, that as we get into this,

7   you are right, you are going to get a pattern.  You are going

8   to know exactly what the questions are, exactly what the

9   information is going to be sought.  The only thing that's going

10   to change is the deponent, and everything else is going to be

11   the same.  And it may be that we'll be able to work out an

12   efficient mechanism.  And, frankly, if you could obtain this

13   information that's publicly available, that would assist.

14          So that's what I'd like you to put in the proposed

15   order, along with those other agreements that you have made.

16          Now, there are just a couple other points.  First of

17   all, we've got our next status report, June 14.  We've got the

18   dates through 2012.  I would like to receive from you, if you

19   can do it jointly, a written status report or an agenda --

20   maybe an agenda might be the better way to put it rather than a

21   written status report -- an agenda for each status report; in

22   other words, what are the points we are going to be covering

23   today.  Because I want you to -- and I'd like you to file that

24   three days before.  So for the June, it would be June 11th to

25   file the -- we will call that status report number 1.

1           All right.  And we did work out the amending the

2   pleadings for the plaintiff, adding new parties.  Do the

3   defendants anticipate -- who else are you going to bring into

4   this?  Who do you think you might?

5           MR. ALPER:  You know, I think it's less amending

6   pleadings with respect to adding new parties, and I think it's

7   more if we have any counterclaims, for instance, declaratory

8   judgment counterclaims and other types of counterclaims.  And

9   what we would ask -- I think if Innovatio's date for amending

10  the pleadings -- I think they would be more focused on joining

11  parties as opposed to --

12          THE COURT:  Oh, yes.  And May 21 is the date.  They

13  agreed.

14          MR. ALPER:  Right.  So that's their date.  Then for

15  us, we would suggest, just because our focus is going to

16  require a little bit more in the way of discovery in order to

17  amend pleadings --

18          THE COURT:  Now you know how they feel with the

19  damages.

20          MR. ALPER:  The damages, exactly.  So, you know, I

21  think a number of months after that, you know, maybe early fall

22  would be something we'd target, if we wanted to shoot for --

23  what if we shot for -- I think we had --

24          THE COURT:  How about the first day of fall?

25          MR. ALPER:  Sure.  I was going to propose the date

1    that we had talked about earlier for the -- on the reexam

2    deadline, just because that's a --

3                    THE COURT:  November 13?

4                    MR. ALPER:  Yeah.

5                    THE COURT:  All right.  Any problem with November 13?

6                    MR. McANDREWS:  That's for amendment as to claims?

7                    THE COURT:  That's to bring any counterclaims of

8    non-infringement or any other declaratory actions, basically.

9                    You are not going to add any new parties that you

10   anticipate now?

11                   MR. ALPER:  I -- we do not anticipate right now

12   adding new parties.  But I can't foreclose the possibility

13   between --

14                   THE COURT:  Why don't we -- yes.  Can we move it back

15   just slightly?  How about October 1?

16                   MR. ALPER:  Sure.

17                   THE COURT:  Can you agree with October 1?  It is a

18   Monday.

19                   MR. ALPER:  We can agree with that, Your Honor.

20                   THE COURT:  It will be a nice day.

21                   MR. McANDREWS:  Can we have till October 1 for

22   joinder of claims?  I think the 21st day in May is going to be

23   fine for --

24                   THE COURT:  Parties?

25                   MR. McANDREWS:  For parties, yeah.

1      THE COURT:  Okay.

2      MR. McANDREWS:  But, you know, every once in a while

3  in the early stages of discovery, something comes up and --

4      MR. ALPER:  If I could ask for a clarification as to

5  what that means?

6      THE COURT:  Yes, that's -- I was --

7      MR. ALPER:  You were going to --

8      THE COURT:  What do you mean?  What do you mean by

9  that, Mr. McAndrews?

10      MR. McANDREWS:  Well, we've not asserted all of the

11  Innovatio patents right now, and we do have preliminary

12  infringement contentions out.  But I suppose if we've got the

13  parties wrapped up by May 21st, that largely does --

14      THE COURT:  Well, I will give you October 1, but I

15  think they need a little time after that.

16      MR. McANDREWS:  They need time beyond that, yeah.

17      THE COURT:  Yes.  So I will give you October 1 --

18      MR. McANDREWS:  Sure.

19      THE COURT:  -- for claims.

20      MR. McANDREWS:  Yes.

21      THE COURT:  Initial claims.  How about November 1 for

22  the defense?  That's closer to your November 13.

23      MR. ALPER:  If I may comment on that, Your Honor,

24  just so I understand what we're talking about?

