1            IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3  IN RE:                        ) MDL 2303
                              ) 11 C 9308 and
4  INNOVATIO IP VENTURES, L.L.C    ) related cases
                              )
5  PATENT LITIGATION.             ) January 10, 2013
                              ) Chicago, Illinois
6                              ) 2:07 p.m.
                              ) Status Hearing

7

               TRANSCRIPT OF PROCEEDINGS
8  BEFORE THE HONORABLE MAGISTRATE SIDNEY I. SCHENKIER

9  APPEARANCES:

10  For the Plaintiff         NIRO HALLER & NIRO, LTD.
    Innovatio IP Ventures:     181 West Madison Street
11                         Suite 4600
                         Chicago, Illinois  60602-4515
12                         BY:  MR. MATTHEW G. McANDREWS

13                         McANDREWS HELD & MALLOY, P.C.
                         500 West Madison Street
14                         Suite 3400
                         Chicago, Illinois  60661
15                         BY:  MR. GREGORY C. SCHODDE
                              MR. RONALD "HANK" SPUHLER

16

17  For Plaintiff SonicWALL:    KRAUS FLAMING, LLC
                         20 South Clark Street
18                         Suite 2620
                         Chicago, Illinois  60603
19                         BY:  MR. TODD H. FLAMING

20

21

22

23         TRACEY DANA McCULLOUGH, CSR, RPR
              Official Court Reporter
24            219 South Dearborn Street
                Room 1426
25          Chicago, Illinois  60604
              (312) 922-3716

1  APPEARANCES CONTINUED:

2

3  For Plaintiffs Cosi,            KIRKLAND & ELLIS LLP
   Dominick's, Meijer,             300 North LaSalle Street
   Cisco Systems, Motorola,        Suite 2500
4  and NETGEAR, and a              Chicago, Illinois  60654
   number of hotel defts:          BY:  MR. ADAM R. ALPER
5                                       MR. GIANNI L. CUTRI

6                                  KIRKLAND & ELLIS LLP
                                   333 South Hope Street
7                                  Los Angeles, California  90071
                                   BY:  MR. MICHAEL W. DeVRIES
8
                                   KIRKLAND & ELLIS LLP
9                                  3330 Hillview Avenue
                                   Palo Alto, California  94304
10                                 BY:  MR. ERIC CHENG

11
   For Defendant                   MANDELL MENKES, LLC
12 Dominick's:                     One North Franklin Street
                                   Suite 3600
13                                 Chicago, Illinois  60606
                                   BY:  MR. STEVEN P. MANDELL
14

15 For Plaintiff Hewlett-          ICE MILLER
   Packard Company:                200 West Madison Street
16                                 Suite 3500
                                   Chicago, Illinois  60601
17                                 BY:  MS. JENNIFER M. DIENES

18
   For Counter-Claimants           HOLLAND & KNIGHT, LLP
19 Meijer, Inc., and               131 South Dearborn Street
   Accor North America:            30th Floor
20                                 Chicago, Illinois 60603
                                   BY:  MR. STEVEN E. JEDLINSKI
21

22

23

24

25

1          THE CLERK:  11 C 9308, In Re:  Innovatio IP Ventures,

2   LLC, Patent Litigation, status.

3          THE COURT:  Good afternoon, everyone.  Why don't we

4   have a roll call.  Starting with plaintiff.

5          MR. McANDREWS:  On behalf of plaintiff Innovatio,

6   Your Honor, Matt McAndrews of Niro Haller.

7          MR. SCHODDE:  Greg Schodde, Your Honor.

8          MR. SPUHLER:  Hank Spuhler from McAndrews also on

9   behalf of Innovatio.

10         MR. DeVRIES:  Good afternoon, Your Honor.  Mike

11  DeVries from the law firm of Kirkland & Ellis on behalf of

12  Cisco, Motorola, Netgear, and a variety of other defendants.

13  With me today here is Adam Alper, Gianni Cutri, and Eric Cheng.

14         MR. FLAMING:  Good afternoon, Your Honor.  Todd

15  Flaming, Kraus Flaming on behalf of SonicWall.

16         MS. DIENES:  Good afternoon, Your Honor.  Jennifer

17  Dienes of Ice Miller on behalf of Hewlett Packard.

18         MR. JEDLINSKI:  Good afternoon, Your Honor.  Steve

19  Jedlinski on behalf of Accor North America.

20         MR. MANDELL:  Good afternoon, Your Honor.  Steve

21  Mandell on behalf of Dominick's.

22         THE COURT:  Hello everybody.  Happy New Year to all.

23  I took a look at the agenda for the conference.  I have the

24  motion that's based on the joint statement.  Perhaps at the

25  outset, though, you could let me know what happened before

 1  Judge Holderman this morning.

 2          MR. ALPER:  Sure.  Yes, Your Honor.  This morning we

 3  talked about --

 4          THE COURT:  If I could ask you to make sure you

 5  identify yourselves so the court reporter attributes the right

 6  people to the right comments.

 7          MR. ALPER:  Absolutely.  This is Adam Alper for

 8  defendants.  This morning we talked about a number of deadlines

 9  on the schedule.  First, plaintiff's deadline for final

10  infringement contentions was set for February 8th.  HP and

11  SonicWALL put on the record a few discovery deadlines for their

12  technical productions that will occur prior to those dates, or

13  to that date.  So that was the first thing that we did.  We

14  then set dates for damages contentions.  The plaintiff's

15  damages contentions are due on February 28th.  And the

16  defendants' responsive contentions are due on March 21st.

17          And --

18          THE COURT:  Is the response as to damage or to the --

19          MR. ALPER:  Damages contentions.

20          THE COURT:  Okay.  So when is the responsive

21  statement in connection with the infringement?

