IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re INNOVATIO IP VENTURES, LLC PATENT LITIGATION | ) ) ) ) | MDL Docket No. 2303 Case No. 11 C 9308 |
| THIS ORDER APPLIES TO | ) ) ) | |
| CISCO SYSTEMS, INC., and MOTOROLA SOLUTIONS, INC., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 11 C 9309 |
| v. | ) ) | |
| INNOVATIO IP VENTURES, LLC, | ) ) | |
| Defendant. | ) ) | |
| NETGEAR, INC., | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 12 C 427 |
| INNOVATIO IP VENTURES, LLC, | ) ) | |
| Defendant. | ) | |

<u>MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
INNOVATIO'S MOTION TO DISMISS THE DEFENDANT'S AMENDED COMPLAINT
(DKT. NO. 473)</u>

JAMES F. HOLDERMAN, Chief Judge:

Plaintiff and patent-owner Innovatio IP Ventures, LLC ("Innovatio") has sued numerous

hotels, coffee shops, restaurants, supermarkets, and other commercial users of wireless internet

technology located throughout the United States (collectively, the "Wireless Network Users"). (*See*

Dkt. No. 198 ("Second Am. Compl.").) Innovatio alleges that, by making wireless internet available

to their customers or using it to manage internal processes, the Wireless Network Users infringe various claims of seventeen patents owned by Innovatio. (*Id.* ¶¶ 48-81.) Additionally, several manufacturers of the devices used by the Wireless Network Users to implement their wireless internet networks have brought declaratory judgment actions against Innovatio seeking a declaration that the manufacturers' products, and the networks or systems of which those products are a part, do not infringe Innovatio's patents. All claims and parties were consolidated before this court by the Judicial Panel on Multidistrict Litigation in this MDL case, No. 2303. (Dkt. No. 1.)

On October 1, 2012, three manufacturers of the allegedly infringing products, Cisco Systems, Inc. ("Cisco"), Motorola Solutions, Inc. ("Motorola"), and Netgear, Inc. ("Netgear") (collectively, the "Manufacturers"), filed an amended complaint ("Manufacturers' Amended Complaint" or "MAC") against Innovatio, as well as against Innovatio Management LLC ("IM"), a related entity, and Noel B. Whitley, the alleged founder of Innovatio and IM (where the context does not indicate otherwise, the court will refer to Innovatio, IM and Whitley collectively as "Innovatio"). (Dkt. Nos. 431, 442 ("MAC") ¶ 57.) The MAC, which contains fifty-five counts in total, alleges, as relevant here, that Innovatio is liable for fraudulently enforcing its patents against the Manufacturers' customers. Count XLIX alleges violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, based on underlying violations of the mail and wire fraud statutes, 18 U.S.C. § 1341 and § 1343, and violations of 18 U.S.C. § 1951, 18 U.S.C. § 1952, and California Penal Code § 518; Count L alleges violations under California Business & Professional Code § 17200, which prohibits "unfair competition"; Count LI alleges a civil conspiracy; Count LII alleges breach of contract; Count LIII alleges promissory estoppel; Count LIV alleges intentional interference with prospective economic advantage; and Count LV alleges unclean hands. Currently

pending before the court is Innovatio's motion to dismiss each of those counts. (Dkt. No. 473.) For the reasons explained below, that motion is granted in part and denied in part.

## BACKGROUND

The MAC alleges that Noel B. Whitley, a former intellectual property executive at Broadcom Corporation ("Broadcom"), founded Innovatio and IM in February 2011 after leaving Broadcom. (MAC ¶ 57.) Thereafter, on February 28, 2011, Innovatio acquired from Broadcom the rights to a series of patents (the "Innovatio Patents")[1] related to wireless internet technology. (*Id.* ¶ 59.) The patents allegedly cover technology that is necessary to implement the standards of the Institute of Electrical and Electronics Engineers ("IEEE")[2] for wireless local area networking technology ("Wi-Fi"), known among those in the wireless industry as the "802.11 standards." In return for the Innovatio patents, Innovatio granted back to Broadcom a license to the Innovatio Patents and a covenant not to assert infringement of the Innovatio Patents against any products or methods using Broadcom components. (*Id.* ¶ 59.)

Before the transfer to Innovatio, Broadcom had acquired some of the Innovatio Patents from other entities, including Intermec IP Corporation, Intermec Technologies Corporation, and Norand Corporation. (*Id.* ¶ 60.) Each of those entities, as well as Broadcom, had taken part in the IEEE

---

[1] The patents include U.S. Patent 5,295,154, U.S. Patent 5,428,636, U.S. Patent 5,504,746, U.S. Patent 5,546,397, U.S. Patent 5,673,031, U.S. Patent 5,740,366, U.S. Patent 5,844,893, U.S. Patent 5,940,771, U.S. Patent 6,046,992, U.S. Patent 6,374,311, U.S. Patent 6,665,536, U.S. Patent 6,697,415, U.S. Patent 6,714,559, U.S. Patent 6,826,165, U.S. Patent 7,013,138, U.S. Patent 7,107,052, U.S. Patent 7,386,002, U.S. Patent 7,457,646, U.S. Patent 7,483,397, U.S. Patent 7,535,921, U.S. Patent 7,536,167, U.S. Patent 7,548,553, U.S. Patent 7,552,246, U.S. Patent 7,558,557, U.S. Patent 7,710,907, U.S. Patent 7,710,935, U.S. Patent 7,826,818, U.S. Patent 7,856,003, U.S. Patent 7,873,343, U.S. Patent 7,916,747, and U.S. Patent 7,917,145. (MAC ¶ 58.)

[2] IEEE is a professional association of engineers, scientists, and others that sets technical standards for the operation of a variety of computer and electronics products. (MAC ¶¶ 48-49.)

procedures for setting the 802.11 standards. (*Id.* ¶¶ 61-67.) As part of those procedures, each of those entities had agreed with IEEE to license any patents it owned covering technology necessary to the operation of the adopted standards on reasonable, and non-discriminatory ("RAND") terms. Norand Corporation's June 20, 1997, letter of assurance to IEEE is a representative agreement:

> In the event the proposed IEEE standard is adopted, and the standard cannot be practiced without the use of one or more patents which are now or hereafter owned by Norand, Norand would upon request be willing to negotiate a non-transferable, nonexclusive sole and personal license, under the relevant claims of such patent or patents, on a nondiscriminatory basis on reasonable terms and conditions.

(*Id.* ¶ 62.) The MAC alleges that Innovatio is bound by the RAND obligations of Broadcom and its other predecessors in ownership of the patents. (*Id.* ¶ 68.)

Shortly after acquiring the Innovatio Patents, Innovatio began a campaign to enforce them by seeking to license entities Innovatio asserted infringed its patents. Rather than targeting the manufacturers of infringing devices, such as Cisco, Motorola, and Netgear, Innovatio's campaign "is largely directed at end users of Wi-Fi technology, such as bakeries, restaurants, cafes, hotels, and other small businesses that do not make or sell devices that provide the accused Wi-Fi functionality." (*Id.* ¶ 73.) The court will refer to the purported infringers whom Innovatio has sought to license as the "Targets." Since February 2011, Innovatio has sent more than 8,000 letters to Targets in all 50 states alleging infringement of its patents and demanding that the Targets pay for a license.[3] (*Id.* ¶ 74.) According to the MAC, those letters "threaten protracted negotiations with onerous burdens on end users, and offer supposed 'discounts' for promptly paying Innovatio without

---

[3] The letters have come directly from Innovatio, as well as from Whitley and others acting on behalf of Innovatio, including Innovatio's counsel, the IP Dispute Resolution Corporation, VICIS Consulting LLC, and Dowell Baker. (MAC ¶ 74.) For ease of exposition, the court will refer to Innovatio as the source of the letters.

engaging in such negotiations, while making it clear that Innovatio will initiate costly litigation with anyone that does not acquiesce." (*Id.* ¶ 75.) The MAC alleges that the threats are particularly effective because the end users lack any expertise in the patented technologies, and because Innovatio encourages payment without investigation by threatening that "patent litigation is an extremely expensive and time-consuming method of resolving disputes." (*Id.* ¶ 84; *see also id.* ¶ 73.)

