## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| In Re Innovatio IP Ventures, LLC, Patent Litigation | Case No. 1:11-cv-09308 |
| This Document Relates To:<br><br>All Cases | Judge James F. Holderman<br>Magistrate Judge Sidney Schenkier<br><br>**PUBLIC REDACTED VERSION** |

## DEFENDANTS' MOTION FOR JUDGMENT PURSUANT TO RULE 52(C) OF THE FEDERAL RULES OF CIVIL PROCEDURE

## TABLE OF CONTENTS

I.    Introduction .................................................................................................................1

II.   Legal Standard .............................................................................................................2

III.  Argument .....................................................................................................................3

      A.    Innovatio Has Failed to Establish the Value of Any of the Patented
            Features ............................................................................................................3

      B.    Innovatio Ignored Hold-Up, Royalty Stacking, and *Ex Ante* Alternatives ............13

IV.   Conclusion .................................................................................................................17

i

# TABLE OF AUTHORITIES

## Cases

*Apple, Inc. v. Motorola, Inc.*,
   Nos. 2012-1548, 2012-1549 (Fed. Cir. Dec. 19, 2012) ........................................... 13

*AVM Techs., LLC v. Intel Corp.*,
   2013 WL 126233 (D. Del. Jan. 4, 2013) ............................................................. 5, 6

*BKCAP, LLC v. Captec Franchise Trust 2000-1*,
   688 F.3d 810 (7th Cir. 2012) .................................................................................. 3

*Cartwright v. Am. Sav. & Loan Ass'n*,
   880 F.2d 912 (7th Cir. 1989) .................................................................................. 3

*Cornell Univ. v. Hewlett-Packard Co.*,
   609 F. Supp. 2d 279 (N.D.N.Y. 2009) .................................................................... 4

*Dynetix Design Sols., Inc. v. Synopsis, Inc.*,
   2013 WL 4538210 (N.D. Cal. Aug. 22, 2013) ....................................................... 5

*Fillmore v. Page*,
   358 F.3d 496 (7th Cir. 2004) .................................................................................. 2

*Follett Higher Educ. Grp., Inc. v. Berman*,
   427 B.R. 432 (N.D. Ill. 2010) ................................................................................. 3

*Garretson v. Clark*,
   111 U.S. 120 (1884) ...................................................................................... 1, 2, 4, 6

*Hulme v. Madison Cnty.*,
   188 F. Supp. 2d 1041 (S.D. Ill. Nov. 28, 2001) .................................................... 2

*In re Berman*,
   629 F.3d 761 (7th Cir. 2011) .................................................................................. 3

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   694 F.3d 51 (Fed. Cir. 2012) ......................................................................... passim

*Lucent Techs. Inc. v. Gateway, Inc.*,
   580 F. 3d 1301 (Fed. Cir. 2009) .......................................................................... 5, 6

*Microsoft*,
   No. C10-1823JLR, 2013 WL 2111217 ............................................................ passim

*Neopost Industries B.V. v. PFE Int'l, Inc.*,
   403 F. Supp. 2d 669 (N.D. Ill. 2005) ..................................................................... 3

*Oracle America v. Google Inc.*,
   798 F. Supp. 2d 1111 (N.D. Cal. 2011) .................................................................. 6

*Powell v. Roberts*,
   921 F.2d 278 (7th Cir. 1990) .................................................................................. 3

**Rules**

Fed. R. Civ. P. 52 ..................................................................................................................... 2, 3

HIGHLY CONFIDENTIAL

Pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, Cisco Systems, Inc., Motorola Solutions, Inc., NETGEAR, Inc., Hewlett-Packard Co., and SonicWALL, Inc. (collectively "Defendants") respectfully move for judgment in favor of Defendants. This motion is made on the grounds that Innovatio IP Ventures, LLC ("Innovatio") has failed to meet its burden of establishing that its proposed RAND royalties for the claims previously found "standard essential" comport with governing precedent of the Supreme Court and the Court of Appeals for the Federal Circuit related to the determination of patent damages in general, or with principles surrounding the setting of RAND royalties specifically. Defendants therefore respectfully request that the Court enter judgment setting a RAND rate in accordance with the RAND rate proposed by Defendants.

## I.    <u>INTRODUCTION</u>

It has been black-letter law for over a hundred years that a patentee seeking damages must:

> *[i]n every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features*, and such evidence must be reliable and tangible, and not conjectural or speculative; or he must show, by equally reliable and satisfactory evidence, that the profits and damages are to be calculated on the whole machine, for the reason that the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature.

*Garretson v. Clark*, 111 U.S. 120, 121 (1884) (emphasis added); *see also LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (quoting *Garretson*, 111 U.S. at 121).