25      THE COURT:  Yes.

1          MR. ALPER:  If Mr. McAndrews is suggesting that he

2     have until October 1st to, say, add patents, that would seem to

3     me to conflict with the rest of the schedule, because I think

4     at that point --

5          THE COURT:  Yes, it does.

6          MR. ALPER:  -- we're going to be into *Markman* --

7          THE COURT:  Yes, you are right.

8          MR. ALPER:  -- on -- and we'll have wanted to be

9     along the ways on infringement contentions, damages

10    contentions, and validity.  I think he's got --

11         THE COURT:  You are right.

12         MR. ALPER:  -- to bring any patent that he wants to

13    bring right now.

14         MR. McANDREWS:  Well, I think it's called for in our

15    contentions, what we are going to be doing in the way of patent

16    claims.

17         THE COURT:  But I don't want you to bring -- okay.

18    You have already got the patent claims in your contentions?

19         MR. McANDREWS:  Well, we do right now, although we're

20    not at the date yet for the initial contentions --

21         THE COURT:  Yes.

22         MR. McANDREWS:  -- in this new consolidated action.

23         THE COURT:  What I am concerned about, and what Mr.

24    Alper is concerned about, is we're going to have more claim

25    construction that's going to be kind of coming in --

```
1              MR. McANDREWS:  Yeah.
2              THE COURT:  -- at the end --
3              MR. McANDREWS:  Right.
4              THE COURT:  -- and we want to get that claim
5    construction done in February.  I mean, I want to be able to
6    provide something to you, well, before a year from now on claim
7    construction, and I don't want to be delayed by new patents,
8    new claim terms slowing us down.
9              MR. McANDREWS:  Understood.
10             THE COURT:  Yes.
11             MR. McANDREWS:  And I am looking at the schedule now.
12             THE COURT:  Sure.
13             MR. McANDREWS:  May 22nd are the initial disclosures.
14             THE COURT:  Yes.
15             MR. McANDREWS:  And any infringement contentions
16   trail after that.  So we'll use that May 21st date, then,
17   for --
18             THE COURT:  Okay.
19             MR. McANDREWS:  -- parties and joinder of additional
20   claims.
21             THE COURT:  Okay.  And then is October 1 okay for
22   them?
23             MR. McANDREWS:  It is.
24             THE COURT:  Okay.
25             MR. McANDREWS:  It is.
```

1        THE COURT:  All right.  You have reached agreement.

2        MR. McANDREWS:  This is for what we're referring to

3    as tier I.

4        THE COURT:  Tier I.

5        MR. McANDREWS:  That's the cutoff for that.  Any

6    later-filed actions are --

7        THE COURT:  They're still safe and still available.

8        MR. McANDREWS:  Yeah.

9        THE COURT:  You aren't foreclosed.

10       MR. McANDREWS:  Right.

11       THE COURT:  Okay?  All right.

12       All right.  What other points have you folks got that

13   you see that -- because you are going to basically be building,

14   now you are going to be building the pretrial scheduling order

15   number 3, and I am going to put a date on your filing that or

16   your proposing it through the *proposed_order* e-mail system.

17       So is there anything else that you have as a dispute

18   that you need me to assist you in resolving?

19       MR. ALPER:  I think just the issue that Mr. McAndrews

20   touched on a moment ago which has to do with filing of separate

21   actions and how they relate to this case.  And, obviously, I am

22   going to let Mr. McAndrews give their position, but I can, I

23   think, summarize it.

24       Innovatio in their proposal I believe has a proposal

25   that later-filed cases would be -- has a proposal for combining

1    later-filed cases with the schedule that we're going to put

2    into place.

3              THE COURT:  Yes.

4              MR. ALPER:  Our recommendation would be let's see

5    what those look like when they're filed and deal with them

6    then.  Because it may make sense --

7              THE COURT:  I agree with you on that.

8              MR. ALPER:  Okay.

9              THE COURT:  So we will make that -- we will cut to

10   the chase there.

11             MR. ALPER:  Okay.

12             MR. McANDREWS:  Yeah, we had actually intended to

13   retreat from that.  That's what I was saying about the May

14   1st -- or May 21st deadline.

15             THE COURT:  All right.

16             MR. McANDREWS:  We will join parties by then --

17   that's tier I -- on the same trial track, subject to

18   whatever --

19             THE COURT:  Right.

20             MR. McANDREWS:  -- Your Honor later decides on that

21   specific issue.

22             THE COURT:  Right.

23             MR. McANDREWS:  And then anything else in tier II or

24   tier III are on their own schedules.

25             THE COURT:  Okay.  Right.  Okay?  Anything else?

1  I've got -- anything else?

2         MR. ALPER:  No.  I think that's it, Your Honor.

3         THE COURT:  Can you build this?  Can you craft now

4  pretrial scheduling order number 3 and submit it?  And how soon

5  can you get it done?