22          MR. ALPER:  We didn't change that date.  So they're

23  currently due --

24          MR. SCHODDE:  February 28th.

25          MR. ALPER:  -- February 28th.

```
 1              THE COURT:  All right.

 2              MR. ALPER:  And then lastly, we confirmed that the

 3    current discovery deadline is going to remain.  I think it's

 4    March 4th.

 5              THE COURT:  Okay.  You agree that's what happened?

 6              MR. SCHODDE:  That's fairly a succinct summary, Your

 7    Honor.

 8              THE COURT:  Okay.  There were a couple of consent --

 9    then we'll move into the agenda.  There were a couple of

10    consent orders that were submitted.  I've signed those.  Those

11    will be entered.  So that takes care of the first item on the

12    agenda.  Let me flip, if I can, to the fourth item, and that is

13    the private sniffings that are ongoing.  And I gather they are

14    still ongoing.

15              MR. DeVRIES:  That is correct, Your Honor.  We

16    have --

17              THE COURT:  Mr. DeVries.

18              MR. DeVRIES:  I'm sorry.  My name is Mike DeVries.

19    And we are making significant progress with completing the

20    sniffs.  By the Court's order they provided us with a list a

21    few weeks ago of all the locations they'd like to sniff.  Since

22    that time, including some from prior to when they found --

23    provided that list.  We've completed essentially two dozen,

24    almost two dozen sniffs.  We have seven more on calendar for

25    the next eight days.  And with respect to our clients, we think
```

1    that we're going to be completed with everything that they've

2    asked for within approximately the next 10 or 11 days.  We're

3    doing some final scheduling right now.  But we've been in some

4    instances double tracking.  We've been making significant

5    progress and haven't found any impediments.

6            And what we -- there were a couple of odds and end

7    issues that we are continuing to discuss.  What we thought

8    would be the right approach is if it's okay with Your Honor,

9    we'd ask Your Honor to set a hearing.  It could even be a phone

10   call if that was more convenient for Your Honor for

11   approximately two weeks from now or at whatever time would be

12   convenient for Your Honor.  And if any of those kind of

13   straggling issues have not been resolved, by that point that

14   would give us an opportunity to bring them to Your Honor.  But

15   right now I don't believe that we're at issue with respect to

16   anything in particular, and we've mostly kind of resolved

17   everything that's come up.

18           THE COURT:  All right.

19           MR. SPUHLER:  Yes, I think that's fair to say that

20   we're not at issue.  Mike and I are probably becoming

21   self-proclaimed sniffing experts.  I don't know where that's

22   going to get us in the future, but as we continue these sniffs,

23   we're learning the process, seeing the issues.  And there may

24   be a couple redos in light of things that have popped up, but I

25   think we're going to be able to resolve those.

1            THE COURT:  All right.  Well, in terms of setting

2   some date to address that issue, why don't we put that at the

3   back of the hearing, and then we'll see what other dates we've

4   set, and then we can talk about it.  Okay.

5            MR. SPUHLER:  Yes, Your Honor.

6            THE COURT:  All right.  Why don't we discuss the

7   third item on the agenda, and this is the production of

8   inventory information for what are labeled with quotes

9   representative locations.  Go ahead.

10            MR. SPUHLER:  Going unopposed I guess.  By the way,

11   I'm sorry, Hank Spuhler on behalf of Innovatio.  So to give you

12   a little background, Your Honor, this all started in the

13   October/November time frame when we started to get some

14   inventory information from some of the defendants.  At that

15   time Innovatio and some of the larger network operators entered

16   into a consent order whereby the parties agreed to provide

17   inventory information to the extent that they maintained it in

18   the ordinary course of business.  And if not, Innovatio then

19   had the right to ask for a reasonable number of locations.

20   Even if that meant that they had to go on site and do an

21   individualized inventory.

22            After the parties entered into that consent order, we

23   then took that and used that as a framework for other

24   defendants.  For example, we went to Accor and said would be

25   willing to agree to a similar consent order.  For the most part

 1    they were.  We had to tweak a few items.  And one of the items

 2    was this representative issue.  Companies like Accor and

 3    Panera, maybe some of the mid-sized defendants typically don't

 4    maintain this type of detailed inventory information for all of

 5    their locations.  They objected to providing it across the

 6    board.  And so what we agreed to was a small number of

 7    locations, maybe one, maybe three just so we can keep the ball

 8    rolling for purposes of the infringement contentions.  And then

 9    the parties could come back and discuss what is a reasonable

10    number for the remainder of the case.

11          Innovatio's position is as part of our proof,

12    obviously we can't prove infringement of the tens of thousands

13    of locations that the defendants maintain throughout the United

14    States.  So our hope is to take a control group, and we've

15    identified the Northern District of Illinois, try to identify

16    the locations in the Northern District, the inventory for those

17    locations.  We can go out then and randomly select a portion of

18    that control group and then go out and sniff those locations,

19    and then apply our findings and try to extrapolate that to

20    similarly situated locations throughout the United States.

21          And our concern right now is simply that without that

22    information up front, we may go through this process of

23    identifying the quote, unquote representative locations only to

24    then have the defendants come back and say, you know, for

25    example, the Panera that you chose doesn't have any -- doesn't

1    use any company owned terminal devices.  And so because of that

2    it was inappropriate.  And as a result, all the time that you

3    spent attempting to prove your infringement was for naught.  So

4    we just want some insight on the front end.

5            MR. DeVRIES:  Your Honor, I must confess I'm not sure

6    what exactly it is that Innovatio's requesting.  And I will

7    note for only one reason that we never saw this request.  I

8    mean, this is our firm on behalf of the vast majority of

9    defendants in the case, until the night the agenda was due.