In addition, the MAC alleges that Innovatio's communications with the Targets included a variety of misrepresentations and omissions. The MAC's allegations include the following:

1. Innovatio is attempting to enforce the patents in violation of its obligation to license the patents on RAND terms. (*Id.* ¶ 75.) Specifically, Innovatio failed to disclose this obligation and demanded licenses costing "many times more than the allegedly infringing Wi-Fi components." (*Id.* ¶ 76; *see also id.* ¶ 80.)

2. Broadcom components are covered by the license Innovatio granted to Broadcom, and the Innovatio Patents are subject to additional licenses, including licenses to Qualcomm Inc., Agere Systems Inc., Intermec Inc., and STMicroelectronics. Nonetheless, Innovatio has enforced the Innovatio Patents while failing to disclose that these licenses exist. (*Id.* ¶¶ 69-70, 77.) In particular, Innovatio has ignored requests from Targets for information about past licensing of the patents.

3. As part of Innovatio's acquisition of the Innovatio Patents, it covenanted with Broadcom to not make any allegations of infringement based on the use of Broadcom's IEEE 802.11 Wi-Fi products. Innovatio failed to disclose the existence of the covenant and made infringement allegations in violation of it. (*Id.* ¶ 79.)

4. At least ten of the thirty-one patents Innovatio has asserted are expired, and yet it still attempted to enforce those expired patents and failed to disclose that the patents were expired. (*Id.* ¶ 81.)

5. Innovatio's communications to the Targets state that the Innovatio Patents are "essential" to anyone practicing the IEEE 802.11 standards, whereas, as part of this litigation, Innovatio has asserted that only "36 of the 348 asserted claims (in seven of the 17 asserted patents cover mandatory features of the 802.11 standard, while 333 of 348 asserted claims (in 14 of the 17 asserted patents) cover" optional portions of the standard. (*Id.* ¶ 82.)

6. Innovatio's communications to the Targets also state that the named inventors of the Innovatio Patents are "widely considered to be the Fathers of Radio Frequency Local

Area Networking Technology," a statement that the Manufacturers claim is false. (*Id.* ¶ 83.)

7.      Innovatio has overstated the number and value of the licenses that it has already granted on its patents. (*Id.*)

8.      Innovatio has misrepresented the "confirmed . . . validity" of its patents when in fact only one of the patents was confirmed in reexamination before the Patent Office. (*Id.*)

In addition, the MAC alleges that Innovatio has filed twenty-three "sham" lawsuits against Targets who refused to buy a license, all "to enhance the credibility of its threats" (*Id.* ¶ 74) and "as part of its campaign to intimidate its other licensing targets to accept its unlawful demands for fear of suit" (*Id.* ¶ 78). The MAC does not specify any further information about those lawsuits, but the court assumes that they are the twenty-three infringement actions filed by Innovatio currently pending before this court as part of MDL No. 2303.

The Manufacturers have attached to the MAC two representative letters from Innovatio to Targets, one dated May 9, 2012, and one dated June 19, 2012.[4] (*Id.* Exs. 24 & 25.) The court may consider those two letters on a motion to dismiss because they were attached to the motion to dismiss, were referred to in the complaint, and are central to the plaintiffs' claims. *See Menominee Indian Tribe v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998) ("Documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim."). The Manufacturers have attached a number of other letters from Innovatio's licensing campaign, along with other materials, to their response to the motion to dismiss. (Dkt. No. 509.) The only document attached to the response that the court will consider is

---

[4] The Manufacturers filed these letters under seal and redacted the names of the recipients of the letters from the MAC to protect their identities. The court will not refer to the identities of the Targets receiving these letters in this opinion.

the "Patent Purchase Agreement" between Broadcom and Innovatio. (Dkt. No. 509, Ex. N.) The court may not consider the other materials on a motion to dismiss because they were not "exhibits attached to the complaint" or "documents referenced in the pleading" that "are central to the claim." *Bogie v. Rosenberg*, --- F.3d ----, No. 12-1923, 2013 WL 174113, at *2 (7th Cir. Jan. 17, 2013) (citing Fed. R. Civ. P. 10(c)).

## LEGAL STANDARD

Under the Federal Rules of Civil Procedure, a complaint need contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "On a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint." *Hall v. Bed Bath & Beyond, Inc.*, 2011-1165, 2013 WL 276080, at *1 (Fed. Cir. Jan. 25, 2013).

## ANALYSIS

I.   *Noerr-Pennington*

Innovatio first contends that its enforcement activity is protected by the *Noerr-Pennington* doctrine from the MAC's RICO, unfair competition, civil conspiracy, intentional interference with

prospective economic advantage, and unclean hands claims. (Counts XLIX, L, LI, LIV, and LV.) The *Noerr-Pennington* doctrine derives from the First Amendment's guarantee of "the right of the people . . . to petition the Government for a redress of grievances," U.S. Const. amend. I, and provides protection from liability for those who petition any department of the government. *See BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516, 525 (2002); *United Mine Workers v. Pennington*, 381 U.S. 657 (1965); *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *see also Tarpley v. Keistler*, 188 F.3d 788, 794 (7th Cir. 1999) (under *Noerr-Pennington*, "parties may petition the government for official action favorable to their interests without fear of suit, even if the result of the petition, if granted, might harm the interests of others"). The Supreme Court has expanded *Noerr-Pennington* protection to groups' use of "the channels and procedures of state and federal . . . courts to advocate their causes and points of view respecting resolution of their business and economic interests vis-á-vis their competitors." *Cal. Motor Trans. Co. v. Trucking Unlimited*, 404 U.S. 508, 511 (1972). Although the *Noerr-Pennington* doctrine originally arose in the antitrust context, the Supreme Court has applied it to interpret the National Labor Relations Act ("NLRA"). *See BE & K Const*, 536 U.S. at 526; *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731 (1983).

The protection, however, is not absolute. The Supreme Court has made clear that *Noerr Pennington* does not apply to "sham" litigation. Sham litigation is litigation that is both "objectively baseless" and subjectively brought in "an attempt to interfere directly with the business relationships of a competitor through the use of the governmental process—as opposed to the outcome of that process." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993) (citations, quotation marks, and alteration omitted).

The Supreme Court's determinations leave open several issues regarding the applicability

of the *Noerr-Pennington* doctrine to protect Innovatio's enforcement activity in this case. For each issue, this court must decide whether to apply Federal Circuit law or Seventh Circuit law. *See Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega Systems, LLC*, 350 F.3d 1327, 1337 (Fed. Cir. 2003) (court answers choice of law issue "on an issue by issue basis"). The court will apply Seventh Circuit law "unless the issue pertains to or is unique to patent law, in which case" the court must apply Federal Circuit law "to both substantive and procedural issues intimately involved in the substance of enforcement of the patent right." *Id.* (citations and quotation marks omitted). Because the analysis differs for each issue, the court will discuss the law applicable to each issue below.

> A.     The Application of *Noerr-Pennington* Outside of Antitrust and Labor Law

First is the question of whether the *Noerr-Pennington* doctrine extends beyond the antitrust and labor law context to protect petitioning activity from the statutory and common law violations the MAC alleges. That question does not pertain to patent law, as it would be equally applicable to RICO, unfair competition, and other tort claims based on underlying requests to settle claims unrelated to the enforcement of a patent. Accordingly, Seventh Circuit law applies.