Innovatio bears the burden of proof on this issue[1] and has rested its case-in-chief without putting forward any evidence apportioning the value of the patented features from the value of unpatented features in the accused products. In fact, Innovatio's expert witnesses explicitly

---

[1]    The parties stipulated that "Innovatio shall bear the burden of establishing damages it seeks as a result of its infringement claims." Dkt. 912 at 1.

admitted that none of them even attempted to determine the value of the patented features by apportionment or otherwise. And Innovatio agrees that the entire market value exception does not apply here. Tr. at 574:3-9 (McAndrews).

Therefore, because Innovatio has not complied with the requirements set forth by the Supreme Court in *Garretson* as elucidated by the Federal Circuit in *LaserDynamics,* Innovatio has not met its burden of establishing that it is entitled to the royalty rate it seeks. In addition, Innovatio has provided no cognizable basis for this Court to determine an appropriate RAND rate.

Accordingly, Defendants respectfully request that the Court enter judgment pursuant to Rule 52(c) against Innovatio on its proposed royalties, and find that Innovatio is entitled only to a nominal damages amount. Alternatively, Defendants request that this Court set a RAND rate in accordance with the RAND rate proposed by Defendants.

## II.    **LEGAL STANDARD**

Federal Rule of Civil Procedure 52(c) authorizes a court to enter judgment against a party if the "party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue." Fed. R. Civ. P. 52(c); *see Fillmore v. Page,* 358 F.3d 496, 502 (7th Cir. 2004) (explaining that Rule 52(c) "applies to bench trials and authorizes the judge, after hearing all of the evidence with respect to an issue, to make findings of fact and enter judgment as a matter of law against that party"). The court may "enter judgment at any time that it can appropriately make a dispositive finding of fact on the evidence." *Hulme v. Madison Cnty.*, 188 F. Supp. 2d 1041, 1045 (S.D. Ill. Nov. 28, 2001) (quoting Notes of the Advisory Committee on Rules—1991 Amendment).

A motion under Rule 52(c) is not the same as a motion for a directed verdict. When ruling on a Rule 52(c) motion, "[t]he court neither draws special inferences in the nonmovant's

2

favor, nor considers the evidence in the light most favorable to the nonmovant." *Follett Higher Educ. Grp., Inc. v. Berman*, 427 B.R. 432, 434 (N.D. Ill. 2010) *aff'd sub nom. In re Berman*, 629 F.3d 761 (7th Cir. 2011); *BKCAP, LLC v. Captec Franchise Trust 2000-1*, 3:07-CV-637, 2011 WL 4916590 at \*3 (N.D. Ind. Oct. 14, 2011) *aff'd*, 688 F.3d 810 (7th Cir. 2012. The court is "bound to take an unbiased view of all the evidence, direct and circumstantial, and accord it such weight as the court believes it entitled to receive." *BKCAP, LLC v. Captec Franchise Trust 2000-1*, 3:07-CV-637, 2011 WL 4916590 at \*3 (N.D. Ind. Oct. 14, 2011) *aff'd*, 688 F.3d 810 (7th Cir. 2012). In analyzing the evidence, the concern is not "whether the plaintiff has made out a prima facie case." *Cartwright v. Am. Sav. & Loan Ass'n*, 880 F.2d 912, 918 (7th Cir. 1989) (quotations and emphasis omitted). Instead, Fed. R. Civ. P. 52(c) allows the court to "weigh[] the evidence and determine whether the plaintiff has proven the case." *Powell v. Roberts*, 921 F.2d 278 (7th Cir. 1990); *Neopost Industries B.V. v. PFE Int'l, Inc.*, 403 F. Supp. 2d 669, 675 (N.D. Ill. 2005), *dismissed*, 190 F. App'x 965 (Fed. Cir. 2006). "A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a)." Fed. R. Civ. P. 52(c).

## III.     <u>ARGUMENT</u>

###     A.     Innovatio Has Failed to Establish the Value of Any of the Patented Features

The law is clear that a patent owner is entitled only to be compensated for the use of its own invention, rather than for non-infringing features or components. If the basis for a damages demand is the revenue or profit associated with the accused products, the Supreme Court and the Federal Circuit explicitly ***require*** patent owners to "apportion" that amount between the value of the asserted patented features and the value of non-patented features. As the Federal Circuit has explained, it follows that "[w]here small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the

patentee will be improperly compensated for non-infringing components of that product." *LaserDynamics*, 694 F.3d at 67. This is why the Federal Circuit recently held that "the patentee … must ***in every case*** give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features." *Id.* (quoting *Garretson*, 111 U.S. at 121) (emphasis added).