6         MR. ALPER:  I think relatively quickly, so --

7         THE COURT:  Yes.  I think you can get it done today,

8  but I'm not --

9         MR. ALPER:  Yeah.  Seven to ten days is all we need.

10         THE COURT:  All right.  Well, we do things by

11  multiples of seven now, so seven days from today would be the

12  17th.

13         MR. ALPER:  Well, maybe we should say two weeks just

14  because of the number of parties.

15         THE COURT:  Two weeks.  Yes, you've got a lot of

16  people to confer with.  Let's make it the 24th.

17         All right.  And let me back up just a second.

18         If there is a dispute -- if after you go back and you

19  confer, blah, blah, blah, and you've got a problem, "I don't

20  agree," here's what I am going to give you.  I am going to give

21  you until May 1 to file final -- or not final, pretrial

22  scheduling order number 3.  If there is a dispute, I want to

23  see you at 10:00 o'clock on the 10th of May.  That will be our

24  first status.  But you won't have to file a status report.  I

25  will know what your dispute is because you are going to tell me

1    in the filing -- or in the proposed order on the 1st of May.

2    Okay?  So I will know.  And I am hoping there will not be a May

3    10th status report.  Do you see what I mean?

4              MR. ALPER:  Yes.  We only have a status on May 10th

5    if there's a dispute.

6              THE COURT:  If there's a dispute.  Okay?

7              MR. McANDREWS:  Yeah.  A final point, Judge.

8              THE COURT:  And then I've got a final point.  But go

9    ahead.

10             MR. McANDREWS:  I'm sorry if I --

11             THE COURT:  You get your final point first.

12             MR. McANDREWS:  I didn't want to cut you off.

13   Please.

14             THE COURT:  Yes.  No, go ahead.  You get your final

15   point first.

16             MR. McANDREWS:  Approximately 120 to 125 of the hotel

17   defendants have neither contacted us nor entered appearances

18   yet, so one thought would be -- and it's just a thought at this

19   point.  So that it doesn't forestall the schedule that we've

20   just talked about, depending on how quickly we can get them on,

21   we would tier them on a separate track or something like that.

22             THE COURT:  Okay.

23             MR. McANDREWS:  I wanted some guidance from the

24   Court.

25             THE COURT:  Well, here's what I want to do.  The

1    first guidance I want to give you is to assist you in any way
2    to get their attention.
3           MR. McANDREWS:  Yes.
4           THE COURT:  So if you want me to note that some of
5    those hotel defendants are in default and then we send them an
6    order saying they're in default and give them a certain period
7    of time to cure the default or the matter will proceed to a
8    default judgment, that might get their attention.  They might
9    then go talk to their lawyer.  I mean, that's what -- we want
10   to get them in.
11          MR. McANDREWS:  I -- there's no question about it.
12   With some of the defendants, in fact, some of my colleagues
13   here, there have been motions to dismiss based on misnomer.
14          THE COURT:  Yes, right.
15          MR. McANDREWS:  Not knowing the -- and sometimes you
16   hit the Secretary of State site, you just can't figure out who
17   owns the place.
18          THE COURT:  Yes.  Your client's bright but not
19   omnipotent, right?
20          MR. McANDREWS:  No, that's right.  My understanding
21   of the law was if they are reasonably put on notice that
22   there's a claim against them, that's binding.  We've not
23   briefed the issue.
24          But I guess to your point about default, can you
25   enter a default against a party who is technically identified

1    by a different name?

2              THE COURT:  The answer is no.

3              MR. McANDREWS:  Okay.

4              THE COURT:  But we can get their attention.

5              MR. McANDREWS:  Yes, right.

6              THE COURT:  Because some day you will figure it

7    out --

8              MR. McANDREWS:  Yeah.

9              THE COURT:  -- and you'll sue him.

10             MR. McANDREWS:  Right.

11             THE COURT:  So you might as well resolve it now.  I

12   leave that up to you.

13             MR. McANDREWS:  Okay.  Thank you for the --

14             THE COURT:  So what I am going to say is that I will

15   help you in any way.

16             MR. McANDREWS:  Thank you.

17             THE COURT:  You bring it to my attention whenever you

18   can.

19             MR. McANDREWS:  We will do --

20             THE COURT:  And if you need to come in and see me on

21   May 10 for that purpose, you can do that, too.

22             MR. McANDREWS:  Okay.  And we will try to do it as

23   best we can informally --

24             THE COURT:  And let everybody know.

25             MR. McANDREWS:  But that's very helpful.

1    THE COURT:  Two other points.  Is everybody getting
2    notice?  Have we got -- any problems with that?  I guess not.
3    Okay.