10   And that's not meant to be an attack in any way.  It's just to

11   say that this is a new request that came to our attention.  We

12   had previously entered into a consent order that required us to

13   provide certain inventory information, and we submitted for the

14   remaining defendants that we represent another consent order

15   attached as Exhibit A to the agenda, which you're signing, that

16   provides for inventory information.  And there hasn't been any

17   suggestion to my knowledge that our inventory productions are

18   inadequate.

19           What I understand Innovatio is suggesting is that for

20   20 locations they would like us to go and provide MAC address

21   information for all wireless devices at that location.  That's

22   what I understand they're actually asking Your Honor to order.

23           THE COURT:  Well, is that what you're asking me to

24   order?

25           MR. SPUHLER:  Ideally that's what we would like.  If

1    certain defendants come back and say that's too burdensome, at

2    a minimum what we would like is simply an inventory list.  We

3    would like to know whether or not -- let's say, for example,

4    Panera.  Not every Panera location has company owned terminals.

5              THE COURT:  What is the difference between that

6    second level list that you just described and the inventory

7    that's in paragraph 1 of the consent order I just signed today?

8              MR. SPUHLER:  Is that Exhibit A?

9              THE COURT:  Yes.  Which says that the defendants

10   described in Exhibit A, which I take it are mostly Mr.

11   DeVries'.

12             MR. DeVRIES:  Yes.

13             THE COURT:  Quote, by January 15th, provide an

14   inventory of all 802.11 or CQ wireless equipment including

15   access points, terminals, et cetera, et cetera.

16             So the second level, the alternative inventory you

17   described, how is that different than what's set forth in

18   paragraph 1 of the order that I have signed?

19             MR. SPUHLER:  Initially for the 20 locations we would

20   only need the make and the model.  We just need to know whether

21   or not Panera uses company owned terminal devices.  We then

22   have a random --

23             THE COURT:  Well, I'm trying to figure out, though,

24   is that make and model part of the inventory information that

25   would be provided under paragraph 1 of this order?

1          MR. DeVRIES:  So, Your Honor --

2          THE COURT:  Can you say yes or no?

3          MR. DeVRIES:  The answer is -- oh, the answer to that

4    question is no, I can't, and here's why:  The inventory

5    information that's maintained by this large number of different

6    companies is variable.  And what I mean by that is some

7    companies keep very very detailed inventory lists that down to

8    the piece of equipment level could tell you lots of the

9    information they are looking for.  And when we have that

10   information, we've readily given it to them.  In some

11   circumstances the inventory information is less detailed.  In

12   certain circumstances companies for certain of their devices

13   don't maintain an inventory at all.

14          So what we've done is provided in every instance, and

15   we're in the process of, to be clear, with some of these

16   defendants the inventory information that's readily available.

17   We have run into situations in the context of this sniffing

18   where they wanted more insight into what kind of devices were

19   there.  So we sniffed a million square foot distribution center

20   in Walmart in Spring Valley.  I think I've got the city right

21   in Illinois.  And we provided them in advance of that a

22   description of the types of wireless devices that were there.

23          What I understand them to be asking now is for a

24   Court order requiring us to provide a far -- potentially at

25   least, because if we have it, we'll give it to them, but a far

1   more detailed item by item inventory that includes, for

2   instance, and this is the biggest problem, MAC address

3   information.  For us to provide the MAC address for every

4   wireless device in a million square foot facility could easily

5   take days to do for that one facility.  And we hadn't met and

6   conferred about this before between the two hearings because

7   this hadn't been raised before.

8           Mr. Spuhler said to me he understood and we could

9   likely reach an agreement that would not require providing that

10  inventory information where we were -- if we were to, for

11  example, agree that all the equipment at the location was ours.

12  That that would obviate the need for that.  And so my

13  suggestion to Your Honor is that we have consent orders that

14  are in place.  This is the type of information that we should

15  be meeting and conferring about certainly before asking for a

16  blanket order.  And that it's going to be really kind of a case

17  by case thing.  Because if we already have the information,

18  there's not a dispute.

19          If we can go and assemble it, it either will be sort

20  of not very burdensome if we're only talking about a small

21  number of devices, or it could be incredibly burdensome.  And

22  so we would request that we sit tight with the consent orders

23  we have.  We don't have any disputes with them.  And that we

24  continue to have the discussions like we had at the lunch

25  break.

1          MR. SPUHLER:  If I may, Your Honor.  One of the

2     reasons why it wasn't addressed with Kirkland & Ellis is

3     because, as Mike mentioned, a lot of the larger entities

4     already have this information.  When it comes to Accor, when it

5     comes to Caribou, when it comes to Panera, they don't maintain

6     this information.  So you were asking would the production

7     that's coming forth on January 15th address the issue?  My

8     answer or my belief is no.  And that is based on prior

9     production from Accor, from Panera, from Caribou where they say

10    corporate headquarters may have some information regarding the

11    access points at those locations, but it's unlikely that we may

12    have, you know, individualized location by location information

13    for terminals.  And Innovatio and those parties have exchanged

14    multiple versions of consent orders.  We've run this issue to

15    ground.  We think it's time to address it.

16          THE COURT:  Well, it's kind of new to me.  And I

17    don't see -- when you say you've run it to the ground, I don't

18    know that you have run it to the ground.  I mean, under this

19    consent order that I signed concerning Accor, they're going to

20    produce the inventory tomorrow, right, January 11th.  And it

21    says that this is going to list the model, manufacturer,

22    location, any unique identifiers, et cetera, et cetera.  That's

23    readily available.  Now, I don't know that you've talked with

24    Accor.  Because if they're going to produce this tomorrow, I

25    would think that they have some idea of what they're producing

1     and what information it's going to have in there and what's not

2     going to be in there. So I don't know why we would be

3     speculating. Why don't we find out.