In the Seventh Circuit, "*Noerr–Pennington* has been extended beyond the antitrust laws, where it originated, and is today understood as an application of the first amendment's speech and petitioning clauses." *New West, L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007) (applying the doctrine to federal housing laws). Accordingly, the Seventh Circuit has applied the doctrine broadly, including to RICO claims. *Int'l Broth. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818, 826 (7th Cir. 1999) ("Although the *Noerr-Pennington* doctrine originated in antitrust law, its rationale is equally applicable to RICO suits."); *Tarpley v.*

*Keistler*, 188 F.3d 788, 794 (7th Cir. 1999) (applying *Noerr-Pennington* to § 1983 suits). Moreover, because the doctrine derives from a constitutional source, other regional circuit courts have held that it must also extend to state law statutory and common law claims. *See, e.g.*, *IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 310 (4th Cir. 2003) ("[A]lthough originally developed in the antitrust context, the doctrine has now universally been applied to business torts."); *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 128 (3d Cir. 1999) ("We are persuaded that the same First Amendment principles on which *Noerr-Pennington* immunity is based apply to the New Jersey tort claims."); *Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns*, 858 F.2d 1075, 1084 (5th Cir. 1988) ("There is simply no reason that a common-law tort doctrine can any more permissibly abridge or chill the constitutional right of petition than can a statutory claim such as antitrust."); *see also Evers v. Cnty. of Custer*, 745 F.2d 1196, 1204 (9th Cir. 1984); *Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d 607, 614 (8th Cir. 1980). Accordingly, the *Noerr-Pennington* doctrine can protect petitioning activity to which it applies from the MAC's federal and state law claims.

B.      The Application of *Noerr-Pennington* to Pre-suit Communications

Second, the court must consider whether *Noerr-Pennington* protects pre-suit demand letters like those the Manufacturers have accused Innovatio of sending to the Targets. Of significance here is that Innovatio's letters were sent to enforce its *patent rights*. The Federal Circuit has held that sending pre-suit letters is a necessary component of enforcing patent rights. *See Va. Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 869 (Fed. Cir. 1997) ("[A] patentee must be allowed to make its rights known to a potential infringer so that the latter can determine whether to cease its allegedly infringing activities, negotiate a license if one is offered, or decide to run the risk of liability and/or the imposition of an injunction."); *see also Virtue v. Creamery Package Mfg. Co.*, 227 U.S. 8, 37-38

-10-

(1913) ("Patents would be of little value if infringers of them could not be notified of the consequences of infringement, or proceeded against in the courts. Such action, considered by itself, cannot be said to be illegal."). Accordingly, any potential restrictions on a patent holder's right to send pre-suit demand letters asserting infringement implicates a substantive issue "intimately involved in the substance of enforcement of the patent right." *Ferguson Beauregard/Logic*, 350 F.3d at 1337 (citation and quotation marks omitted). The court will thus apply Federal Circuit law to this question.

The best guidance regarding the Federal Circuit's position on the question is that the Federal Circuit has applied a standard derived from the *Noerr-Pennington* doctrine to pre-suit demand letters in the context of preemption of state law counterclaims. *See Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 362 F.3d 1367 (Fed. Cir. 2004). In *Globetrotter*, the Federal Circuit addressed the question of whether federal patent law preempts state law counterclaims based on pre-suit demand letters. To address the question, the Federal Circuit first noted its longstanding rule that "[s]tate-law claims [based on a patent-holder's assertion of infringement in litigation] can survive federal preemption only to the extent that those claims are based on a showing of 'bad faith' action in asserting infringement." *Id.* at 1374. The Federal Circuit then explained that the "bad faith" standard applicable in preemption cases was derived from *Noerr* and *Pennington*, and particularly the Supreme Court's decision in *Professional Real Estate* establishing that a lawsuit cannot be a "sham" unless it is both objectively baseless and brought without a subjective expectation of success. *Id.* at 1375-76 (citing *Prof'l Real Estate*, 508 U.S. at 60).

To answer the preemption question, the Federal Circuit then examined the application of *Noerr-Pennington* itself to pre-suit activity:

-11-

The Supreme Court has not addressed the question whether the *Professional Real Estate* standard applies outside the context of actual litigation. However, our sister circuits, almost without exception, have applied the *Noerr* protections to pre-litigation communications. . . .

These cases have dealt almost exclusively with the protections provided by federal antitrust law for pre-litigation communications. However, in another line of cases, our sister circuits have also applied the *Noerr-Professional Real Estate* line of cases to bar state-law liability (as opposed to federal antitrust liability) for pre-litigation communications.

*Id.* at 1376 (citations omitted).[5] Based on that background, the court determined that the bad faith standard of *Professional Real Estate*, including both its subjective and objective prongs, applied to pre-suit communications alleging patent infringement in the preemption context. *Id.* at 1377.

Although *Globetrotter* arose in the context of preemption, its reasoning is equally applicable to the question of whether *Noerr-Pennington* shields Innovatio's pre-suit communications here.[6] As the Federal Circuit explained in *Globetrotter*:

Our decision to permit state-law tort liability for only objectively baseless allegations of infringement rests on *both federal preemption and the First Amendment*. The federal patent laws preempt state laws that impose tort liability for a patentholder's good faith conduct in communications asserting infringement of its patent and warning about potential litigation. In addition, the same First Amendment policy

---

[5] The Federal Circuit cited the following regional circuit authority applying *Noerr-Pennington* to pre-suit activity: *IGEN Int'l, Inc. v. Roche Diagnostics GMBH*, 335 F.3d 303, 310 (4th Cir. 2003); *A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 252-53 (3d Cir. 2001); *Primetime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 100 (2d Cir. 2000); *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 128 (3d Cir. 1999); *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1560 (11th Cir. 1992); *South Dakota v. Kan. City S. Indus., Inc.*, 880 F.2d 40, 50-51 (8th Cir. 1989); *Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir.1983). The Federal Circuit also cited 1 Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 205e, at 237-38 (2d ed. 2000) ("*Noerr* protects the right to petition the government. Although a mere threat directed at one's competitor to sue or to seek administrative relief does not involve or 'petition' the government, it would be anomalous and socially counterproductive to protect the right to sue but not the right to threaten suit.").

[6] Innovatio does not contend that federal patent law preempts the MAC's claims.

-12-

> reasons that justify the extension of *Noerr* immunity to pre-litigation conduct in the context of federal antitrust law apply equally in the context of state-law tort claims.

*Id.* (emphasis added) (citation omitted). To remove any doubt, the Federal Circuit has subsequently noted that *Globetrotter*'s articulation of the bad faith standard applies to claims of protection under the First Amendment's right to petition and the *Noerr-Pennington* doctrine. *See SKF USA, Inc. v. U.S. Customs & Border Prot.*, 556 F.3d 1337, 1354 (Fed. Cir. 2009) ("Under that line of cases, we have little doubt that SKF's opposition to the antidumping petition here is protected First Amendment activity." (citing *Globetrotter*, 362 F.3d at 1377)). *Globetrotter* thus requires the application of *Noerr-Pennington* to shield pre-suit communications from state law claims.[7] Moreover, because *Globetrotter*'s reasoning depends on the First Amendment, and not only on preemption law, it is equally applicable to federal claims like the RICO claim the Manufacturers have brought here.