In most cases, the starting point in the apportionment analysis is identification of the smallest salable patent-practicing unit ("SSU"). *LaserDynamics*, 694 F.3d at 67 ("Where small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product. Thus, it is generally required that royalties be based not on the entire product, but instead on the 'smallest salable patent-practicing unit.'"). The identification of the smallest salable unit is usually of great importance because it reduces the potential for error leading to compensating the patent owner beyond the value of the patented features. *See id.*; *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 283, 287-88 (N.D.N.Y. 2009) (explaining that "counsel would have wisely abandoned a royalty base claim encompassing a product with significant non-infringing components. The logical and readily available alternative was the smallest salable infringing unit with close relation to the claimed invention—namely the processor itself."). Once the SSU is identified, it must be further apportioned down in an attempt to quantify the value of the patented features relative to the non-patented features of the SSU. *LaserDynamics*, 694 F.3d at 70 (noting that if laptops were the royalty base, "when it comes time to then apportion a royalty rate that accounts for the ODD contribution only, the exceedingly difficult and error-prone task of discerning the ODD's value relative to all other components in the laptop remains").

Innovatio did none of this.  First, Innovatio mistakenly asserted that "the device that is usable by a consumer" constitutes the SSU.  Tr. 451:24-452:2 (Nettleton).  This is flat wrong. *See, e.g.*, *Cornell*, 609 F. Supp. 2d at 285 (holding that the smallest salable unit is a microprocessor, not a device usable by the consumer); *AVM Techs., LLC v. Intel Corp.*, 2013 WL 126233, *3 (D. Del. Jan. 4, 2013) (same). Even if the SSU were limited to the products that is purchased by a "consumer" (which it is not), the "consumers" here are the manufacturer defendants who purchase Wi-Fi chips, not Wi-Fi end products.  In any event, SSUs are not so limited: the SSU cannot be expanded simply through the addition of non-inventive elements to the claim. *See Lucent Techs. Inc. v. Gateway, Inc.*, 580 F. 3d 1301, 1310-11, 1336-39 (Fed. Cir. 2009) (finding that royalty base is Microsoft Outlook, despite the fact that claim explicitly required a display).   In this case, the evidence establishes that Wi-Fi chips enable the 802.11 standardized functionality at issue in this case, as even Innovatio's experts agree.[2] *See* Tr. 451:24-452:2 (Nettleton).  Thus, Innovatio uses the wrong starting point for its RAND analysis.

Innovatio compounds this problem by explicitly failing to apportion the value of either the item it claims is the SSU (*i.e.*, the entire device) or the Wi-Fi chipset (which Defendants identified as the SSU) as between the patented and unpatented features.  This also is error because apportionment down to the patented features is required even after the SSU has been determined. *See, e.g.*, *Dynetix Design Sols., Inc. v. Synopsis, Inc.*, 2013 WL 4538210, at *3 (N.D. Cal. Aug. 22, 2013) (Grewal, Mag. J.) ("Thus, *LaserDynamics* supports the premise that an apportionment is required even where there the accused product is the smallest salable unit or

---

[2]     Dr. Nettleton's admission that he had "no evidentiary basis today to provide any opinions that the 802.11 MAC and PHY in any of the accused products in this case are implemented on anything other than a Wi-Fi chip or chipset" shows that Innovatio recognizes that the "inventions" in this case reside on the Wi-Fi chip. Tr. at 495:10-14 (Nettleton).  And Innovatio's damages expert Mr. Evans admitted that damages should be based on the broadest claims, rather than the narrowest. Tr. at 930:16-21 (Evans). As Dr. Nettleton admitted, the broadest claims (e.g. those with the fewest claim limitations) are embodied within the Wi-Fi chipset. *See, e.g.*, Tr. at 464:11-18 (Nettleton); *see also* Tr. at 1106:8-12 (Evans) (same).

where whatever the smallest salable unit is it is still a multi-component product encompassing non-patent related features."); *see also Lucent*, 580 F.3d at 1336-39 (Fed. Cir. 2009) (requiring that royalties be apportioned to the accused date picker functionality despite the fact that the smallest salable unit was Microsoft Outlook); *LaserDynamics*, 694 F.3d at 70 (noting that if laptops were the royalty base, "when it comes time to then apportion a royalty rate that accounts for the ODD contribution only, the exceedingly difficult and error-prone task of discerning the ODD's value relative to all other components in the laptop remains"); *Garretson*, 111 U.S. at 121 (holding that an improvement in the construction of mop-heads should exclude the value of the mop-heads themselves, as "[w]ith the exception of [the patented invention], mop-heads like the plaintiff's had been in use time out of mind."); *Oracle America v. Google Inc.*, 798 F. Supp. 2d 1111, 1115-16 (N.D. Cal. 2011) (holding that damages opinion "must apportion the total value between the specific infringing features versus the rest of Android"); *AVM Techs. v. Intel Cop.*, 2013 WL 126233 at *3 (holding that microprocessors, despite being the smallest salable unit, must still be apportioned to arrive at the value of the accused dynamic logic circuits). Accordingly, Defendants are entitled to judgment in their favor on Innovatio's proposed royalty rates irrespective of the SSU determination because Innovatio failed to apportion the value of the accused products as between the patented features and the value derived from unpatented features, as required by the law.