4        The next point and it involves Judge Schenkier.  We
5    are blessed in this case to have the outstanding magistrate
6    judge that we have assigned to this case.  It was at random.
7    And I couldn't be more thrilled to be partnering with Judge
8    Schenkier.  We have done it in the past in other cases.  In
9    fact, a rather simple but somewhat interesting case.  Judge
10   Schenkier and I partnered together on resolving the trademark
11   infringement case involving the rooftop owners around Wrigley
12   Field.

13       Now, I don't know if anybody is this year, given the
14   way they are starting out, that they're going to go to rooftops
15   around Wrigley Field.  But Judge Schenkier resolved that case,
16   and it was very difficult.  And we partnered together on that.
17   We're going to do that.

18       But I want you guys to constantly have in the back of
19   your mind settlement.  I want you to be thinking about it all
20   the time.  Because this is a business dispute.  This is about
21   resolving for financial purposes the issues in the case.

22       And I will turn it over to Judge Schenkier.  What he
23   and I talked about was that each of these second Thursday
24   status reports that you'd see me, then you'd go see him, and
25   your seeing me today wouldn't take as long.  Because my clerk

1    is now wondering why am I taking this long now, because I've

2    got a noon hearing that's involving the secret stuff that the

3    Chief Judge in our court has to deal with, the grand jury and

4    wiretaps, et cetera, since the government can't go into a drug

5    house and set up a wi-fi and figure it out.

6              MR. McANDREWS:  We could sniff it for you.

7              THE COURT:  I'll turn it over to Judge Schenkier.

8              MAGISTRATE SCHENKIER:  Well, you mentioned sniff.

9    That's actually up in the Supreme Court.

10             THE COURT:  Yes.

11             MAGISTRATE SCHENKIER:  Dog sniffs.  So I guess I will

12   see, you know, everybody the second Thursday, you know, of the

13   month beginning at least in June.

14             THE COURT:  Right.

15             MAGISTRATE SCHENKIER:  And, you know, I certainly

16   want people to think about settlement.  I mean, you are at the

17   beginning of what could be a very long road.  And looking at

18   the number of hours that are allocated for depositions kind of

19   takes my breath away, you know.

20             I was trying to think, did I ever depose anybody for

21   22 days?  I mean, it seems likely, but I don't think I did.

22             But I think that it's always useful to look at not

23   just what it is you think you need ultimately to try the case,

24   if it ever comes to that, but really what is it that you need

25   to know to fairly evaluate the case for purposes of settlement.

1   Because I think we all know that that is a much smaller subset,
2   you know, of the form.  And so I think that within the schedule
3   that you have, that's something that, you know, you always
4   should be evaluating, and I will discuss it with you, you know,
5   when we have our little meetings.  But just to reinforce what
6   Chief Judge Holderman is saying, I think it is something worth
7   keeping in mind.
8           And obviously, you know, I'm available to do that.
9   There are other resources to do that also.  But I'd be happy to
10  get involved if people think that would be constructive at some
11  point to start helping you resolve pieces of the case, whether
12  it's individual parties or groups, you know, however it may be.
13          THE COURT:  The purchase of peace may be a reasonable
14  purchase for some of the defendants in this case.  Also Judge
15  Schenkier will be available to assist in the resolution of any
16  discovery disputes.
17          MAGISTRATE SCHENKIER:  Right.
18          THE COURT:  But given you folks, the quality of the
19  lawyering, I think that aspect will be minimal.  But he will be
20  available to assist you.  We hope we can assist you to get this
21  resolved.
22          All right.  Anything else anybody else has?  All
23  right.  We thank you, all, for your patience.  We thank you for
24  coming in.
25          MAGISTRATE SCHENKIER:  Thanks a lot.

1          MR. McANDREWS:  Thank you, Your Honors.

2          MR. ALPER:  Thank you.

3          THE COURT:  I will look forward to not seeing you on

4    May 10, and I will look forward to receiving that proposed

5    pretrial order number 3 by agreement by May 1.

6          MR. ALPER:  Thank you, Your Honor.

7          MR. McANDREWS:  All right.  Thank you --

8          THE COURT:  All right?

9          MR. McANDREWS:  -- Judge.

10          THE COURT:  Thank you, all.

11       (Proceedings concluded.)

1                C E R T I F I C A T E

2

3

4

5              I, Colleen M. Conway, do hereby certify that the

6    foregoing is a complete, true, and accurate transcript of the

7    proceedings had in the above-entitled case before the

8    HONORABLE JAMES F. HOLDERMAN, Chief Judge of said Court, and

9    the HONORABLE SIDNEY I. SCHENKIER, Magistrate Judge of said

10   Court, at Chicago, Illinois, on April 10, 2012.

11

12

13        _/s/ Colleen M. Conway, CSR,RMR,CRR_        _04/16/12_

14              Official Court Reporter              Date
                United States District Court
15             Northern District of Illinois
                     Eastern Division
16

17

18

19

20

21

22

23

24

25