4           MR. JEDLINSKI: Again, Your Honor, Steve Jedlinski

5     for Accor. Exactly what the consent order we've been willing

6     to agree to produce is to do it -- to actually go to the hotels

7     and actually figure out the MAC addresses, the SSID

8     information, and what not for those three locations. Obviously

9     it would be a lot more burdensome to go into each Accor hotel

10    in the Northern District of Illinois trying to find out this

11    information because Accor does not maintain this in its normal

12    and ordinary course of business.

13          MR. SPUHLER: And I expect to get the information

14    that we're looking for for those three locations. Part of the

15    issue is from a statistical standpoint you need to do a random

16    sampling of a control group. And so we need that information

17    up front for more than three locations. And so the issue is

18    not really are they going to be able to provide us the specific

19    information, but for how many locations can they provide it.

20          THE COURT: How many different locations are there in

21    the Northern District?

22          MR. JEDLINSKI: I think the number is about 20.

23          MR. SPUHLER: Yes, it's just over 20. I've been

24    dealing with multiple defendants, so I can't state specifically

25    with the Court. But I think for Accor, Panera, and Caribou

1   they're all around that 20 range.

2          THE COURT:  So when you say no more than 20, I mean

3   that's functionally all of their locations in the Northern

4   District, which isn't a sample of their locations in the

5   Northern District, right?

6          MR. SPUHLER:  Well, to the extent it's more, and then

7   for a company like Starbucks, you know, there are some

8   defendants that have significantly more than 20.

9          THE COURT:  Right now we're talking about Accor.

10          MR. SPUHLER:  Yes.

11          THE COURT:  Okay.  Why 20?  Why not 5?  Why not 3?

12   Why not 7?  I don't know how you pick the number.  I don't know

13   what the threshold that you think is for statistical

14   significance.  I know what they say.  You know, are you talking

15   with some expert?  Is there some expert who is providing that

16   information?  I'm not aware of that.  You want to impose, you

17   know, what may be a significant burden, you know, on them to

18   develop the information.  And I don't know to what end.

19          MR. SPUHLER:  So to clarify, we have retained an

20   expert, and we've been working with him.  I don't, I don't

21   believe that it really is that burdensome for them to simply

22   identify --

23          THE COURT:  Nobody ever thinks that somebody's else

24   task is burdensome.

25          MR. SPUHLER:  Fair enough.

1            THE COURT:  That's what I've observed.

2            MR. SPUHLER:  But at this point it --

3            THE COURT:  Would you like to pay for their efforts

4    to do it?

5            MR. SPUHLER:  To identify company owned terminals?  I

6    don't know what would be involved.  It seems like it would be a

7    simple inquiry.

8            THE COURT:  You just told me it's not burdensome, so

9    it shouldn't be much involved.

10           MR. SPUHLER:  If it's a simply inquiry of identifying

11   whether or not they have that type --

12           THE COURT:  Then you'd be willing to pay for it?

13           MR. SPUHLER:  I'm sure we would consider that.

14           THE COURT:  But what if it's a very complicated thing

15   and takes days and days?  You willing to pay for that?

16           MR. SPUHLER:  I can't commit my client to pay for it

17   now, but I don't think it will.  It's simply identifying --

18           THE COURT:  No, but what I'm saying is that -- the

19   point is if it's not a significant burden, you shouldn't have

20   to pay it, because in the normal course, you know, that's what

21   people have to do.  But if it's going to be a significant

22   burden, then you're saying I'm not committing my client to pay

23   for that.  But if it's so important that they should be put to

24   that significant burden, if it is such, why wouldn't your

25   client pay for it?

1          MR. SPUHLER:  I'm sure it's something that we'd

2     consider.  At this point it's a case --

3          THE COURT:  So why don't you all consider that.  Why

4     don't you talk about this some more.  Figure out what's

5     actually going to be produced, what you think you really need.

6     Then you come back to me with a more refined issue, because I'm

7     not in a position to rule on this right now.  I don't really

8     know what the burden is.  You haven't really explained that.

9     You've told me it will take days.  I don't know why.  I don't

10    know if it's so hard to find out for a particular device or

11    it's simply because some locations may have so many devices

12    that it's just going through hundreds and hundreds or

13    thousands.  I just don't know what the basis for that is.  So

14    you haven't really given me the tools yet to make that

15    decision.

16         MR. DeVRIES:  Well, we'll work with them in good

17    faith, Your Honor, to work this out.

18         THE COURT:  And work fast.

19         MR. DeVRIES:  And we'll do it fast.

20         THE COURT:  And work fast.  I mean, you're going to

21    get inventories tomorrow and Tuesday, right?

22         MR. SPUHLER:  And I think that will assist us with

23    meeting our deadlines.

24         THE COURT:  And that should assist you in figuring

25    out what it is you really think you need.  Talk specifically

1    about that and what you want, and you can then discuss what

2    that involves.  And maybe you can reach some agreement on how

3    to do that and who pays for that or cost sharing.  You know,

4    there are different ways of doing it.  I can give you the

5    considerations, but I don't have the data right now to apply

6    the considerations.  Okay.

7              MR. DeVRIES:  Yes, Your Honor.

8              THE COURT:  So why don't we then move to the motion

9    to compel discovery, which is the last item, last remaining

10   item on the agenda.  I've taken a look at the joint statement.