Even though *Noerr-Pennington* applies to pre-suit communications, the Manufacturers next contend that the doctrine does not apply to Innovatio's letters to the Targets, which they contend are not pre-suit communications. They argue that:

> [T]he unlawful activity in this case goes far beyond mere litigation threats, and

---

[7] The parties did not address *Globetrotter*. Instead, the parties in their filings on this motion dispute the application of *Noerr-Pennington* to pre-suit communications by citing a regional circuit split on the question. Innovatio cites *Sosa v. DIRECTV, Inc*., 437 F.3d 923, 928 (9th Cir. 2006), in which the Ninth Circuit applied *Noerr-Pennington* to pre-suit communications. In response, the Manufacturers cite the Tenth Circuit's holding in *Cardtoons, L.C. v. Major League Baseball Players Association*, 208 F.3d 885 (10th Cir. 2000), that pre-suit communications are too far removed from litigation to trigger *Noerr-Pennington*. Neither party cites any Federal Circuit cases on the issue. In light of the binding Federal Circuit precedent bearing on the question, this court believes the holdings of other circuits are irrelevant. In light of the fact, however, that counsel for the parties did not address *Globetrotter*, the court would invite any party's counsel to weigh in, if they desire, through the filing of a timely motion to reconsider setting forth the moving party's position and supporting authority.

instead involves communications to numerous entities that contain misrepresentations and significant omissions unrelated to any threats of litigation. The mere fact that Innovatio also threatens some of these entities with litigation does not immunize its conduct from scrutiny.

(Dkt. No. 508, at 12-13.) The Manufacturers then cite an Innovatio e-mail to one of the Targets in which Innovatio stated that it was not initiating litigation at this time, but that it believed it had an infringement claim and offered to negotiate a license. (*Id.* at 13 (citing *id.* Ex. J).)

That e-mail is not attached to the MAC, so the court cannot consider it on a motion to dismiss. Regardless, the Manufacturers' contentions do not explain how Innovatio's communications to the Targets differ from protected pre-suit demand letters. Innovatio's alleged communications to the Targets include no more than a typical pre-suit demand letter in a patent case: a statement that the sender believes that the recipient is infringing, an offer to negotiate a license, and a statement of the patent holder's position on a variety of legal and factual issues. Even if those statements are misrepresentations (a concern addressed below), they are not "unrelated to any threats of litigation," as the Manufacturers contend.[8]

C.      Sham Litigation Exception

Although the *Noerr-Pennington* doctrine applies to pre-litigation communications, the Manufacturers contend that the "sham litigation" exception removes Innovatio's licensing campaign from *Noerr-Pennington* protection. The Federal Circuit has clearly stated that *Noerr-Pennington* does not apply to petitioning activity that, although "ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to

---

[8] The Manufacturers also contend that Innovatio is a patent assertion entity whose entire business is licensing patents, and that *Noerr-Pennington* should not apply to shield normal business activity. The Manufacturers do not, however, provide a compelling explanation of why patent assertion entities are not entitled to the protection of the First Amendment.

interfere directly with the business relationships of a competitor." *Globetrotter*, 362 F.3d at 1375 (quoting *Noerr*, 365 U.S. at 144).

For this court to decide whether allegations of patent infringement are legitimate or a sham requires addressing the merits of those allegations. That exercise plainly involves the application of the patent laws, so, as stated earlier, Federal Circuit law should be applied to analyze the question. *Cf. Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998) ("[W]hether conduct in procuring or enforcing a patent is sufficient to strip a patentee of its immunity from the antitrust laws is to be decided as a question of Federal Circuit law.").

*Globetrotter* establishes that pre-litigation communications are a sham if they are sent in "bad faith," and that "bad faith" includes both objective and subjective components. 362 F.3d at 1375-77. Specifically, for bad faith to exist, the claims must be "'so baseless that no reasonable litigant could realistically expect to secure favorable relief.'" *Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*, 524 F.3d 1254, 1261 (Fed. Cir. 2008) (quoting *Prof'l Real Estate*, 508 U.S. at 62). A litigant cannot be acting in bad faith if it has "probable cause" to institute a lawsuit. *Id.* To survive a motion to dismiss, a plaintiff must allege bad faith as part of any tort claim based on pre-litigation assertions of infringement, "'even if bad faith is not otherwise an element of the tort claim.'" *Id.* at 1260 (quoting *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1355 (Fed. Cir. 1999)).

Here, the MAC alleges that Innovatio's licencing campaign was a sham in part because certain statements in its communications to the Targets were fraudulent misrepresentations. (*See, e.g.*, MAC ¶ 83.) To satisfy the subjective and objective components of the bad faith standard with respect to fraud, the Manufacturers must plead both that the statements were "objectively false," and

that Innovatio made the statements "with knowledge of their incorrectness or falsity, or disregard for either." *Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1371 (Fed. Cir. 2002) (quoting *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 897 (Fed. Cir. 1998)).

Several of the MAC's allegations also face an additional pleading hurdle because they purport to allege fraud. Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see also In re BP Lubricants USA Inc.*, 637 F.3d 1307, 1310 (Fed. Cir. 2011) ("In all cases sounding in fraud or mistake, Rule 9(b) requires a plaintiff to plead 'with particularity the circumstances constituting fraud or mistake.'" (quoting Rule 9(b))); *cf. Formax, Inc. v. Hostert*, 841 F.2d 388, 390 (Fed. Cir. 1988) (holding that pleading a RICO count based on fraud "requires sufficient specificity so as to satisfy Fed. R. Civ. P. 9(b)"). Rule 9(b) "'requires that the pleadings contain explicit rather than implied expression of the circumstances constituting fraud.'" *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 (Fed. Cir. 2009) (quoting *King Auto., Inc. v. Speedy Muffler King, Inc.*, 667 F.2d 1008, 1010 (C.C.P.A. 1981)). Specifically, "Rule 9(b) requires identification of the specific who, what, when, where, and how of the material misrepresentation or omission." *Id.*

In addition, Rule 9(b) allows "[m]alice, intent, knowledge, and other conditions of a person's mind" to be alleged generally. Fed. R. Civ. P. 9(b). Nonetheless, the pleadings must "allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind." *Exergen Corp.*, 575 F.3d at 1327.

Applying the pleading principles described above, the court will now examine in turn each of the Manufacturers' reasons for contending that Innovatio's licensing campaign was a sham.

-16-

1.      RAND Commitments

First, the Manufacturers argue that Innovatio's licensing campaign was a sham because it asserted infringement against the Targets before offering them a RAND license, offered licenses on terms less favorable than RAND terms, and failed to disclose its RAND obligations to the Targets. (MAC ¶¶ 75-76, 80.) Innovatio responds first that the RAND obligations apply only to patents protecting technology that is essential to mandatory portions of the 802.11 Wi-Fi standard, and that most of Innovatio's patent claims read on the optional portions of the standard. According to the MAC, however, RAND obligations apply "with respect to patents whose infringement is . . . unavoidable in a compliant implementation of *either mandatory or optional* portions of the standard," so Innovatio's argument fails. (MAC ¶ 51 (emphasis added).)

But there is a more fundamental problem with the Manufacturers' argument that Innovatio's RAND obligations make its licensing campaign a sham. The existence of an obligation to license a patent on RAND terms, without more, is not an actual express license providing a defense to infringement. As one law review article explains:

> The typical RAND provision is not itself the actual licensing instrument. Instead, a typical RAND term is a contractual covenant of the granting participant, pursuant to which that entity agrees that it will, at some point in the future, grant a license on reasonable and nondiscriminatory terms to any requesting implementer of [the] applicable standard.

Brad Biddle et al., *The Expanding Role and Importance of Standards in the Information and Communications Technology Industry*, 52 Jurimetrics 177, 196 (2012); *accord* Intellectual Property Owners Ass'n, *Standards Primer: An Overview of Standards Setting Bodies and Patent-Related Issues That Arise In The Context of Standards Setting Activities* 14 (2009) ("One should note that the license commitment is not itself a license but rather a commitment to negotiate a license with

those members and, in some cases, non-members that request a license.").That is true here, as well, because the RAND promises to which the MAC alleges Innovatio is subject do not provide for the immediate creation of a license, but instead include a promise to negotiate one on RAND terms in the future. (*See* MAC ¶¶ 62-66.)