Innovatio's experts repeatedly conceded that apportionment must be performed. For example, Dr. Teece agreed that apportionment was necessary:

> [Q.] Now, you're not providing an opinion on apportionment in this case, right?
> A. No. *I believe apportionment needs to be done*, but in terms of the exact way in which it's done, I'm not.

Tr. at 211:4-7 (Teece); *see also* Tr. at 242:10-14 (Teece) (admitting that the reason for apportionment is "to ensure that the royalty that you arrive at is attributable to the value related to the patented features"); Tr. at 1095:5-7 (Evans) (agreeing the "whole point" of apportionment "is to assess the value of the patented features"); Tr. at 1128:18-22 (Evans) (agreeing that Innovatio has the burden of proof "to show that the money that goes into Innovatio's pocket is due to their patents"). Despite these concessions, and the dictates of the controlling caselaw, none of Innovatio's experts carried out the required apportionment.

Even though the accused end products contain numerous functionalities that are unrelated to the patented features, Mr. Bergey, Innovatio's purported apportionment expert,[3] admitted that he "didn't look at what percentage of the 802.11 products is attributable to the patented features." Tr. at 734:4-6 (Bergey). In fact, Mr. Bergey admitted he "made no effort to ascertain or assess the value of the asserted patents in this case" and didn't try to "quantify the value of any of the patents-in-suit." Tr. at 604:8-13 (Bergey).

The Court elicited testimony from Mr. Bergey concerning this issue, in the process establishing that Innovatio apportioned no further than the alleged value of the 802.11 standard as a whole to the accused products:

> THE COURT: Why 802.11? The only purpose of 802.11 is it's a standard set by the industry. I have determined and counsel have agreed as to some of these patent claims are standard-essential.
> THE WITNESS: Uh-huh.
> THE COURT: That kind of ends the discussion on 802.11, doesn't it? Because now what I have to apply are the patented features, the value of the patented features, not unpatented 802.11 features that are not part of these patents. ***So you didn't separate out these patent claims or even the families of patent claims in order to evaluate those?***
> You just said whatever is standard-essential, that's the value you're putting it on, right?

---

[3]    Innovatio's attorneys stated that Mr. Bergey would testify that the components of the accused product drove market demand. Tr. at 519:15-520:8 (McGrath). And, the very first page of Mr. Bergey's demonstratives claimed that he would be opining on the "patented features as basis for demand." PTX-1027.0001. As noted above, however, Mr. Bergey never tried to apportion the value of the patented features from the unpatented features in the accused products, or as compared to the value of the rest of the 802.11 standard itself.

THE WITNESS: *That is correct.*

Tr. at 625:7-20 (emphasis added).

A day after the Court questioned whether Mr. Bergey's analysis would be "quantitative" in gauging the importance of the patented features (Tr. at 525:6-14), Mr. Bergey admitted that his evaluation was wholly "qualitative", not quantitative (Tr. at 604:8-10; 777:17-778:10). Indeed, all Mr. Bergey or Innovatio did was describe various Innovatio patent families[4] using vague terms like "valuable," "important," or "essential":

> [Q.] If we go through your report and look at your conclusions, we will see that you opine that the features are "***valuable***," correct?
> A. Yes.
> Q. And we will see that you opine that the features are "***important***," right?
> A. Yes.
> Q. And we will see that you opine that the features are "***essential***"?
> A. Yes.
> Q. And we will see that you opine that the features are necessary to make 802.11 products ***commercially viable***? Those are your opinions, right?
> A. Yes.

Tr. at 786:23-787:11 (Bergey). These adjectives are, verbatim, the same qualitative descriptions that the Federal Circuit rejected as being inadequate to show that the patented features drive consumer demand in *LaserDynamics*. *See* 694 F.3d at 68 ("It is ***not enough*** to merely show that the disc discrimination method is viewed as ***valuable, important, or even essential*** to the use of the laptop computer. Nor is it enough to show that a laptop computer without an ODD practicing the disc discrimination method would be ***commercially unviable***.") (emphasis added). When it came to the required showing, however, Mr. Bergey admitted that he had not shown that "the Innovatio patents are the sole basis for demand." Tr. at 787:12-16 (Bergey).