11   I'm happy to hear what anybody would like to add.

12             MR. SCHODDE:  Sure, Your Honor.  Greg Schodde for

13   Innovatio.  First just in case there's any confusion, we're not

14   seeking their back and forth correspondence, their course of

15   negotiation.  The requests on their face, and if it wasn't

16   clear in the briefing, I thought it was, or in the joint

17   statement, we just want that notice letter or that demand

18   letter regarding a patent claim or a demand, whether they sent

19   it or they received it.  And we've got two I think these are

20   independent grounds for seeking these.

21             And I'm going to go to the second one first because I

22   think it may actually be more compelling.  Your Honor may be

23   aware that the defendants have filed a RICO counterclaim, which

24   to a large extent is based on Innovatio's practices with

25   respect to notice letters that it had sent.  And some of the

1   practices that they've identified in that pleading are things

2   like whether or not there's a duty to disclose, for example,

3   the expiration dates on patents or whether the patents were

4   prior -- previously licensed to anyone, whether there might be

5   potentially an exhaustion defense available.

6           I think the industry practice in general is not to

7   discuss potential defenses that may be applicable in a notice

8   or demand letter.  I think the ones that they've gotten and the

9   ones that they have sent out will tend to show that.  They've

10  also made FRAND obligation claims, fair, reasonable, and

11  nondiscriminatory licensing obligation claims.  And some of

12  these patents may be subject to obligations made to standard

13  setting bodies where you commit to license on reasonable and

14  nondiscriminatory terms.  I believe that these defendants in

15  this industry have from time to time made and received RAND or

16  FRAND demands.  I think those notice and demand letters

17  containing those demands and those rates will tend to show what

18  FRAND and RAND rates might be or at least what a range of

19  negotiation might be over RAND rates.

20          So that's I think one prong for ruling that these are

21  certainly at least discoverable.  And the other is to the

22  hypothetical negotiation.  Even without their counterclaim,

23  what rates are being paid, what portfolio rates are being

24  offered, I think tends to bond the hypothetical negotiation.  I

25  would agree necessarily it doesn't necessarily state what the

1  ultimate outcome would be.  But I think if you're going to talk

2  about a hypothetical negotiation, I think you can at least

3  start with bid and ask.

4        THE COURT:  But why is it relevant if it didn't

5  result in a license?

6        MR. SCHODDE:  I think it informs the negotiation as

7  to what opening bid --

8        THE COURT:  I didn't think it did when we were

9  talking about those between your client and others.

10        MR. SCHODDE:  Although, Your Honor, to be fair, we

11  never said we wouldn't produce our notice and demand letters.

12  And, in fact, we did.  There was never any dispute about that.

13  The dispute was over any subsequent Rule 408 type settlement

14  discussions.  And we never -- we did not argue that they

15  weren't relevant or potentially discoverable.  It was just in

16  the context of this case in terms of managing discovery that we

17  didn't think they should be -- there should be a seat at the

18  settlement table, if you will, for the defendant.  So that was

19  a different, a different basis for that.  We're not taking an

20  inconsistent position here I don't believe.

21        But factor 15 in the Georgia Pacific analysis is the

22  hypothetical negotiation.  And I think to the extent that you

23  can show what the industry ranges are, that informs the

24  hypothetical negotiator at least in terms of being probative of

25  what the range of royalty might be.

1          THE COURT:  I'm sorry.  Has Innovatio produced demand

2   letters with respect to third parties where there was not

3   ultimately a license or settlement agreement reached?

4          MR. DeVRIES:  My understanding is that they have.

5          THE COURT:  Okay.  Is that something that was within

6   the scope of what you asked for?

7          MR. DeVRIES:  The scope of our request, as I recall,

8   was all of their licensing correspondence with respect to

9   patents in suit, so yes.

10         THE COURT:  So even if it didn't result in a license?

11         MR. DeVRIES:  That's correct.

12         THE COURT:  Okay.  So it is within the scope of what

13  you asked for?

14         MR. DeVRIES:  Well, I wouldn't put that it way

15  because --

16         THE COURT:  I know.  I just did, though.

17         MR. DeVRIES:  Well, because here's the -- and if

18  you'll bear with me, Your Honor.  What we're really talking

19  about here is actually quite a narrow subset of documents,

20  because we've agreed to produce the notice and demand letters

21  that underlie the licenses.  So all we're talking about are

22  notice and demand letters that we have frankly in large part

23  received and if there are any that we've sent.  Okay.  But

24  mostly --

25         THE COURT:  No, I understand.  54 is the send and 55

1   is the received I think.

2          MR. DeVRIES:  That's right.  And as a practical

3   matter given the way that our clients are structured, these are

4   almost in virtually every instance something that we've

5   received.  Okay.  And so unlike their own notice and demand

6   letters where the owner of the patent is saying something about

7   the value of the patent, which I think is sort of indisputably

8   relevant to damages, here we're talking about another patent

9   owner on a different patent telling us that we need to pay X

10  dollars.  And I think under the precedent there's just no way

11  that's relevant to any damages issues in the case where there's

12  no license agreement.

13         THE COURT:  Well, it seemed to me looking at the

14  letter, the joint statement that there were a couple issues.

15  One is whether this should -- there should be production with

16  respect to demand or notice letters that did not result in

17  license agreement or settlement.  A second -- I couldn't tell

18  if there was a dispute as to the time frame.  I think that the

19  10 years got reduced to 6 years.  And I don't know if there was

20  any more dispute about that.  That was a little bit unclear.

21         MR. DeVRIES:  I don't think there's a dispute that is

22  separate and apart from the others.

23         THE COURT:  All right.  So the six-year period is not

24  the issue?