Of course, even though a RAND obligation does not act as an express license, it may nonetheless have some effect on the remedies available to a patent holder in an infringement action by providing defenses based on implied license, patent misuse, or equitable estoppel.[9] The parties have not cited, however, and the court has not found, any cases suggesting that the existence of a RAND commitment provides a *complete* defense against an infringement lawsuit. Instead, most cases merely limit a patent holder's remedy to collecting a RAND royalty, thus precluding injunctive relief. As the Ninth Circuit explained recently, "[i]mplicit in such a sweeping promise [to license a patent on RAND terms] is, at least arguably, a guarantee that the patent-holder will not take steps to keep would-be users from using the patented material, such as seeking an injunction, but will instead proffer licenses consistent with the commitment made." *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 884 (9th Cir. 2012).

Seventh Circuit Judge Richard Posner, sitting by designation in the Northern District of Illinois, also recently addressed the effect of a RAND commitment (which he calls a "FRAND" commitment, for "fair, reasonable, and non-discriminatory") on the availability of injunctive relief:

> I don't see how, given FRAND, I would be justified in enjoining Apple from infringing the '898 unless Apple refuses to pay a royalty that meets the FRAND requirement. By committing to license its patents on FRAND terms, Motorola

---

[9] *See* Michael G. Cowie & Joseph P. Lavelle, *Patents Covering Industry Standards: The Risks to Enforceability Due to Conduct Before Standard-Setting Organizations*, 30 AIPLA Q.J. 95, 146 (2002).

committed to license the '898 to anyone willing to pay a FRAND royalty and thus implicitly acknowledged that a royalty is adequate compensation for a license to use that patent. How could it do otherwise? How could it be permitted to enjoin Apple from using an invention that it contends Apple *must* use if it wants to make a cell phone with UMTS telecommunications capability—without which it would not be a cell *phone*.

*Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901, 913-14 (N.D. Ill. 2012). Not even Judge Posner could go so far as to say that a patent holder with a RAND obligation can never recover damages for infringement. *Id.* at 913 (discussing the proper standard for calculating a RAND royalty to award as damages for infringement, but finding that the patent holder failed to present evidence sufficient to calculate that royalty). This issue has been the subject of substantial, often contradictory, academic commentary.[10] In short, the question is muddled. *See Microsoft*, 696 F.3d at 877 ("Courts

---

[10] At least one academic commentator agrees that RAND obligations may bar injunctive relief, but do not prevent a patent holder from suing for damages. Doug Lichtman, *Understanding the Rand Commitment*, 47 Hous. L. Rev. 1023, 1043 (2010) ("Courts could interpret RAND as a public commitment that creates a defense of equitable estoppel. Under that estoppel, the patent holder would be deemed to have permanently waived his right to seek triple damages or to ask for injunctive relief, but would otherwise be allowed to invoke patent law's damages regime."). Other commentators contend that both an injunction and damages are available. Suzanne Michel, *Bargaining for RAND Royalties in the Shadow of Patent Remedies Law*, 77 Antitrust L.J. 889, 893 (2011) ("If negotiations break down, the implementer can bring a contract claim asking the court to enforce the patentee's promise to license at RAND rates. The patentee can claim patent infringement, seeking remedies, including compensatory damages and a permanent injunction prohibiting future infringement." (footnote omitted)); *see also* J. Gregory Sidak, *Holdup, Royalty Stacking, and the Presumption of Injunctive Relief for Patent Infringement: A Reply to Lemley and Shapiro*, 92 Minn. L. Rev. 714, 747-48 (2008) (arguing that "removing the presumption of injunctive relief would decrease dynamic efficiency"). The court also notes that Professor Mark Lemley, another highly respected patent law scholar, contends that a RAND obligation should bar an infringement action, but would allow the patent holder to recover a RAND royalty through a contract claim. *See* Mark A. Lemley, *Intellectual Property Rights and Standard-Setting Organizations*, 90 Cal. L. Rev. 1889, 1925 (2002) ("[I]f a court determines that an IP owner granted a license by virtue of agreeing to be bound by an SSO IP rule, the only remaining questions concern the scope of the license and the royalty rate. The IP owner in that case has only a contractual claim for a royalty, not a cause of action for patent infringement that might result in an injunction, treble damages, and attorneys' fees.").

and commentators are divided as to how, if at all, RAND licensing disputes should be settled."). The court need not, however, resolve the effect that Innovatio's alleged RAND commitments have on its infringement claims at this time.[11] It is enough for now to determine that Innovatio at least has a plausible argument that its infringement claims are still viable despite its alleged RAND obligations. The court concludes, therefore, that the infringement claims Innovatio asserted against the Targets, as alleged in the MAC, are not "so baseless that no reasonable litigant could realistically expect to secure favorable relief," *Dominant Semiconductors*, 524 F.3d at 1261 (citation and quotation marks omitted), and that the licencing campaign is therefore not a sham because of Innovatio's RAND commitments.

### 2. Existing Licenses

Next, the MAC alleges that Innovatio's infringement claims are a sham because the asserted patents are subject to a variety of licenses. (Am. Compl ¶¶ 69-70, 77.) Specifically, the MAC alleges that Broadcom, Qualcomm Inc., Agere Systems Inc., Intermec Inc., and STMicroelectronics all manufacture wireless device components that are licensed under the Innovatio patents. The Manufacturers argue that the Targets would benefit from those licenses to the extent that they use products incorporating components from those companies, and that any infringement allegations against the Targets thus would be a sham.

As Innovatio points out, the MAC alleges only that Innovatio knew that the licenses existed, and that they could limit Innovatio's recovery against the Targets using licensed products. (*See, e.g.*, MAC ¶ 77 ("In documents concerning Innovatio's planned purchase of the Innovatio Patents from

---

[11] Nor would it be possible to do so. For one thing, the MAC does not provide a complete description of the policies of the IEEE with respect to standards-essential patents. (*See* MAC ¶¶ 60-68.)

Broadcom, Defendants state internally that their ability to recover against end-users of products with Broadcom Wi-Fi components is limited . . . .".) The MAC does not allege that Innovatio knew that any particular Target was using wireless products containing components subject to those licenses.[12] As the court knows from the last several months of observing the discovery disputes in the underlying infringement actions, Innovatio has been gathering information about which products the Targets use to operate their wireless networks, indicating that Innovatio did not possess that information as fully as it would have wanted prior to its licensing campaign.[13]

Innovatio thus had a reasonable expectation that at least some of the products that any given Target used were not covered by any licenses. It follows that Innovatio's enforcement efforts were not a sham at the time Innovatio commenced those efforts, even assuming the truth of the MAC's

---

[12] The MAC also includes a number of general allegations that Innovatio acted "with knowledge and with the intent to defraud and extort illegal fees from Defendants' licensing targets." (MAC ¶ 85.) Those general allegations are nothing more than a recitation of the elements of the causes of action, and are inadequate under *Twombly*. 550 U.S. at 555 (although "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do").

[13] Moreover, information about the types of devices the Targets use and the components that they contain is not publicly available, so Innovatio had no reason to know that information, and it would not have been reasonable to require Innovatio to obtain that information prior to pursuing its infringement allegations. *Cf. Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300, 1309 (Fed. Cir. 2012) ("Furthermore, even if the claim is objectively baseless, it must be shown that lack of objective foundation for the claim 'was either known or so obvious that it should have been known' by the party asserting the claim." (quoting *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007))); *Digeo, Inc. v. Audible, Inc.*, 505 F.3d 1362, 1369 (Fed. Cir. 2007) ("'A frivolous infringement suit is one which the patentee knew or, on *reasonable investigation*, should have known, was baseless.'" (emphasis added) (quoting *Haynes Int'l Inc. v. Jessop Steel Co.*, 8 F.3d 1573, 1579 (Fed. Cir. 1993))). Both *Highmark* and *Diego* applied the standard of *Professional Real Estate* in the context of assessing whether a patent infringement suit was frivolous to justify an award of attorneys' fees under 35 U.S.C. § 285.

allegations.[14] Of course, were Innovatio to persist in pursuing its claims against a Target after discovering that the Target's wireless systems use only licensed products (and assuming Innovatio possessed no plausible argument that the licenses did not apply), Innovatio may then be considered to be pursuing a sham. But the MAC makes no such allegations, so the existence of the licenses does not make Innovatio's licensing campaign a sham.