---

[4]    Further, Mr. Bergey's testimony was about how the functionality purportedly enabled by the patented features was "valuable, important or even essential." However, as Dr. Nettleton admitted, there are a number of alternatives to Innovatio's patented technology (Tr. at 385:11-20) and Innovatio never established that its patented features were uniquely important, valuable or essential ("essential" in the sense of absolutely necessary).

Indeed, there is no way Mr. Bergey could have properly apportioned in light of his admission that he "didn't read all of the asserted patents" and "at best, … scanned a couple of them…." Tr. at 589:16-19 (Bergey). Mr. Bergey's "Wi-Fi feature factor" – a dubiously-derived percentage that he claims reflects the value of Wi-Fi as a whole to certain general classes of products[5] – is reminiscent of the arbitrary apportionment by the plaintiff's expert in *LaserDynamics*, which the Federal Circuit held had been "plucked out of thin air based on vague qualitative notions of the relative importance of the ODD technology." *LaserDynamics*, 694 F.3d at 69. Dr. Nettleton, Innovatio's technical expert, likewise admitted that because apportionment was "not [his] bailiwick" he had not made any attempt to apportion the value of the end products attributable to the patented features. Tr. 468:15-25; 492:10-13; 485:19-22 (Nettleton).[6] Mr. Evans – who determined Innovatio's ultimate royalty rates – admitted that he "didn't perform [his] own apportionment analysis" and "for the apportionment analysis, … relied on Mr. Bergey." Tr. at 1080:21-1081:1 (Evans). Innovatio's failure to apportion renders Innovatio's entire damages analysis flawed.

In addition to these admissions that the end products contain numerous non-accused technologies that Innovatio never apportioned away from the alleged patented features, Innovatio also admitted that the 802.11 standard itself contains numerous features other than the patented features:

> Q. Can you give the Court a ballpark of how many features you believe there are in the 802.11?
> A. I think **there would be well over a thousand**.

---

[5]  The absurdity of Mr. Bergey's "feature factor" is evidenced by the fact that, for access points for example, he included in the value he attributed to Wi-Fi the value of the Ethernet interface. Tr. at 803:18-21 (Bergey).  Of course, Ethernet, a standard (IEEE standard 802.3) that predates the IEEE's 802.11 standard and relates to a particular type of **wired** functionality, is the very opposite of **wireless** functionality.

[6]  Dr. Nettleton also frankly admitted that he had provided no evidentiary basis whatsoever to opine that the Innovatio asserted claims are core functionality of the 802.11 standard. *See* Tr. at 490:24-491:2.

Tr. at 605:13-15 (Bergey) (emphasis added). And as Mr. Bergey admitted again later as well:

> Q. Okay. There are *several features that have nothing – in the 802.11 that have nothing to do with the patents-in-suit*?
> A. Yes.

Tr. at 772:12-16 (Bergey) (emphasis added); *see also* Tr. at 358:7-362:14 (Nettleton) (listing a number of 802.11 features that have nothing to do with the patents-in-suit); Tr. at 772:24-773:13 (Bergey) (same); 1097:5–9 (Evans) (acknowledging there is more to the end products than just the patented features, but admitting that "Innovatio stops at the end product"). Dr. Nettleton even testified that a number of these unpatented features were central to the standard. Tr. at 360:5-7; 362:9-14 (Nettleton) (noting that OFDM is "central" to the standard); Tr. at 364:17-22 (stating that CSMA-CA is "the fundamental channel sharing access method in the Wi-Fi standards" and its "foundation"). Yet despite these concessions, each of Innovatio's experts admitted that he had not determined the value of the patented technologies in relation to the numerous other unpatented features in the standard. Tr. at 210:13-20 (Teece) (agreeing that he did not have an opinion "on the relative value of the patented features in this case as compared to the rest of the standard"); Tr. at 788:2-4 (Bergey) (agreeing that he "didn't analyze the importance of the patented features in relation to any other features in 802.11"); Tr. at 1118:9-23 (Evans) (agreeing that he relied on Dr. Nettleton and Mr. Bergey for apportionment, but admitting that "they didn't look at the value of those claim groups relative to the other features in 802.11."); 492:10-13 (Nettleton) (admitting he did not "take into account the relative contributions of each component of an accused device or system"); 485:19-22 (Nettleton) (admitting he had "not analyzed even a single accused product in this case to determine whether it actually infringes any of the asserted claims"). Innovatio's failure to apportion is especially noteworthy in light of Dr. Teece's admission that a RAND royalty rate must determine the value of the patented features compared

10

to the other features in the standard. Tr. at 241:5-10 (Teece) (agreeing that "in connection with determining a RAND royalty rate, you need to consider the value of the patented features relative to the other features in the standard").