25         MR. DeVRIES:  Yes, Your Honor.

1        THE COURT:  And then the third issue or second issue

2   now that we've eliminated the time period was I guess some

3   difference of opinion or interpretation about what is it that

4   was being offered, because I think you talk about demand and

5   notice letters that use -- concerning technology that uses the

6   wireless, and I think the plaintiff's formulation was that it

7   relates to the wireless.  And so it wasn't clear to me how

8   significant that dispute was or disagreement was and whether

9   the difference in that language drops to the bottom line.

10       MR. SCHODDE:  Yes, I -- if I may, Your Honor.  Greg

11  Schodde.  I think both the time period and the scope of the

12  notice and demand particularly for defendants that might be

13  involved in other industrial products besides wireless

14  communications equipment, devolves to a burden issue.

15       THE COURT:  I don't want to talk about time period

16  because he's just said that he doesn't object to six years

17  independently.

18       MR. SCHODDE:  Sure.  But I would categorize it the

19  same way in terms of being an issue of burden.  Is it

20  burdensome for them to go out and get all the notice and demand

21  letters they have --

22       THE COURT:  Well, we don't worry about burden unless

23  we first decide that something actually is relevant.  And so

24  the question is is something -- a demand letter concerning

25  technology that doesn't use wireless, is that relevant here?

1  Because I don't know exactly what the boundary is for

2  technology that relates to wireless.

3         MR. SCHODDE:  Sure.  I'm going to give you an

4  example.  In their brief they talk about encryption and how

5  Cisco has got a patent on encryption.  If that patent is -- I

6  think in their view they're saying that if they got a demand

7  letter related to that patent, for example, it's their own

8  patent in this case, but let's say Cisco sent it to Motorola

9  and said we demand that you pay us on fair, reasonable, and

10 nondiscriminatory terms a license royalty of 2 percent on this

11 encryption patent.  If they're aiming that patent at cars, I

12 think we have room to agree that that's -- they can exclude

13 that demand letter from our collection.

14        But if that patent is being aimed at a mobile

15 wireless device like a cell phone or a laptop or an 802.11

16 device or a 3G or a 4G device, then I would say that's in the,

17 in the area at least, and we should at least be able to

18 consider whether it's ultimately probative of FRAND or RAND

19 licensing ranges in the lawsuit.

20        I think the formulation that I hear from my

21 colleagues is that, well, it's encryption, so that's not 802.11

22 specifically.  So even though it might go into an 802.11

23 product, we're going to not give you that notice and demand

24 letter.  I'd rather not make those sort of relevancy

25 determinations now.  I think that's better preserved for the

1    experts and for trial.  I think we should draw that circle more

2    broadly.  Get the notice and demand letters and go from there.

3    And again, that all relates to the hypothetical negotiation

4    prong.  It doesn't speak to the other reason we think that it's

5    relevant, which is I think they've put it into play.

6             MR. DeVRIES:  I'm sorry.

7             THE COURT:  Is his interpretation of how you would

8    limit things correct, using the example he did for encryption?

9             MR. DeVRIES:  Right.  So I have to confess that I'm

10   not certain exactly now what their position is because in

11   their --

12            THE COURT:  I'm not certain what your position is

13   because you're not answering my question.

14            MR. DeVRIES:  Right.  So the short answer is this:

15   The primary dispute --

16            THE COURT:  No, the short answer is yes or no.  Yes,

17   he accurately characterized what -- how we would draw the line.

18   And if we're talking about an encryption patent that's going to

19   apply to wireless, you would still keep it out because it's not

20   a wireless patent?

21            MR. DeVRIES:  No, that's not how I would characterize

22   our position.

23            THE COURT:  Okay.  So the hypothetical that Mr.

24   Schodde described, in that situation if you had to produce

25   notice letters that fell within that definition, would that

1    notice letter be produced?

2           MR. DeVRIES:  So the issue that I don't understand is

3    if whether that notice letter was indicating that wireless

4    devices were the accused device or not.  And so I think what

5    he's saying is that really many many technologies that don't on

6    their face relate to wireless could conceivably relate to

7    wireless, so that the notice letter regardless of what it says,

8    whether it says your 802.11 products infringe or your ZigBee

9    products infringe, that those are lines that are too fine to

10    draw.  And I don't agree with that because I think that that

11    standard could lead to a situation where with a company like

12    Cisco that's selling billions and billions of dollars worth of

13    diverse technology products all over the world, we're really

14    starting to talk about every notice and demand letter that

15    we've ever received even if it didn't lead to a license.  And

16    those, those letters couldn't possibly be relevant to damages.

17           THE COURT:  What about the issue of the counterclaim?

18           MR. DeVRIES:  So here's our thought about that, Your

19    Honor:  I think there are two different categories of documents

20    to keep in mind.  One are the letters that we've received and

21    then the letters that we've sent.  In terms of the letters that

22    we received, those letters we think are not at all relevant to

23    our counterclaims.  Our counterclaims have to do with the

24    licensing practices of Innovatio and its agents.  And so what

25    some other patent owner does when sending us a letter either

 1  exonerates their conduct or says it's okay, maybe they're all

 2  doing the same thing.  But there's also another thing --

 3          THE COURT:  So you want me to make a determination

 4  that that evidence would never be relevant at trial?

 5          MR. DeVRIES:  That's correct.

 6          THE COURT:  I'm not going to make that determination.

 7          MR. DeVRIES:  Well, here it's, it's -- maybe I should

 8  put it then slightly differently.  It's that --

 9          THE COURT:  Because you see that that one didn't

10  work.