The MAC also alleges that Innovatio made material misrepresentations to many Targets by stating that those Targets are infringing its patents, but failing to disclose the existence of a possible license. (MAC ¶ 77.) As an example, the MAC includes a statement from an April 27, 2011, letter from Innovatio to a Target[15] stating that:

> Claims of the Innovatio Patents cover, among other things, WLANs that use the IEEE 802.11 communication protocols. The operation and use of any such systems by [the Target] would constitute infringement of, by way of example and not limitation, claims of at least the following Innovatio Patents [listing 20 patents].

(*Id.* (emphasis omitted).)[16]

Innovatio contends that it had no duty to disclose the existence of the licenses. (Dkt. No. 474,

---

[14] The Manufacturers also contend that the sham exception should apply because Innovatio sent a series of demand letters to the Targets without regard to whether any Target was licensed. To support that argument, they invoke the rule of *Kottle v. Northwest Kidney Centers* that "[i]f the alleged anticompetitive behavior is the filing of a series of lawsuits, the question is not whether any one of them has merit—some may turn out to, just as a matter of chance—but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival." 146 F.3d 1056, 1060 (9th Cir. 1998) (citation and quotation marks omitted). That articulation of the sham exception contemplates many harassing lawsuits against a single defendant, not a licensing campaign against many defendants, as here. Even assuming *Kottle* is applicable, however, Innovatio did not initiate its licensing campaign without regard to whether any particular Target was licensed. To the contrary, that information was not reasonably accessible prior to bringing suit. *See supra* note 11.

[15] This letter is not attached to the MAC.

[16] The two letters from Innovatio to Targets that are attached to the MAC contain similar statements. (*See* MAC, Exs. 24 & 25.)

at 15-16.) The Manufacturers do not dispute that Innovatio was not under any general obligation to give the Targets legal advice, or to disclose to them any possible defense that they might have to its allegations. The Manufacturers contend, however, that Innovatio's duty to disclose the licenses arose because Innovatio made an affirmative statement (that the Target infringes) while omitting material facts (the existence of a license). (Dkt. No. 509, at 24 (citing *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 398 (7th Cir. 2009) (applying Illinois law)).)

*Crichton* provides that a duty to disclose arises when "the defendant makes an affirmative statement that it passes off as the whole truth while omitting material facts that render the statement a misleading 'half-truth.'" *Crichton*, 576 F.3d at 398. A similar rule applies to the determination of whether non-disclosure is fraudulent for purposes of the mail and wire fraud statutes, where "[w]hether a failure to disclose is fraudulent depends on context." *Emery v. Am. Gen. Fin., Inc.*, 71 F.3d 1343, 1347 (7th Cir. 1995). Here, the context of Innovatio's alleged statements, a pre-suit demand letter to a potential adversary in litigation, make plain that Innovatio had no duty to disclose the licenses. The recipient of a demand letter typically approaches any representations therein with a dose of skepticism, knowing that demand letters by definition assert a litigation position that the recipient is able to contest. *See Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 941 (9th Cir. 2006) ("[L]egal representations made by potential litigation adversaries are exceedingly unlikely to be believed without investigation."). The Targets thus had no reason to rely on Innovatio's assertion of infringement, or to assume that Innovatio had disclosed all of the Targets' possible legal defenses.

The alleged misrepresentation in the April 27, 2011, letter thus does not render Innovatio's enforcement actions a sham. *Cf. Mikohn*, 165 F.3d at 897 ("[F]ederal authority makes clear that it is not improper for a patent owner to advise possible infringers of its belief that a particular product

may infringe the patent."). The general allegations that communications with other Targets contained similar misstatements are also insufficient, as they lack the specificity necessary under Rule 9(b).

### 3. Covenant with Broadcom

The reasoning behind the court's determination that the existence of licenses does not render Innovatio's licensing campaign a sham also applies to Innovatio's covenant with Broadcom. Innovatio had no way of knowing which Targets may have been using only products with Broadcom components. It thus had a reasonable expectation of succeeding in its claims against any particular Target, and its actions are not a sham.

### 4. Expiration of Innovatio's Patents

The MAC also alleges that some of the patents Innovatio asserted in its licensing campaign are expired. (MAC ¶ 81.) As Innovatio points out, however, the statute of limitations for a claim of infringement is six years, 35 U.S.C. § 286, and none of its patents expired more than six years prior to any part of its licensing campaign. (MAC ¶ 81.) Moreover, the MAC does not allege that any of the Targets used the patented methods or devices only after the patents expired. Accordingly, Innovatio is justified in asserting infringement for the expired patents, and it is not a sham to seek a licensing fee for the period when the patents were effective.

### 5. Misrepresentation That Innovatio Patents Are "Essential"

Next, the MAC alleges that Innovatio's licensing campaign is a sham because Innovatio has "stated hundreds of times, in correspondence to third party licensing targets and publicly over the past year, that the Innovatio Patents are 'essential' and anyone practicing the IEEE 802.11 standards or WI-Fi is infringing and must pay for its '31 patents' and '1454 patent claims.'" (MAC ¶ 82.)

Those statements are false, the MAC alleges, because Innovatio told the court in this litigation that:

> 36 of the 348 asserted claims (in seven of the 17 asserted patents) cover mandatory features of the 802.11 standard, while 333 of the 348 asserted claims (in 14 of the 17 asserted patents) cover: (1) portions of the standard that are "optional" for a device to support; (2) portions of the standard that, even if supported by the device, are "optional" for the user to utilize; or (3) device or network implementations that are not defined by the standard and that may be different for each manufacturer or user. Put another way, **more than 95% of the asserted claims cover "optional" or implementation features that are not defined by the standard**.

(MAC, Ex. 28, at 8 (footnote omitted).) The MAC's allegations on this point fail the test of Rule 9(b), because they do not include the specific "who, what, when, where, and how of the material misrepresentation or omission." *Exergen Corp.*, 575 F.3d at 1327. Instead, the MAC merely states generally that Innovatio made the alleged misrepresentation "hundreds of times . . . over the past year," without including any details. (MAC ¶ 82.)

The MAC does include three other specific statements from Innovatio to support its allegations, but those specific statements differ from the general statement that the claims are "essential." First, the MAC points to statements in the May 9, 2012, letter to a Target stating that the Innovatio Patents "are controlling patents in the area of WLAN (e.g. Wi-Fi) and mesh networking technologies" and that the Target infringes the patents by operating "WLANs deployed in any corporate office, manufacturing, distribution, retail, inventory management, warehousing, industrial monitoring or control, or 'smart energy' environments." (MAC ¶ 82; *see also id.* Ex. 24.) The first statement means no more than that the patents protect WLAN and mesh networking technologies, and does not say anything about whether the patents cover essential aspects of the 802.11 standard. The second statement is merely a statement of Innovatio's legal position that the Target infringes. Neither is a fraudulent misrepresentation.

Next, the MAC quotes a statement from Innovatio's June 19, 2012, letter to a Target that "the

WLAN Patents cover the manner in which access points and terminal devices communicate with each other, including 802.11, Zigbee, and many other short distance communication protocols." (*Id.* ¶ 82; *see also id.* Ex. 25.) That statement, again, makes no representation about whether the patents cover essential, rather than optional, aspects of the 802.11 standard, and is not fraudulent. The MAC's allegations fail to establish that Innovatio's licensing campaign is a sham.