Innovatio's admitted failure to apportion ensures that, if allowed, Innovatio's proposed royalties will improperly capture value that Innovatio is not entitled to. Innovatio's ultimate royalty has three inputs: the weighted average selling price (ASP) for Defendants' products; Mr. Bergey's "feature factor"; and Mr. Evans's 6% royalty rate. *See, e.g.*, PTX-1028.0047. First, the weighted ASP reflects the retail cost of products that have many functions beyond the patented features (e.g., notebooks and printers). Second, Mr. Bergey's feature factor only purports to reflect the value of all Wi-Fi functionality,[7] rather than just the patents-in-suit, as noted above. And third, the 6% royalty rate determined by Mr. Evans was based solely on licenses between other companies, ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████ Mr. Evans admitted that the purported 6% rate was not based on the patents-in-suit, claiming that Innovatio would be entitled to 6% for every product regardless of whether the licensed product used all of the asserted patents or just a subset. Tr. at 1114:22-1115:16 (Evans). Indeed, Mr. Evans candidly admitted on the stand his failure to apportion to the patented features:

> Q. Okay. But *you haven't apportioned in the 6% down to the patented features*--
> A. *That's correct*.

---

[7]     And, as explained above, it actually reflects features and functions other than just the value of the Wi-Fi functionality contained in the accused products.

11

Tr. at 1115:17-20 (Evans). As Innovatio's experts conceded, Innovatio has not apportioned (or even attempted to apportion) the value of the patented features from the value of the unpatented features and functions in the accused products anywhere in Innovatio's royalty calculations. A simple example serves to demonstrate how Innovatio's failure to apportion the value of the patented features results in Innovatio acquiring royalties due to functionality unrelated to the patents-in-suit. Under Innovatio's methodology, Innovatio would get $17.49 more for a Cisco Aironet 1040 access point than for a Linksys N300 which has exactly the same Wi-Fi functionality. *See* Tr. at 819:8-822:25 (Bergey). Yet every single Innovatio expert admitted that they had done no analysis to determine whether this difference in royalties – which Innovatio contends should end up in its coffers – was attributable to the patented features. For example, Mr. Bergey admitted that he did no analysis to determine whether the differences in royalties Innovatio was seeking were attributable to the patented features:

> Q. Okay. And you *did no analysis* to determine whether the *difference in royalty as between more expensive products and less expensive products is attributable to the patented features*, right?
> A. Uh --
> Q. Correct?
> A. Again, I -- *I did not*, but I don't -- I mean, this is pretty logical.

*See* Tr. at 824:5-12 (Bergey). Mr. Bero admitted the same thing:

> Q. So my question for you, just to be totally clear, is *you didn't perform any analysis*, and *you're not offering any opinion* as to whether *the difference in the royalties as between more expensive products and less expensive products is attributable to the patented features of Innovatio's patents*.
> A. *I'm not, no*.

Tr. at 556:2-7 (Bero). Mr. Evans also admitted that he had not performed the required apportionment:

> Q. Isn't it correct that *you did not perform an analysis of the features* available on the expensive access points as compared to the features available on the less expensive access points *to determine whether the difference in price and the*

12

> *difference in royalty due to Innovatio using your methodology is attributable to*
> *the patented features in this case*?
> A. I personally *did not do an analysis*.

Tr. at 1127:24-1128:5 (Evans). And Dr. Nettleton admitted the same thing:

> [Q.] *You did not do anything to determine whether the difference in price*
> *between any products is attributed – is attributable to the Innovatio patented*
> *features or to Wi-Fi technology*; is that correct?
> A. Yes. *I did -- did no such thing*. It's not my bailiwick to look at the economics
> of the matter.
> Q. And by that, by not your bailiwick, you mean you do not have the expertise to
> do that; is that fair?
> A. That's correct.

Tr. at 468:17-25 (Nettleton). Finally, Dr. Teece also conceded that he had not carried out any

apportionment:

> Q. Right. *You haven't performed an apportionment analysis* in this case.
> A. *That is correct*.

Tr. at 211:8-10 (Teece) (same).

Innovatio's admitted failure to apportion to the value of the patented features results in a

royalty rate that is both legally impermissible and logically unsound. Defendants are therefore

entitled to judgment in their favor on the issue of the proper RAND royalty rate.