11          MR. DeVRIES:  But what we're really talking about is

12  opening up a scope of discovery that really has nothing -- it

13  couldn't possibly relate to our counterclaims.  And under any

14  scenario --

15          THE COURT:  See, you keep saying that.  But I guess

16  I'm a little more skeptical about that.  You know, for

17  instance, in the joint statement you say, you know, there is no

18  basis to believe that the supplier defendants have engaged in

19  conduct that they accuse Innovatio of with respect to what

20  you've described as to the intimidating nature of the letters,

21  the misleading nature.  Of course, how would I know that?  You

22  know, you're asking me to make an assumption that there's

23  nothing in those letters that would show that what they do is

24  par for the course and perhaps not misleading because it's not

25  expected that certain information that you're saying they

1    should have put in is routinely put in.

2         You know, you may be right about what their letters

3    say or, you know, the conclusion you would draw from that.  I'm

4    not at all, you know, making any kind of rulings or suggestions

5    about that.  But to say that, well, you know, they have to make

6    a prima facie showing this is what our letters say before they

7    get to see what our letters say, that seems to me to put, you

8    know, it backwards.

9         MR. DeVRIES:  May I clarify something?  Because I was

10   actually talking about a different set of documents.  And I

11   want to see --

12        THE COURT:  You were before, but I was going back to

13   what you said in the joint statement.

14        MR. DeVRIES:  Right.  Well, and so I do -- I mean, in

15   my experience these kinds of requests where you said we've done

16   something wrong so we kind of want to see every instance where

17   you might have done something wrong, can lead to a scope of

18   discovery that can be very unwieldy.  But I mean, I can say

19   this to Your Honor.  We don't think that there's any reason to

20   think that there's anything there.  But if that's a sticking

21   point or you feel like they need to see these things first, we

22   can produce them.  We have nothing to hide there.  I do think

23   it's a fishing expedition.  I think it's a kind of a scope that

24   is really kind of beyond what might normally be considered

25   discoverable.  But we can provide those, although we do think

1    it's a fishing expedition.

2            When we're receiving letters from other companies, I

3    really think that's the realm where, you know, they couldn't

4    say, well, look, you're doing it too.  What they'd really be

5    saying is, well, someone else out there in the world not you is

6    doing that.  And it could really be this sort of large volume

7    of documents, and it just doesn't seem to have any relevance.

8            THE COURT:  Let's say you got letters that were sent

9    to the various defendants.  How would you use that to show

10   industry practice?

11           MR. SCHODDE:  We would show them -- we would use

12   them to show that no one explicates affirmative defenses that

13   the target might have in their notice and demand letter.  I

14   think that's --

15           THE COURT:  But how would those --

16           MR. SCHODDE:  That, in fact, is the issue, Your

17   Honor.

18           THE COURT:  I understand you might have letters that

19   you hypothetize that would be the case.  Maybe the letters

20   don't show that's the case.  But let's assume that you got some

21   number of letters that fit the description that you would

22   hypothetize.  How would you show that that is actually proof of

23   the industry practice?  How do we know whether that's

24   representative?  I mean, in the end if you're going to try to

25   prove industry practice, aren't you going to have an expert on

1       what industry practice is?  And isn't the expert going to, you

2       know, do investigation on his or her own behalf to figure out

3       what the industry practice is and discuss standards?

4               I mean, this -- I could see potentially this being a

5       quite cumbersome way of trying to get certain information that

6       would be incomplete in the end anyway.

7               MR. SCHODDE:  I think in the end, Your Honor, if I

8       may respond, I'll take the last part first.  My colleague Mr.

9       DeVries I think has already said that they don't consider this

10      a particularly -- this request, notice and demand letters to be

11      unwieldy or unduly burdensome.  I thought I heard that.  So I

12      don't think we're talking about a blooming expansion or some

13      exercise that's going to consume enormous resources.  At least

14      I haven't heard that argument from my colleague yet.

15              But in terms of your expert, he's got to have some

16      information to form the basis for his opinion.  The defendants

17      in this case by themselves constitute a large fraction of this

18      industry.  And as they've said, they do probably get more of

19      these than they've actually -- than they've sent out on

20      balance.  So I think between the five of them we'll end up with

21      a fairly good collection from which we can establish that, yes,

22      this is really how it goes in the notice and demand space in

23      this industry.  Because the industry is here.  Cisco, Motorola,

24      Netgear, these are the major players in this space.

25              So I think that by getting these produced we'll have

1   a good collection of notice and demand letters to say, yes,

2   this is how the industry works.

3           MR. DeVRIES:  I wouldn't agree.  Here's why, and I

4   don't --

5           THE COURT:  I don't know which part you wouldn't

6   agree with.

7           MR. DeVRIES:  I'll explain.  What we've alleged in

8   our counterclaims is not that Innovatio has gone out to the

9   suppliers of the accused devices.  In fact, we've alleged

10  something very different.  They've gone out to consumers of the

11  devices who don't have the knowledge about what's going on.

12  And so if they -- I don't, I don't concede that this would be

13  relevant evidence.  If they want to say that going after

14  consumers who may have already licensed devices and not telling

15  them that the device might be licensed is industry practice,

16  going to the suppliers of the products like us and seeing what

17  letters we get is not going to get them there.

18          What they might have to do is go to the corner coffee

19  shops and, you know, health care nonprofits and the other kinds

20  of companies that they've gone to with their own licensing

21  demands to see whether when they received the kind of letters

22  that Innovatio sends, the patent owner doesn't tell them about

23  the defenses or the reasons that they may not owe the money

24  that's being demanded.  So I actually think that the situations

25  are different and in a material way.