### 6. Other Statements

That leaves a number of additional statements that the MAC alleges make Innovatio's licensing campaign a sham. The statements include purported misrepresentations about the number of locations that Innovatio had licensed under the patents, the value of the licenses, the number of patents that had been held to be valid in court or reexamination proceedings, and that the inventors on the patents are "fathers" of Wi-Fi. (MAC ¶ 83.)

For example, the May 9, 2012, letter to a Target includes the comment that "[t]o date, we have successfully licensed thousands of business locations under the Innovatio Patents, including businesses in the corporate, banking, retail, hospitality and hotel, restaurant and café, healthcare, insurance, and manufacturing market segments, among others." (*Id.* Ex. 24; *see also id.* Ex. 25 (containing a similar statement).) The MAC alleges that this statement "grossly misrepresent[s]" the number of licenses Innovatio has actually granted. (*Id.* ¶ 83.) Similarly, the June 19, 2012, letter includes the following statements:

> In 2007, Broadcom began to assert the WLAN Patents against Qualcom [sic], ST Micro, and other infringers, generating in excess of $1 Billion in settlements and license fees. Since that time, the validity of many claims of the WLAN patents has been confirmed by both the Federal Circuit and the United States Patent Office, via both judicial and re-examination proceedings.

(*Id.* Ex. 25.) The MAC alleges that, contrary to that statement, most of the $1 billion Innovatio

claimed was "based on the $891 million that Qualcomm was publicly reported to have paid Broadcom as part of a broad settlement unrelated to Innovatio's licensing program." (*Id.* ¶ 83.) Similarly, the MAC alleges that only one of the Innovatio Patents has confirmed validity through a reexamination at the U.S. Patent Office. (*Id.*)

None of those alleged misstatements is sufficiently central to Innovatio's infringement claims to make its entire licensing campaign a sham. As Innovatio argues, the Seventh Circuit has established that a misrepresentation can render an adjudicative proceeding a sham under *Noerr-Pennington* only if the misrepresentation is material enough to "actually alter[] the outcome of the proceeding." *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 843 (7th Cir. 2011). The court has not found, and the parties do not cite, any case in which the Federal Circuit has addressed whether misstatements of only tangential relevance to an infringement claim can render the assertion of that claim in pre-suit demand letters an objectively baseless sham.

Several circuits in addition to the Seventh have adopted such a rule. *Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 401-02 (4th Cir. 2001) ("If a fraud exception to *Noerr Pennington* does exist, it extends only to the type of fraud that deprives litigation of its legitimacy."); *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 124 (3d Cir. 1999) ("In sum, a material misrepresentation that affects the very core of a litigant's . . . case will preclude *Noerr-Pennington* immunity, but not every misrepresentation is material to the question of whether a petition . . . had an objective basis."); *Kottle v. Nw. Kidney Centers*, 146 F.3d 1056, 1060 (9th Cir. 1998) (misrepresentation exception applies only if misrepresentation "'deprive[s] the litigation of its legitimacy'" (citation omitted)). Moreover, Judge Margaret Morrow of the Central District of California has persuasively explained why such a materiality limitation makes sense in light of the

-27-

policy behind *Noerr-Pennington*:

> When one considers the policy behind the *Noerr–Pennington* doctrine . . . it is apparent that any misrepresentation exception to the doctrine should be limited to misrepresentations respecting the substance of the claim that show that the party's litigation position had no objective basis, i.e., that it was not "objectively genuine." If such an interpretation is adopted, the misrepresentation exception would parallel the sham exception, and ensure that the *Noerr–Pennington* doctrine covers the type of First Amendment petitioning activity it is designed to protect, e.g., complaints as to which "a reasonable litigant could realistically expect success on the merits."

*Thomas v. Hous. Auth. of Cnty. of L.A.*, No. CV 04-6970, 2006 WL 5670938, at *9 n.49 (C.D. Cal. Feb. 28, 2006) (citations omitted). Accordingly, this court will adopt the rule that only misrepresentations material enough to affect the outcome of a litigation proceeding are sufficient to render petitioning activity a sham.

Here, Innovatio's general statements about the number of licenses it has granted, the cost of those licenses, the reputation of the inventors of its patents, and the number of times its patents had been adjudicated are all peripheral to the question of infringement. Accordingly, those statements do not make Innovatio's licensing campaign a sham.

### 7. Conclusion

The MAC's allegations, taken as true, do not establish that Innovatio's licensing campaign alleging infringement of the Innovatio Patents is a sham. Accordingly, Innovatio's campaign is protected petitioning activity under the First Amendment and *Noerr-Pennington*. The court will thus grant the motion to dismiss the MAC's RICO, unfair competition, civil conspiracy, intentional interference with prospective economic advantage, and unclean hands claims. (Counts XLIX, L, LI, LIV, and LV.)[17]

---

[17] Innovatio does not contend that *Noerr-Pennington* provides immunity from the MAC's breach of contract and promissory estoppel claims, thus conceding that it is not applicable. *See*

II.     Breach of Contract and Promissory Estoppel (Counts LII & LIII)

On these counts, Innovatio contends that Illinois law applies, and the Manufacturers argue that California law applies. Neither party provides significant analysis of the question. They relegate their brief comments on the issue to a footnote. (*See* Dkt. No. 509, at 31 n.28.; Dkt. No. 474, at 22 n.2). Moreover, neither party identifies a conflict between Illinois and California law, so the court will apply Illinois law. *See Kochert v. Adagen Med. Int'l, Inc.*, 491 F.3d 674, 677 (7th Cir. 2007) ("Where the parties have not identified a conflict in state law, we will generally apply the law of the forum state.").

The MAC alleges that Innovatio is heir to the contractual obligations of its predecessors in ownership of the Innovatio Patents to license those patents on RAND terms. (MAC ¶¶ 60-68.) According to the MAC, Innovatio breached those contractual obligations by offering licenses on terms less favorable than a RAND license, asserting infringement through its licensing campaign and subsequent litigation before offering a RAND license, and failing to disclose that it is subject to RAND obligations. (*Id.* ¶¶ 75-76.) Innovatio does not dispute that it is subject to the contractual obligations of its predecessors in ownership of the patents. Moreover, it does not dispute the general theory that patent holders who make RAND commitments to a standards-setting organization may

---

*Apple, Inc. v. Motorola Mobility, Inc.*, 11-CV-178, 2012 WL 3289835, at *14 (W.D. Wis. Aug. 10, 2012) (Crabb, J.) ("Although the First Amendment protects Motorola's right to petition the courts to enforce its patents, Apple's breach of contract claims are based on the theory that Motorola agreed by contract that it would not enforce its patent rights until it offered a license to Apple on fair, reasonable and nondiscriminatory terms. In other words, Apple contends that Motorola waived some of its petitioning rights through contract. It would be improper to use the *Noerr-Pennington* doctrine to bar Apple from enforcing that contract.").

be liable in contract.[18]

Instead, Innovatio disputes that the Manufacturers have standing to bring the breach of contract claim. Specifically, it argues that "the customers who requested and were allegedly denied a RAND license are the intended beneficiaries of the IEEE contract—not the Manufacturing Defendants (who have never even requested a license)." (Dkt. No. 474, at 24.) Under Illinois law, "if a contract is entered into for the direct benefit of a third person, the third person may sue for a breach of the contract in his or her own name, even though the third person is a stranger to the contract and the consideration." *Olson v. Etheridge*, 686 N.E.2d 563, 566 (Ill. 1997). Here, the promises of Innovatio's predecessors to offer a RAND license to all users of the applicable IEEE standards plainly contemplate benefitting those users. *Apple*, 2012 WL 3289835, at *21-22 ("The primary purpose of the ETSI and IEEE intellectual property rights policies and Motorola's licensing commitments is to protect companies that need to obtain licences in order to practice the standards adopted by the organizations. . . . The entities that care the most about the availability of a license are those entities such as Apple, who will incorporate the standards into their own products. As a potential user of the standards at issue and a prospective licensee of essential patents, Apple is a third party beneficiary of the agreements between Motorola and IEEE and Motorola and ETSI."). The Targets are all potential users of the standards, and so are third-party beneficiaries.