## B.    Innovatio Ignored Hold-Up, Royalty Stacking, and *Ex Ante* Alternatives

Even apart from Innovatio's failure to apportion, Defendants are entitled to judgment in

their favor on Innovatio's royalty proposals because those proposals are admittedly inconsistent

with basic RAND principles. The purpose of RAND commitments is to prevent hold-up and

royalty stacking. *See* Dkt. 851 (Memorandum Order on Essentiality) at 6; *Microsoft*, No. C10-

1823JLR, 2013 WL 2111217, at ¶ 72; Ex. 1, Amicus Brief of the Institute of Electrical and

Electronics Engineers, *Apple, Inc. v. Motorola, Inc.*, Nos. 2012-1548, 2012-1549 (Fed. Cir. Dec.

19, 2012), p. 15 ("Patent commitments like the IEEE LOA protect implementers of a standard

against patent hold-up."); Ex. 2, Department of Justice & Federal Trade Commission, Antitrust

Enforcement and Intellectual Property Rights: Promoting Innovation and Competition at 61 (Apr. 2007) ("Royalty stacking can make production unprofitable and retard innovation."). Hold-up refers to the ability of a company, post-standardization, "to charge inflated prices that reflect not only the intrinsic value of its technology, but also the inflated value attributable to its technology's designation as the industry standard," while royalty stacking refers to the "payment of excessive royalties to many different holders of SEPs." Dkt. 851 (Memorandum Order on Essentiality) at 6; *Microsoft*, No. C10-1823JLR, 2013 WL 2111217, at ¶ 65. Innovatio's proposed royalties do nothing to avoid these problems, and Innovatio's experts have even gone so far as to suggest that hold up and royalty stacking are not problems to be avoided.

Innovatio's experts repeatedly confirmed Innovatio's anti-RAND posture. While Dr. Teece allows that a RAND royalty requires avoidance of holdup, that is only because he defines holdup in an exceptionally narrow way that is inconsistent with most authorities on this issue, including the Court's order on essentiality (Dkt. No. 851), the *Microsoft* case, the IEEE's definition, and many others: according to Dr. Teece, hold-up requires opportunism, which involves "self-seeking coupled with guile." Tr. at 223:13-18 (Teece).[8] Under Dr. Teece's narrow definition of holdup, he opined that "a RAND royalty rate could include the value due to a technology's inclusion in the standard …" Tr. at 227:13-16 (Teece). For his part, Mr. Evans agrees with Dr. Teece – and disagrees with this Court and the *Microsoft* court – in opining that "a RAND royalty can include not just the actual value of the technology but, to at least some extent, the value of the technology due to its inclusion in the standard." Tr. at 1192:1-10 (Evans).

With respect to licenses, Mr. Evans bases his opinion on a number of licenses that plainly include holdup value. ███████████████████████████████████████

---

[8]    Even Innovatio's licensing expert, Mr. Evans, was unwilling to sign on to Dr. Teece's unusual definition. Tr. at 1193:12-20 (Evans).



Indeed, consistent with these facts, most of the licenses that Mr. Evans relies on were considered by the *Microsoft* court and found not to be RAND.

Mr. Evans' reliance on these licenses is therefore at odds with the law and even the opinions of Innovatio's own expert, Dr. Teece, who takes the view that a license that has been found by a court to include hold-up value should not be used to determine a RAND royalty. Tr. at 247:9-248:7 (Teece).

Mr. Evans also agreed at trial that if a viable alternative to one of Innovatio's patented technologies existed before standardization, the value of Innovatio's patent cannot exceed the cost of incorporating the alternative technology into the standard and implementing it. Tr. at 1202:17-24 (Evans). Yet his actual analysis does not consider the *ex ante* alternatives identified by Defendants. Defendants and Innovatio's expert, Dr. Nettleton, are in agreement that "at the time of Wi-Fi standardization, there were a number of alternatives available to the patented technology." Tr. at 385:15-20 (Nettleton). For instance, Dr. Nettleton failed to explain why BTMA was not a viable alternative to Innovatio's channel-sharing patents (Tr. at 415:19-416:3); why the many identified alternatives to the sleep mode patents, such as the Mobitex technology, could not have been used instead of the Innovatio's patents (Tr. at 434:20-23, 433:16-23; 446:13-447:1); or why the Messenger patent and other identified alternatives could not have been used

in place of the Innovatio multi-transceiver patents (Tr. at 424:15-22; 430:23-431:3; 431:9-17). But one will search Innovatio's royalty calculation in vain for any accounting of how the existence of these alternatives limits or in any way impacts the proposed royalties for Innovatio's patents.