1          MR. SCHODDE:  And again, Your Honor, to respond to

2     Mr. DeVries talking about probative weight, relative value, not

3     discoverability.  That's their argument.  I think --

4          THE COURT:  Tell me what the burden is.

5          MR. DeVRIES:  Your Honor, I think that there was some

6     burden associated with obtaining these, making sure that

7     they're complete, figuring out which relate to that, and I

8     can't -- you know, I don't think it would be insanely

9     burdensome to do not like the MAC address thing.  I think that

10    there is work associated with it, and it's -- but it's not

11    something that I can say it's going to take us weeks to do.

12         THE COURT:  All right.  How did you pick six years?

13         MR. SCHODDE:  It was an effort to compromise, Your

14    Honor.  I really would prefer 10.

15         THE COURT:  I'm sure you would.

16         MR. SCHODDE:  But if -- you know, if Your Honor wants

17    to impose limits --

18         THE COURT:  I'm going to order three.

19         MR. SCHODDE:  -- we'll impose them --

20         THE COURT:  I'm going to order three years.  But I'm

21    not going to limit it to consummated agreements.  I'm not going

22    to limit it to only what uses the wireless.  I'm going to use

23    the plaintiff's formulation.

24         MR. SCHODDE:  Thank you, Your Honor.

25         MR. DeVRIES:  Thank you, Your Honor.

1          THE COURT:  How long would it take you you think to

2   produce that?  You want go back and consult about that and try

3   to agree on a time frame to do it?

4          MR. DeVRIES:  I'd appreciate that.  I don't think --

5          THE COURT:  I don't want you to shoot in the dark on

6   it.

7          MR. DeVRIES:  Right.  I'd appreciate that.  But I

8   don't -- I think we could do it relatively expeditiously within

9   a matter of a couple of weeks, but I need to confirm.

10          MR. SCHODDE:  Do you want us to call Your Honor for a

11   date for an order, or just agree amongst ourselves?

12          THE COURT:  I think you can just agree among

13   yourselves.  If you want to embody it in a consent order that

14   you submit to me, I'm happy to sign it.

15          MR. DeVRIES:  Yes, Your Honor.

16          THE COURT:  And I'll put into the order today that

17   this is what I'm requiring, and that the parties will meet and

18   confer about a schedule in which to produce the information.

19   Okay.

20          MR. SCHODDE:  Thank you, Your Honor.

21          MR. DeVRIES:  Yes, Your Honor.

22          THE COURT:  All right.  I think that that addresses

23   all of the items on the agenda.  Why don't we go back to the

24   issue about another time to get together.  There was some

25   suggestion about perhaps setting a date in a couple weeks to

1    talk about where you're at with the sniffs and to resolve any

2    other issues about that.  And since we talked about that, we

3    also have this MAC issue.  So maybe we can set a date a couple

4    weeks out where we could take up any issues regarding all of

5    that.  That make sense?

6              MR. DeVRIES:  Yes, Your Honor.

7              THE COURT:  Okay.  So looking at the schedule where

8    these inventories are going to be all produced by the 15th, one

9    of them tomorrow and the others on the 15th, you want to talk

10   about a day the last week of January?

11             MR. DeVRIES:  That works for us, Your Honor.

12             THE COURT:  Is that enough time then to figure this

13   out?

14             MR. SPUHLER:  That should be enough time, Your Honor.

15   The one thing I'm concerned about is that February 8th deadline

16   for contentions.  If we do have issues with the sniffing, we

17   may want to address it before then so we've got ample time to

18   gets the results.

19             THE COURT:  Well, if you want to do it the prior

20   week, we can probably find a date.

21             MR. SPUHLER:  The 24th.

22             MR. DeVRIES:  That works for us too, Your Honor.

23             MR. SPUHLER:  That was the one we had discussed

24   previously.

25             THE COURT:  How about 1:30 on the 24th?

1    MR. SPUHLER:  That's fine, Your Honor.  And then we

2  would have a joint statement or something the Monday prior?

3    THE COURT:  Yes, but you have to make it shorter so I

4  have a chance to read it, or get it in earlier.  But if you

5  want you to do it Monday at noon.

6    MR. DeVRIES:  And we'll make it short, Your Honor.

7    THE COURT:  Okay.  And, you know, if you're able to

8  resolve things, you don't think you need a hearing that date,

9  then you can let us know, but, you know, we'll set the time

10  aside.

11    MR. DeVRIES:  Our hope is that we may not need it, so

12  we'll see.

13    MR. SPUHLER:  Even on the MAC address issue

14  hopefully.

15    THE COURT:  Well, you know, I think that it's

16  important to be optimistic.  There's always time for pessimism

17  later.  All right.  So that's good.  January 24th at 1:30 for

18  the next status and/or motion hearing.  And then if any joint

19  statement is going to be filed, that should be by soon on

20  Monday the 21st.  I know it's a court holiday, but since you

21  all do things electronically, it doesn't matter.  But you'll

22  just deliver it the next morning.  Okay.

23    MR. DeVRIES:  Yes, Your Honor.

24    THE COURT:  All right.  Is there anything else that

25  we should take up today?

1          MR. SCHODDE:  Nothing further, Your Honor.

2          MR. DeVRIES:  Nothing further.

3          THE COURT:  Okay.  Thanks a lot everybody.

4                          CERTIFICATE

5          I HEREBY CERTIFY that the foregoing is a true,

6  correct and complete transcript of the proceedings had at the

7  hearing of the aforementioned cause on the day and date hereof.

8

9  /s/TRACEY D. McCULLOUGH                    January 14, 2013

10  Official Court Reporter                   Date
   United States District Court
11  Northern District of Illinois
   Eastern Division

12

13

14

15

16

17

18

19

20

21

22

23

24

25