Innovatio disputes, however, that the Manufacturers have standing to sue to enforce Innovatio's obligations to the Targets as third-party beneficiaries. That argument, of course, assumes

---

[18] Multiple courts have adopted this theory of liability. *See, e.g.*, *Apple, Inc.*, 2012 WL 3289835, at *17-23; Dkt. No. 66, *Microsoft Corp. v. Motorola, Inc.*, No. 10-cv-1823, at 4-5 (W.D. Wash. May 31, 2011); *Research In Motion Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d 788, 797 (N.D. Tex. 2008).

that Innovatio has no contractual obligations to the Manufacturers themselves. But that assumption does not hold up in light of the MAC's allegations. Specifically, the MAC alleges that the conduct of Innovatio's predecessors in ownership of the patents created a contract not only with IEEE, but also with IEEE's members, including Cisco. (MAC ¶ 67.) According to the Manufacturers, IEEE members have standing to sue Innovatio as direct beneficiaries of the contract.

Assuming for purposes of this motion to dismiss that IEEE's members are parties to the contract,[19] the Manufacturers are correct. The longstanding rule in Illinois, and elsewhere, is that "the promisee of a third-party-beneficiary contract may bring suit for a breach of that contract and recover damages therefor." *Carmack v. Great Am. Indem. Co.*, 78 N.E.2d 507, 511 (Ill. 1948); *accord Restatement (Second) of Contracts* § 305(1) (1981) ("A promise in a contract creates a duty in the promisor to the promisee to perform the promise even though he also has a similar duty to an intended beneficiary."). In other words, Innovatio's predecessors made a contractual promise to Cisco to offer licenses on RAND terms to all users of the relevant IEEE standards. If Innovatio fails to perform that obligation to any of those users, Cisco can sue Innovatio to recover all foreseeable damages it suffers because of that breach.

But what of Motorola and Netgear, who are not members of IEEE, and thus not parties to the contract?[20] Motorola and Netgear, as users of the standard, are only third-party beneficiaries of

---

[19] A full evaluation of the argument that IEEE's members (rather than just IEEE itself) are parties to the contract resulting from any member's RAND assurances to IEEE will require additional factual development regarding the structure of IEEE, its bylaws and policies, and the precise terms of the contract. For purposes of this motion to dismiss, however, the MAC has adequately alleged that IEEE's members are parties to the contract.

[20] The MAC alleges that Cisco is a member of IEEE. (MAC ¶ 48.) The Manufacturers' brief asserts, without citation, that both Cisco and Motorola are members of IEEE. (Dkt. No. 509, at 33.) Because the MAC does not allege that Motorola is a member of IEEE, the court will not accept that

the contract, not direct beneficiaries. (*See* MAC ¶ 308 ("[T]he [Manufacturers] . . . developed, marketed and/or used products that operate in accordance with the IEEE 802.11 standards.").). As Innovatio points out, moreover, there is no principle of contract law that allows one third-party beneficiary to assert the rights of any other third-party beneficiary. Motorola and Netgear thus cannot sue Innovatio for breaching its contractual obligations to the Targets.

That does not necessarily mean that Netgear's and Motorola's claims for breach of contract must be thrown out completely. As the court reads the MAC, the Manufacturers are asserting not only that they were harmed by Innovatio's failure to offer a RAND license to the Targets, but also by its failure to offer a RAND license to the Manufacturers themselves. (*See, e.g.*, *id.* ¶ 308 ("In reliance on [the RAND] assurances, companies including [the Manufacturers] . . . invested substantial resources in developing marketing, selling, and improving products that operate in accordance with the accused 802.11 standards."); *id.* ¶ 311 ("Innovatio breached its contractual obligations, including by . . . seeking to enjoin [the Manufacturers] from using components that operate in accordance with the accused 802.11 standards.").). Indeed, had Innovatio offered such a license to the Manufacturers, it likely would not, under the doctrine of exhaustion, have any viable infringement claims against the customers who purchased the Manufacturers' products. *See Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625 (2008) ("The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item."); *id.* at 630 (holding that method claims are exhaustible). The court will thus allow Netgear's and Motorola's contract claims to proceed, but they may not pursue any damages on the theory that Innovatio's failure to offer RAND licenses to the Targets harmed them.

---

fact as true for purposes of this motion to dismiss.

Innovatio also contends that the MAC's breach of contract claim fails because it fails to allege that the Manufacturers triggered the RAND obligation by requesting a license from Innovatio. In support, the MAC notes that some of the RAND assurances from Innovatio's predecessors specified that they were required to offer a RAND license only "upon request." (MAC ¶¶ 62, 63.) But other assurances, as alleged, do not include this qualifier. (*Id.* ¶¶ 64-66.) With respect to those assurances, there is no basis for concluding that the Manufacturers were required to request a RAND license before bringing a contract claim for Innovatio's failure to offer one.

Next, Innovatio contends that the Manufacturers cannot proceed on their promissory estoppel claim because they have also asserted violation of a contract. *See Prodromos v. Poulos*, 560 N.E.2d 942, 948 (Ill. App. Ct. 1991) ("As a rule, plaintiffs cannot pursue quasi-contractual claims where there is an express contract between the parties."). Under Fed. R. Civ. P. 8(a)(3), however, a party may plead alternative grounds of relief. Accordingly, "a plaintiff may plead breach of contract in one count and unjust enrichment and promissory estoppel in others, but he may not include allegations of an express contract, which governs the relationship of the parties, in the counts for unjust enrichment and promissory estoppel." *Nathan v. Morgan Stanley Renewable Dev. Fund, LLC*, 11 C 2231, 2012 WL 1886440, at *15 (N.D. Ill. May 22, 2012) (Lefkow, J.) (citation, alteration, and quotation marks omitted). Here, ¶ 314 of Innovatio's promissory estoppel count incorporates all preceding paragraphs of the MAC, including several alleging the existence of an express contract. (MAC ¶ 314.) Rather than requiring the Manufacturers to amend their complaint to remove the offending allegations in the promissory estoppel count, however, the court will construe ¶ 314 merely as background. *See Apps Commc'ns, Inc. v. S2000, Corp.*, 10 C 1618, 2010 WL 3034189, at *2 (N.D. Ill. Aug. 3, 2010) (Manning, J.) ("However, the court construes such allegations as

simply providing background. Apps is not seeking double recovery under both breach of contract and unjust enrichment; rather, any relief would be in the alternative.").

Innovatio's only other argument against the MAC's promissory estoppel claim is that the Manufacturers lack standing to bring it, for reasons parallel to those asserted with respect to the contract claim. (Dkt. No. 474, at 24-25.) That argument fails for the same reasons explained above, and the Manufacturers may pursue their promissory estoppel claim on the same terms as those explained above. That is, Motorola and Netgear may not pursue any damages based on the theory that Innovatio's failure to offer RAND licenses to the Targets harmed them, because neither Motorola nor Netgear can assert any claim for Innovatio's breach of its obligations to the Targets.

<u>CONCLUSION</u>

For the reasons stated above, Innovatio's motion to dismiss Counts XLIX, L, LI, LII, LIII, LIV, and LV of the Manufacturers' Amended Complaint (Dkt. No. 473) is granted in part and denied in part. Counts XLIX, L, LI, LIV, and LV are dismissed in their entirety. Counts LII and LIII shall remain. This case is set for a status hearing on 2/21/13 at 10:00 am. The parties are encouraged to discuss settlement.

ENTER:

_____

JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: February 4, 2013