To the contrary, rather than addressing the *ex ante* value of the patented inventions – as required to assess the value of the technologies at issue in the absence of lock-in and hold up – Mr. Evans attempts to show the value of Wi-Fi through present-day communications in which customers of the "network operator" defendants complained about disruptions in Wi-Fi offered at a restaurant. Tr. at 1196:6-20 (Evans). Mr. Evans conceded that these emails came from a time when Wi-Fi was ubiquitous and people were locked in to the Wi-Fi standard. *See* Tr. at 1196:24-1197:5 (Evans). Mr. Evans thus admittedly bases his valuation of the patents-in-suit squarely on post-standardization holdup value, rather than on the actual value of Innovatio's technology.

Finally, Innovatio has not determined a RAND royalty that avoids royalty stacking concerns. *See Microsoft*, No. C10-1823JLR, 2013 WL 2111217, at ¶ 110; Ex. 2, Department of Justice & Federal Trade Commission, Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition at 61 (Apr. 2007). Rather, Innovatio's experts opined that royalty stacking is not harmful, and may potentially even be beneficial. Despite Dr. Teece's admission that a lot of licenses are "stacked up on 802.11 products," Tr. at 257:15-17, Dr. Teece explained on the stand that, in his opinion, "royalty stacking, per se, isn't bad, not something that you should have an allergic reaction to." Tr. at 191:11-192:22 (Teece). Mr. Evans disagrees with those who have recognized the problems of royalty stacking, as well: specifically, he testified that he did not believe that "you should consider the number of essential patents that cover a standard in connection with a RAND royalty analysis." Tr. at 1210:5-14 (Evans).

16

Unsurprisingly, Innovatio's refusal to acknowledge the problem of royalty stacking results in rates that are inconsistent with any attempt to avoid royalty stacking. The *Microsoft* court held that a rate that, when demanded by each of the 92 entities that have submitted Letters of Assurance, exceeds the total product price implicates "clear stacking concerns" and "cannot be a RAND royalty rate." *Microsoft*, No. C10-1823JLR, 2013 WL 2111217, at ¶ 456. The same can be said for Innovatio's royalty demands. For example, Innovatio's 5.7% royalty rate on access points, if demanded by all 92 LOA submitters, would result in a royalty rate over *five times* the price of the entire access point itself – let alone its profit or the much lower price of the Wi-Fi chip within the access point that actually provides the Wi-Fi functionality.

As a result of Innovatio's failure to propose a royalty rate that comports with RAND, the Court should enter judgment against Innovatio on its proposed royalty rates for this additional reason also.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, Defendants respectfully request that this Court set a RAND rate in accordance with the RAND rate proposed by Defendants.

September 17, 2013                              Respectfully submitted,

17

*/s/ Gianni Cutri*
Gianni Cutri
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
312.862.2000 (Telephone)
312.862.2200 (Facsimile)
gianni.cutri@kirkland.com

Adam R. Alper (Pro Hac Vice)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
415.439.1400 (Telephone)
415.439.1500 (Facsimile)
adam.alper@kirkland.com


Michael W. De Vries (Pro Hac Vice)
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, California 90071
213.680.8400 (Telephone)
213.680.8500 (Facsimile)
michael.devries@kirkland.com

**Counsel for Cisco Systems, Inc., Motorola
Solutions, Inc., and NETGEAR Inc.**

*/s/ Barry K. Shelton*
Barry K. Shelton
barry.shelton@bgllp.com
Conor M. Civins
conor.civins@bgllp.com
BRACEWELL & GIULIANI LLP
111 Congress Avenue, Suite 2300
Austin, Texas 78701
Telephone: (512) 472-7800
Facsimile: (512) 472-9123

Anthony Nimmo
anthony.nimmo@icemiller.com
Jennifer M. Dienes
jennifer.dienes@icemiller.com
ICE MILLER LLP

18

200 W. Madison Street, Suite 3500
Chicago, IL  60606-3417
Telephone: (312) 726-1567
Facsimile:  (312) 726-7102

**Counsel for Hewlett-Packard Company**

*/s/ Kimball R. Anderson*
Kimball R. Anderson
Kathleen B. Barry
Solana P. Flora
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
kanderson@winston.com
kbarry@winston.com
sflora@winston.com

Michael A. Jacobs
Efrain Staino
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

Christopher F. Jeu
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 813-5600
Facsimile: (650) 494-0792

**Counsel for SONICWALL, INC.**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 17, 2013 a true and correct copy of the foregoing

**DEFENDANTS' MOTION FOR JUDGMENT PURSUANT TO RULE 52(C) OF THE**

**FEDERAL RULES OF CIVIL PROCEDURE** was electronically filed with the Court via the

CM/ECF system which sent notification of such filing to all Counsel of Record.


Dated:    **September 17, 2013**

*/s/ Gianni Cutri*

Gianni Cutri
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois  60654
312.862.2000 (Telephone)
312.862.2200 (Facsimile)
gianni.cutri@kirkland.com