1

```
1              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3    IN RE:                      )  MDL 2303
                                 )  11 C 9308 and
4    INNOVATIO IP VENTURES, L.L.C. )  related cases
                                 )
5    PATENT LITIGATION.          )  Chicago, Illinois
                                 )  September 9, 2013
6                                 )  9:00 o'clock a.m.

7                           VOLUME 1
8              TRANSCRIPT OF PROCEEDINGS - Trial
             BEFORE THE HONORABLE JAMES F. HOLDERMAN
9

10   APPEARANCES:

11   For the Plaintiff      NIRO, HALLER & NIRO, LTD.
     Innovatio IP Ventures, BY:  MR. MATTHEW G. McANDREWS
12   L.L.C.:                181 West Madison Street, Suite 4600
                            Chicago, Illinois  60602-4515
13                          (312) 236-0733

14                          McANDREWS, HELD & MALLOY, P.C.
                            BY:  MR. GREGORY C. SCHODDE
15                               MR. RONALD "HANK" SPUHLER
                                 MR. THOMAS J. WIMBISCUS
16                               MR. PETER J. McANDREWS
                                 MS. PATRICIA J. McGRATH
17                               MR. CHRISTOPHER SCHARFF
                            500 West Madison Street, Suite 3400
18                          Chicago, Illinois  60661
                            (312) 775-8000
19
     For Cosi,              KIRKLAND & ELLIS, L.L.P.
20   Dominick's, Meijer,    BY:  MR. ADAM R. ALPER
     Cisco Systems, Motorola,    MR. MICHAEL W. DeVRIES
21   and NETGEAR; and a          MR. GIANNI L. CUTRI
     number of hotel defts.:     MR. BRANDON H. BROWN
22                               MR. RAGHAV KRISHNAPRIYAN
                                 MR. ERIC CHENG
23                               MR. TIM G. MAJORS
                            300 North LaSalle Street
24                          Chicago, Illinois  60654
                            (312) 862-2000
25
```

2

```
 1    APPEARANCES (Continued):

 2                            KIRKLAND & ELLIS, L.L.P.
                             BY:  MR. STEVEN C. CHERNY
 3                            Citigroup Center
                             153 East 53rd Street
 4                            New York, New York  10022
                             (212) 446-4965
 5
      For SonicWALL, Inc.:    WINSTON & STRAWN, L.L.P.
 6                            BY:  MR. KIMBALL R. ANDERSON
                                  MS. KATHLEEN B. BARRY
 7                            20 South Clark Street, Suite 2620
                             Chicago, Illinois  60603
 8                            (312) 447-7217

 9    For Hewlett-Packard     BRACEWELL & GIULIANI
      Company, Panera,        BY:  MR. BARRY K. SHELTON
10    Caribou, HVM, Springhill     MR. CONOR M. CIVINS
      Suites:                      MR. ALAN D. ALBRIGHT
11                            111 Congress Avenue, Suite 2300
                             Austin, Texas  78701-4061
12                            (512) 494-3620

13    For Wal-Mart:           SHEPPARD MULLIN
                             BY:  MR. BRADLEY C. GRAVELINE
14                            Three First National Plaza
                             70 West Madison Street, 48th Floor
15                            Chicago, Illinois  60602
                             (312) 499-6316
16
      For Lowe's:             HUNTON & WILLIAMS, L.L.P.
17                            BY:  MR. MICHAEL A. OAKES
                             2200 Pennsylvania Avenue, NW
18                            Washington, D.C.  20006
                             (202) 955-1500
19
      For Dominick's:         MANDELL MENKES, L.L.C.
20                            BY:  MS. ELIZABETH MORRIS
                             One North Franklin Street, Suite 3600
21                            Chicago, Illinois  60606
                             (312) 251-1000
22

23

24

25
```

1   APPEARANCES (Continued):

2
    Also Present for
3
    Broadcom Corp.:          PERKINS COIE, L.L.P.
4                            BY:  MS. AMANDA J. TESSAR
                             1900 Sixteenth Street, Suite 1400
5                            Denver, Colorado  80202-5255
                             (303) 291-2357
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22
                   COLLEEN M. CONWAY, CSR, RMR, CRR
23                      Official Court Reporter
                 219 South Dearborn Street, Room 2144-A
24                      Chicago, Illinois  60604
                           (312) 435-5594
25                 colleen_conway@ilnd.uscourts.gov

**4**

1    (Proceedings heard in open court:)

2    THE CLERK:  11 C 9308, Innovatio IP Ventures.

3    MR. McANDREWS:  Appearances, Your Honor?

4    THE COURT:  Good morning.  Yes, please.

5    MR. McANDREWS:  Good morning.

6    On behalf of the Plaintiff Innovatio IP Ventures,

7    L.L.C., Matt McAndrews, and I suppose, given the number of my

8    colleagues here, we should do individual introductions, if that

9    makes sense with the Court.

10   THE COURT:  If you would.  My court reporter can then

11   make sure we've got all the names with the faces.

12   MR. SCHODDE:  Greg Schodde, Your Honor.

13   THE COURT:  Good morning.

14   MR. WIMBISCUS:  Good morning, Your Honor.  Tom

15   Wimbiscus.

16   THE COURT:  Yes.  Good morning.

17   MR. SPUHLER:  Good morning, Your Honor.  Hank

18   Spuhler.

19   THE COURT:  Good morning.

20   MR. SCHARFF:  Your Honor, Christopher Scharff.

21   THE COURT:  Good morning.

22   All right.  Have we got everybody that's appearing on

23   behalf of Innovatio?

24   MR. McANDREWS:  As of today.  We have a few more

25   members of the team.  Why don't we get the final appearances.

1    MR. P. McANDREWS:  Pete McAndrews, Your Honor.

2    THE COURT:  I'm sorry?

3    MR. P. McANDREWS:  Peter McAndrews.

4    MS. McGRATH:  Patricia McGrath.

5    THE COURT:  All right.  Thank you.  The older I get,

6    the harder my hearing is, and so I appreciate everybody keeping

7    their voices up.

8    MR. CHERNY:  Good morning, Your Honor.

9    Steve Cherny from Kirkland & Ellis on behalf of

10   Cisco, Motorola, and NETGEAR.

11   THE COURT:  Good morning.

12   MR. CHERNY:  And we have a number of lawyers

13   representing a number of parties at our table.

14   THE COURT:  Yes.

15   MR. ALPER:  Good morning, Your Honor.  Adam Alper.

16   THE COURT:  Good morning.

17   MR. DeVRIES:  Good morning, Your Honor.  Mike

18   DeVries.

19   THE COURT:  Good morning.

20   MR. CUTRI:  Gianni Cutri, Your Honor.  Good morning.

21   THE COURT:  Good morning.

22   MR. ANDERSON:  Kimball Anderson on behalf of

23   SonicWALL, Your Honor.

24   THE COURT:  Good morning.

25   MR. CIVINS:  Good morning, Your Honor.

1       Conor Civins on behalf of Hewlett-Packard.

2       THE COURT:  Good morning.

3       MR. SHELTON:  Good morning, Your Honor.

4       Barry Shelton on behalf of Hewlett-Packard.

5       THE COURT:  Good morning.

6       MR. SHELTON:  Also in the courtroom is Adam Albright

7  from my firm for Hewlett-Packard, Your Honor.

8       MR. ALBRIGHT:  Good morning, Your Honor.

9       THE COURT:  Good morning.

10      Okay.  Well, I appreciate all of the endeavors that

11 you have engaged in.  The reason I was running a little late is

12 I noticed some things were filed even in the early-morning

13 hours this morning, and I wanted to go through some of those

14 items before we proceed further.

15      I know you spent time on Friday preparing the

16 courtroom, and I appreciate the setup that you have.  I

17 appreciate your working with my court reporter for that purpose

18 and my other members of my staff.

19      First of all, let me start out with what you have

20 agreed upon, and that's the stipulation and the proposed order

21 of presentation that's been agreed upon.

22      I agree wholeheartedly.  Innovatio is the plaintiff

23 in the case from the standpoint of how we're going to proceed

24 with this matter and has both the benefits and the burdens that

25 come with that position.  All right.

1           MR. CHERNY:  Thank you, Your Honor.

2           MR. McANDREWS:  Thank you.

3           THE COURT:  All right.  Now, something that may or

4    may not be -- you have agreed upon.  I know you have submitted

5    your joint motion to admit exhibits.  I know there are some

6    objections.  I appreciate the preciseness with which you have

7    articulated your respective positions.  I have not had a chance

8    to review all of the exhibits that you have submitted.  They're

9    here arrayed on my bench.

10          But what I intend to do is to take whatever

11   objections there are with the trial and make determinations

12   after I have an opportunity to review the evidence that's been

13   presented.  Okay?

14          MR. CHERNY:  Thank you, Your Honor.

15          MR. McANDREWS:  Okay.  Thank you.

16          THE COURT:  All right.  Counsel are nodding in

17   affirmance.

18          I also want to thank you for submitting very

19   efficiently your response to my inquiry for input with regard

20   to the smallest salable patent-practicing unit method of making

21   a determination.  That, of course, concept was first generated

22   by now Chief Judge Rader when he was sitting by designation in

23   the District Court in Buffalo in the *Cornell University* case,

24   and it is something that we -- because it's been adopted by the

25   Federal Circuit, continues to be a concept that I need to take

1    into account. I appreciate your input on that. And as we move

2    through the trial, if you have further positions on that, you

3    certainly can let me know.

4         All right. Also, with regard to the defendants'

5    motion to exclude two of Innovatio's witnesses, Larry Evans and

6    Christopher Bergey, I am going to take those with the case.

7    You can certainly address those issues as we proceed along so

8    that we can move efficiently. To some extent, the testimony

9    that will be presented will be an offer of proof subject to the

10   objections that the defense will be presenting or have been

11   presenting. Okay?

12        MR. McANDREWS: Thank you, Your Honor.

13        MR. CHERNY: Thank you.

14        THE COURT: All right? All right. Now, moving on to

15   a series of motions, some of which are now being withdrawn,

16   various motions related to that, and that is the network

17   operator defendants' motions to exclude testimony and evidence

18   related to what they contend to be undisclosed damages

19   contentions.

20        Let me say this. My thought on that, since I know

21   there may be a disagreement on that point, is to go ahead and,

22   if I can reach some consensus on this, sever that from this

23   proceeding today and move with just the manufacturers' issues.

24        What's Innovatio's position?

25        MR. McANDREWS: Your Honor --

1          THE COURT:  Holding it for a later time.

2          MR. McANDREWS:  Yeah.  I think you'll find in our

3    presentation, starting right off with the opening, that the

4    emphasis today and this week is primarily on the dispute with

5    the manufacturers.

6          THE COURT:  Yes.

7          MR. McANDREWS:  If you don't mind, I will footnote

8    the point about the manufacturers and the use-based royalty,

9    but it is literally just that.

10         THE COURT:  You will footnote the point about the

11   network --

12         MR. McANDREWS:  Did I say "manufacturers"?

13         THE COURT:  You did.

14         MR. McANDREWS:  I'm sorry.  I misspoke.

15         THE COURT:  You are going to footnote the network

16   defendants.

17         MR. McANDREWS:  The network operator use-based

18   royalty.  And when I say "footnote," that is just a very quick

19   point that puts in context the broader dispute with the

20   manufacturers.

21         THE COURT:  Yes.  And I understand that.  And to the

22   extent that there are disagreements about what was disclosed or

23   what is being disclosed, we are going to put those aside and

24   focus on the issues with regard to the manufacturers and hold

25   for a later time these issues that were raised by Lowe's and

1    Wal-Mart and the other folks that are raising that point.

2    Because I have obviously read the materials that you previously

3    had filed and, consequently, I know your focus is going to be

4    on the manufacturers.

5           So is that okay with everybody?  Let me hear from the

6    network folks.

7           MR. CHERNY:  Yes.

8           THE COURT:  Basically, I'm granting your motion from

9    the standpoint -- your motions from the standpoint of severing

10   those issues at this time.

11          Anybody want to comment on that from the network

12   folks?

13          MR. OAKES:  Good morning, Your Honor.  Michael Oakes

14   for one of the network operators, Lowe's.

15          We're okay with that concept for purposes of this

16   trial today.  We do want to preserve our objections to any

17   evidence that would come in with respect to use-based damages

18   for the network operators.

19          THE COURT:  Okay.  All right.  Does anybody have a

20   disagreement?  You don't have to stand up and concur, but if

21   anybody in the courtroom has a disagreement about that, let me

22   know.

23          All right.  Silence is affirmance, and we'll go ahead

24   and proceed that way.

25          With regard to the various housekeeping motions about

1  withdrawing motions and correcting motions, I will work that
2  out with my clerk and we'll get an administrative order
3  addressing that.
4          Okay.  We've got just a couple of other housekeeping
5  matters.  I see that Ms. Tessar on behalf of her client, who is
6  not a party in this case, desires to file an appearance *pro hac*
7  *vice*.  This is document number 906.
8          And I assume that the person who has risen from the
9  middle of the audience in the public area is Ms. Tessar.
10         MS. TESSAR:  Yes, Your Honor.  My client, Broadcom
11 Corporation, was asked last week to appear as a witness, and so
12 they're here.  David Djavaherian, who's in the back, will be
13 testifying this morning.
14         I put in my application largely because we just want
15 to be sure that Broadcom's confidentiality interests are
16 protected.
17         THE COURT:  Okay.  Any objection to that?
18         MR. McANDREWS:  No, Your Honor, not on behalf of
19 plaintiff.
20         MR. CHERNY:  No, Your Honor.
21         THE COURT:  All right.  Welcome to the case --
22         MS. TESSAR:  Thank you.
23         THE COURT:  -- for those purposes.  Thank you.
24         All right.  I am trying to move efficiently because
25 of my pausing to review some of these materials that were filed

1    late, which delayed me five minutes getting on the bench, and I

2    want to move through this trial as efficiently as possible

3    because I want to help you folks come to a resolution.

4            And I want to emphasize again that we are going to

5    proceed with the trial today, tomorrow, Wednesday, Thursday,

6    and then we're going to take a break, and Judge Schenkier has

7    agreed that he is available on Monday for the purpose of

8    assisting you in conducting a real negotiation as opposed to

9    the hypothetical negotiation that I have to evaluate, and

10   perhaps you can work some resolution out, knowing what will

11   have been presented this week.

12           I am not offended if you deny me the opportunity of

13   issuing an opinion on this point and reach an agreement.

14   That's perfectly acceptable and, frankly, would be welcomed.

15   But, otherwise, I'll be ready to go.  I am ready to go.

16           MR. McANDREWS:  Thank you.

17           MR. CHERNY:  Thank you, Your Honor.

18           THE COURT:  All right.  Anything else we need to take

19   up before we proceed with opening statements?

20           My court reporter had mentioned to me, as we were

21   walking out, that the parties may want to spend a little time

22   explaining what they have arrayed in my courtroom by way of

23   exhibits; but if you do, I am perfectly open to that.  If

24   not --

25           MR. CHERNY:  Maybe later.

1      THE COURT:  -- I probably can figure it out as we go

2   along.

3      MR. CHERNY:  Steve Cherny on behalf of the

4   defendants.

5      THE COURT:  Yes.

6      MR. CHERNY:  We're happy to certainly do that.  I am

7   not prepared at the moment because no one has told me all the

8   things we brought in.  But we do have two brief housekeeping

9   matters.

10      THE COURT:  Okay.

11      MR. CHERNY:  The first one is that, as you heard from

12   Ms. Tessar, Mr. Djavaherian from Broadcom has graciously

13   appeared to testify here.

14      THE COURT:  Okay.

15      MR. CHERNY:  As I think the Court knows, the

16   patents-in-suit were owned by Broadcom previously before they

17   were sold to Innovatio.

18      THE COURT:  Yes.

19      MR. CHERNY:  He has a scheduling issue requiring him

20   to go to Europe, and so the parties have discussed it and, if

21   the Court is amenable, we would like to call him out of order

22   as the first witness after the openings.

23      THE COURT:  Okay.

24      MR. CHERNY:  Mr. McAndrews does not have any issue

25   with that.  So it's in your court.

1     THE COURT:  All right.  Let me make sure I've got the
2     spelling of his name for the benefit of my court reporter who
3     has prepared a glossary for herself, since she's providing
4     realtime.
5           And so, Ms. Tessar, your client's name is spelled
6     how?
7           MS. TESSAR:  There is a silent D at the beginning,
8     D-j-a-v-a-h-e-r-i-a-n, Dave Djavaherian.
9           THE COURT:  Djavaherian?
10          MS. TESSAR:  Yes.
11          THE COURT:  David?
12          MS. TESSAR:  Yes.
13          MR. CHERNY:  Yes.
14          THE COURT:  All right.  Any objection to calling him
15    so he can go to Europe?
16          MR. McANDREWS:  No, there is not, Your Honor, no.
17          THE COURT:  Okay.  All right.  It's beautiful in
18    Europe this time of year.  Okay.
19          MR. CHERNY:  One other --
20          THE COURT:  Anything else?
21          MR. CHERNY:  One other issue is that --
22          THE COURT:  Sure.
23          MR. CHERNY:  -- during a short part of my opening,
24    there will be some third-party confidential information,
25    actually specifically Broadcom information --

1          THE COURT:  Okay.

2          MR. CHERNY:  -- and then there is going to be

3    Mr. Djavaherian's testimony.  After talking to Ms. Tessar and

4    Mr. Djavaherian, I think that as long as people in the court

5    are either counsel or in-house counsel and agree to be bound by

6    the protective order, they have no issue.

7          But to the extent there are people outside this case

8    -- and I note that we have an array of people from --

9          THE COURT:  We have a pretty full courtroom, yes, we

10   do.

11         MR. CHERNY:  I actually went through and asked

12   everybody who they are, and almost all of the people are

13   related to the case.  It's just the case is very large, and the

14   only people --

15         THE COURT:  Sure.

16         MR. CHERNY:  -- I have been able to identify who are

17   not lawyers or related to the parties are a contingent from

18   John Marshall Law School in the background.

19         So it may be that specifically when we get to

20   Mr. Djavaherian's testimony, we may need to ask them to leave,

21   because --

22         THE COURT:  All right.

23         MR. CHERNY:  -- apparently, there is very highly

24   confidential information of Broadcom's that will be elicited.

25         THE COURT:  All right.  Well, let me just ask, is

1    Professor Arthur Yuan here?

2              Yes.  Good morning, Professor.

3              PROFESSOR YUAN:  Yes.  Good morning, Judge.

4              THE COURT:  You and I, of course, have known one

5    another for years.  We've talked together.  We've worked in

6    China together.  And you called my chambers last week and asked

7    is there a particular day or time that would be better than any

8    other day or time to come in to allow the folks that are here

9    from China, from the John Marshall Law School to come in and

10   visit, and I said to my secretary, whom I assume conveyed to

11   you, no, there really isn't any one time that I could predict

12   that would be better than any other.

13             So I am pleased that you chose this morning.  The

14   difficulty, as you may have heard -- I know you are back in the

15   public area, Professor.  The difficulty is that some of the

16   information is confidential.

17             PROFESSOR YUAN:  Right.

18             THE COURT:  And perhaps by the time we get to that

19   confidential information, your folks will have seen enough

20   anyway to have an understanding of the proceedings that are

21   taking place.

22             So let me just ask Mr. Cherny, how soon in your

23   opening remarks do you think you will get --

24             MR. CHERNY:  I think the opening is not going to be a

25   big issue.  I have actually moved two or three slides that

1  address it to the end, and so I will be able to signal at the

2  end.  So they will be able to see, I believe, almost all of the

3  openings, Mr. McAndrews' and mine.

4              THE COURT:  Okay.

5              MR. CHERNY:  And I think probably the part with most

6  sensitivity will be Mr. Djavaherian's testimony, which I'm told

7  is relatively short.

8              THE COURT:  Okay.

9              MR. CHERNY:  So it may just be a matter of asking the

10  contingent from John Marshall to leave.  I mean, as interesting

11  as Mr. Djavaherian's testimony, I'm sure, would be to them,

12  perhaps that might be the one part of the day they won't be

13  able to watch.

14              THE COURT:  All right.  Professor, you understand?

15              PROFESSOR YUAN:  Yes, I do.

16              THE COURT:  And you can convey our apologies to the

17  folks that are with you.  But we'll have to ask you and your

18  folks to step out during that period of time.  You're certainly

19  welcome to come back.

20              PROFESSOR YUAN:  Sure.

21              THE COURT:  And let me just say to those folks, this

22  happens not too often, but certainly happens in these types of

23  cases where we have to exclude people from the courtroom

24  pursuant to a protective order.  And so, consequently, some

25  people need to step out.

1          So I will leave it up to you to assist us in that.  I

2     have known you long enough.

3          PROFESSOR YUAN:  All right.

4          THE COURT:  Professor Yuan is a member of the bar --

5          MR. CHERNY:  Yes.

6          THE COURT:  -- and recently a citizen of the United

7     States, sworn in in this courtroom --

8          MR. CHERNY:  Congratulations.

9          PROFESSOR YUAN:  Thank you.

10          THE COURT:  -- and I have known him for many years.

11     He was a practicing attorney before he became a professor.

12          MR. CHERNY:  Thank you, Your Honor.  We appreciate

13     your diligence here.

14          THE COURT:  All right.  Let me also ask, because I

15     see some other friendly faces out there as well, how about

16     witnesses?  Are we going to exclude witnesses or not?

17          MR. McANDREWS:  No.

18          MR. CHERNY:  We don't have any intention to invoke

19     the rule.

20          MR. McANDREWS:  Nor Innovatio, Your Honor.

21          THE COURT:  All right.  Then Rule 615 of the Federal

22     Rules of Evidence will not apply in these proceedings, and

23     we'll proceed accordingly.

24          MR. CHERNY:  Thank you, Your Honor.

25          THE COURT:  Okay.  Anything else?

1          MR. McANDREWS:  And then a final point.  We have just

2     a couple of Cisco confidential schematics --

3          THE COURT:  Okay.

4          MR. McANDREWS:  -- that we're going to briefly touch

5     on in the opening.  My understanding is with the technical

6     setup here, we can blank out the Jumbotron, the gallery screen,

7     and the others.  So those exhibits are just published to

8     counsel and Your Honor.

9          THE COURT:  All right.

10          MR. McANDREWS:  Did I get that right, Mr. Thies?

11          THE COURT:  All right.  Well, excellent.  I am glad

12     that technology allows you to do that.  And I know that we are

13     all hard-wired here.

14          MR. McANDREWS:  Yes.

15          THE COURT:  There's no wireless going on.  My court

16     reporter made sure --

17          (Laughter.)

18          MR. CHERNY:  There will be no request for royalties

19     from Innovatio for the Court.

20          THE COURT:  Right.  I understand.

21          MR. McANDREWS:  So stipulated.

22          THE COURT:  Okay.  All right.  And just so a

23     reviewing court would not get the wrong impression, what

24     Mr. McAndrews referred to as a Jumbotron is a projection screen

25     that actually isn't as large as some projection screens that

1　have been in this courtroom.  But last night when the Cowboys

2　were playing the Giants in Dallas, that's a Jumbotron.

3　　　　　MR. McANDREWS:  That's a Jumbotron.

4　　　　　THE COURT:  That's 60 yards wide.  So --

5　　　　　MR. CHERNY:  Perhaps the next hearing, we could

6　convene in a Texas courtroom.

7　　　　　THE COURT:  If you want to, but we'll talk about it.

8　　　　　MR. CHERNY:  Okay, Your Honor.

9　　　　　THE COURT:  Okay.

10　　　　　MR. McANDREWS:  And the larger screen, Your Honor,

11　was jointly at the request of counsel and the parties, and we

12　appreciate the accommodation.

13　　　　　THE COURT:  Yes.  And I fully understand.  When we

14　had the earlier proceeding, it was difficult because we hadn't

15　considered the audience.  And I appreciate your setting up the

16　flat screen over here to the left of the bench to assist me,

17　and the projection screen over to the right of the bench

18　hopefully will assist members of the public --

19　　　　　MR. CHERNY:  Thank you, Your Honor.

20　　　　　THE COURT:  -- and others sitting in the public area.

21　　　　　All right.  Anything else?

22　　　　　MR. CHERNY:  Not from our side, Your Honor.

23　　　　　THE COURT:  Okay.

24　　　　　MR. McANDREWS:  Not from Innovatio, Your Honor.

25　　　　　THE COURT:  All right.  We'll give the signal when we

1    have to.  We'll just pause and talk about exclusion when we

2    have to.  But we're ready to proceed with the folks from China,

3    from John Marshall, as well as everyone else who has gathered

4    here this morning in the courtroom.

5              Mr. McAndrews, the floor is yours.

6              MR. McANDREWS:  Thank you, Your Honor.

7              As an initial matter -- I know I speak on behalf of

8    Mr. Whitley, Innovatio, and the entire Innovatio legal team --

9    and I'm sure that I speak on behalf of my colleagues on the

10   defense team as well -- when I thank Your Honor for all the

11   time and energy that you and your staff have put in to this,

12   the complicated issues in this case.

13             MR. CHERNY:  And in this regard, Mr. McAndrews does,

14   indeed, speak for all of us.

15             THE COURT:  Well, I just want to comment, that I have

16   commented many times to my staff and to others, what an

17   excellent job you lawyers are doing.  And I know you're

18   fighting hard and, yet, you were able to resolve issues that

19   should be resolved so we can get right to the key points, and

20   that's why I am endeavoring hard to get a resolution to you and

21   for you and to assist you in that endeavor.  But it is

22   certainly a pleasure to sit in this courtroom in this case

23   with --

24             MR. CHERNY:  Thank you, Your Honor.

25             THE COURT:   -- the outstanding lawyers that I have

1    before me.  So thank you.

2          MR. McANDREWS:  We appreciate that, Your Honor.  We

3    have tight disputes.

4          THE COURT:  Right.

5          MR. McANDREWS:  A few areas of agreement.  I would

6    add -- and I think my colleagues know this -- it has also been

7    a pleasure working with the defense team on this.  These are

8    complex issues.  We have issues of first impression at bar, and

9    we have been, by and large, very pleased to work with them.

10         THE COURT:  Yeah, you folks are a model, I have to

11   say.  I have other cases that aren't quite as good in that

12   area.

13         All right.  Let's get to the issue at hand.

14         MR. McANDREWS:  Yes.  Get down to business.

15     OPENING STATEMENT ON BEHALF OF PLAINTIFF INNOVATIO

16         MR. McANDREWS:  So how much value do we assign the

17   creative genius of Ron Mahany and his colleagues from Cedar

18   Rapids, Iowa?  What's his technical legacy worth with respect

19   to 802.11 technology, the Wi-Fi market, and specifically the

20   patents-in-suit?

21         That's what we're here to decide this week.  That's

22   the subject of these very, very important RAND proceedings.

23         Now, as Your Honor recently pointed out at one of our

24   status hearings, the issues in this case and how Your Honor

25   comes down on those issues is not only important to Noel

1   Whitley and to Innovatio, but it's important to the future of

2   science technology -- science and technology in the United

3   States as well, and it certainly has given the issues at bar.

4           Now, in many instances, Your Honor, under the patent

5   law, we're told that we have to disregard the statements and

6   commentary from inventors, such as Mr. Mahany.  I see Mr. Thies

7   is nodding his head.  A couple of examples might be claim

8   construction, what's the value of the invention, what's the

9   scope of the invention, damages issues, just by way of example.

10          In this case, though, something that Mr. Mahany said

11  back in 1997 is critically relevant to the issues that are now

12  at bar.  Let's take a look.

13          In June of 1997, on behalf of his company, Norand,

14  Mr. Mahany submitted a Letter of Assurance to the IEEE with

15  respect to the then-emerging technology of Norand directed to

16  the 802.11 products as in technologies.

17          Importantly, Mr. Mahany's assurance guaranteed that

18  Norand would make licenses available "on reasonable terms and

19  conditions."  Reasonable terms and conditions.

20          Now, I suspect that his choice of the term

21  "reasonable" was not coincidental.  It harmonizes quite

22  perfectly with §284 of the Patent Act, which, of course,

23  provides that an inventor or a patentholder in the event of

24  infringement is entitled to no less than a reasonable royalty

25  for infringement.

1           It also squares up very nicely with the IEEE bylaws.

2    In here, we're referring specifically to Plaintiff's Exhibit

3    633, and this is Section 6.2(b) of the IEEE Standards Board

4    Bylaws.  And, again, this section of the bylaws provide that in

5    a Letter of Assurance, the granter or the submitter has to make

6    licenses for compliant implementations available "under

7    reasonable rates, with reasonable terms and conditions."

8           So what do we see here?  We see in the Letter of

9    Assurance from Mr. Mahany, we see in §284 of the Patent Act,

10   and then, again, we see in the bylaws the term "reasonable."

11   We don't see anything about nominal cost, we don't see anything

12   about pennies or fractions of a penny per unit, and we

13   certainly don't see anything that says that RAND in the context

14   of essentiality means low.

15          And, yet, what we're going to see here is an emerging

16   theme in this case, one of the prevailing themes, to be sure.

17   The defendants' position is that RAND means low and RAND means

18   insignificant.

19          The evidence is going to show -- and you'll hear it

20   through the testimony of Dr. Teece on behalf of Innovatio and

21   others -- that RAND, instead, means reasonable and it has to

22   mean reasonable.

23          Now, on the issue of nominal cost, I examined the

24   defendants' expert, Dr. Shoemake, on the very point.  And

25   you'll see in his report he confirmed that his interpretation

1    of RAND is that it requires licensing at nominal cost.  He even

2    says in his view, nominal cost is consistent with RAND

3    obligations.

4           During his deposition, I probed a little bit further.

5    I wanted to understand exactly what his interpretation of

6    nominal cost was, and he told me he believes it means "small or

7    low cost," and he even used the term "insignificant," or he

8    agreed with me when I did.  Insignificant, low, small.  RAND

9    means low.

10          And then the final bit of his testimony, again, I

11   asked whether or not the concept of RAND being low was a

12   guiding principle for Dr. Shoemake for the purposes of him

13   forming his opinions in this case.  He confirmed that it was.

14          Now, putting aside for the moment that this is

15   altogether inconsistent with the purpose -- or the dual

16   purposes of RAND, on the issue of nominal cost, Dr. Shoemake's

17   testimony and his opinion don't square with the IEEE

18   requirements themselves.

19          What do I mean by that?  If we take a look at two

20   versions of the IEEE Operations Manual.  The first is the 1995

21   version -- and for the record, this is Plaintiff's Trial

22   Exhibit 642 -- we see that that version specifically referred

23   to nominal competitive costs.  However, by the time we arrive

24   at the 1997 version of the same section of the Operations

25   Manual -- and this is 6.3.2, the Submittal section dealing with

1    Letters of Assurance and the guarantees that the submitters

2    make -- the 1997 manual, by the way, for the record, is

3    Plaintiff's Trial Exhibit 673 -- the IEEE shows decidedly

4    different language by the time we got to this point.  And what

5    was the language they chose?  "Reasonable rates, terms, and

6    conditions."  Again, back in harmony with the Letter of

7    Assurance Mr. Mahany submitted back in June of 1997, in harmony

8    with §284 of the Patent Act, and sitting quite squarely -- in

9    fact, I think using verbatim language -- right out of the IEEE

10   bylaws.

11            So we've talked about the general and prevailing

12   theme that defendants have taken the position that RAND must

13   mean, it must command an insignificant or low royalty rate, but

14   let's put that in context.  Let's take a look right now at

15   exactly how low the defendants think the rate ought to be.

16            In this case, defendants' expert, Dr. Lynde, has

17   opined that Innovatio is entitled to a royalty in the range of

18   6/100ths of a cent -- and I have to struggle with that for a

19   little while with the decimal places and the cent versus the

20   dollar sign.  That is 6/100ths of a cent all the way to 4.16

21   cents at the high end.

22            Fair?  Not even close.  Reasonable?  No way.  Does it

23   comply with RAND?  No.  That is all attorney argument, though.

24   So let's put it in context.

25            The evidence will show -- and this is just an

1    exemplary example, Your Honor.

2              There is some confidential information.  As I

3    understand it, in talking to counsel, this is publicly

4    available in the 10 case.

5              We see Cisco's sales topping approximately $10.5

6    billion with estimated profits of just north of $7.5 billion.

7              Embracing just the low end of Dr. Lynde's proposed

8    royalty rate here would net Mr. Whitley and Innovatio a royalty

9    of $71,000, just a hair over $71,000.  So what we're talking

10   about is a royalty rate at the low end that wouldn't even cover

11   the cost of prosecuting just a handful of these rather complex

12   patents.

13             And that puts aside, Your Honor, the issue of the

14   tens of millions of dollars that companies like Norand and

15   Cisco and Broadcom dump into research and development to

16   develop these essential technologies in the first place.

17             I mentioned earlier the dual purposes of RAND, and

18   Dr. David Teece from the University of Cal, Berkeley will

19   testify later this morning on this point.  Obviously, one of

20   the purposes is to make standard-essential technology available

21   to implementers.  And we have to do that, as we've already

22   seen, in the continuity of the documentary record all the way

23   back, dating back to the June 20th Letter of Assurance, the

24   1997 Letter of Assurance.  The licenses have to be made

25   available on reasonable and non-discriminatory terms.

1     But also -- and Dr. Teece is going to focus on the

2     absence of this recognition throughout the defendants' case and

3     their expert reports -- you've also got to provide adequate

4     compensation or motivation for inventors like Ron Mahany to

5     contribute to the standards-setting process.  And I would

6     submit, and I think the evidence is going to show, that a

7     royalty rate of $71,000 on the low end or even the high end,

8     numbering in the very, very low single million dollars, isn't

9     the type of motivation that's sufficient to meet this purpose

10    of RAND, Your Honor.

11          Now, without adequate compensation, there are few

12    obvious consequences.  First of all, patentholders of

13    standard-essential technology may simply opt out of the process

14    in the first place.  Alternatively, they may withhold their

15    technology from the marketplace altogether, irrespective of the

16    standards-setting process.  And in that case, and in either

17    event, the standards simply aren't going to include the best

18    available technology, and we don't want that.  We want to

19    foster creativity, creative genius, ingenuity, all that go into

20    strong and robust standards.  At the same time, we want to

21    reward the inventors for their incredible contributions to that

22    standard.

23          Let's turn to the purpose of 802.11 itself.  And, of

24    course, this comes from the IEEE 2007 version of the standard.

25    For the record, this is Plaintiff's Trial Exhibit 1.

1          In here, in sum and substance, of course, and it's

2     not surprising, we're focusing on wireless connectivity,

3     technology that goes to the core of the mobile computing and

4     mobile communication world that we live in today, that we rely

5     on, and that is not only essential as a term of art, but is

6     critical to our day-to-day business and lives.

7          One of the things that we focus on as well in the

8     stated purpose of the standard is the concept of use of this

9     technology, specifically with portable or handheld devices.

10         I recall one of the hearings, Your Honor talked about

11    your granddaughter needing the data, I think on the iPad or

12    another tablet-type device -- and, of course, the data, I

13    suspect, that your granddaughter needs to access is content

14    that doesn't inherently reside just on that tablet.  Instead,

15    she accesses it somewhere else.  And I would venture a guess

16    that the iPad she has is not tethered to anything.  It's all

17    wireless connectivity.

18         Now, what we're here to talk about isn't Wi-Fi in

19    general, but the importance of the claim technologies of

20    Innovatio's asserted patents to the Wi-Fi market.

21         And Your Honor may recall that during the

22    essentiality phase, at the broadest level, we broke the

23    Innovatio technologies down into four categories.

24         We're going to hear testimony from Dr. Ray Nettleton.

25    Your Honor recalls and is familiar with Dr. Nettleton.  He

1    testified during the essentiality phase.  We will hear

2    testimony as well from Mr. Chris Bergey, a former Broadcom

3    marketing executive and an electrical engineer concerning

4    these.

5           But just by way of high-level review, we've got the

6    channel-sharing family, the multi-transceiver/multi-channel,

7    the sleep family, and then, finally, the mesh family.

8           And a high-level description again, we will let the

9    experts get into a lower level of the weeds on this, but the

10   channel-sharing basically avoids collisions between messages.

11          One of the things that Dr. Nettleton will talk about

12   is the hidden node problem, and I think that was addressed

13   briefly at the essentiality proceeding with some nice

14   schematics.

15          The multi-transceiver/multi-channel, the way that my

16   EE colleagues have explained this to me is let's just think

17   about all the access points on the market these days that are

18   dual band or dual radio.  It allows operation, the 2.4

19   gigahertz and 5 gigahertz bands.  It makes it

20   backwards-compatible so you can talk on -- the access point can

21   communicate with devices on the newer bg channel as well as the

22   legacy devices in the 802.11a band.  I'm sorry, in the 2.4

23   gigahertz band.

24          One of the other possibilities with this technology,

25   and one of the values received, is that you can increase

**31**

1    significantly the bandwidth of the access point.

2              The "sleep" family we talked about a good deal during

3    the essentiality proceeding.

4              This family of technologies was important to Ron

5    Mahany and his team at Norand because they implemented this in

6    wireless barcode systems and inventory management.  Those are

7    battery-operated devices.  And in the field, battery

8    charge/length of use is critical.  This technology allows

9    mobile devices to remain mobile for a much longer period of

10   time.

11             And then, finally, the mesh networking that allows

12   for wireless infrastructure, in applications, perhaps, where a

13   wired backbone or Ethernet cable is impractical or inefficient,

14   and that's becoming more popular.  Dr. Nettleton is going to

15   talk about that.

16             Let's turn to the accused products, which is one of

17   the main issues, one of the things that gives value to the

18   Innovatio asserted claims here.

19             Broadly, the accused products break down, of course,

20   into two categories, the network devices and the terminal

21   devices on the other hand.

22             Within the network device category, we've got the

23   popular access points.  One of the points that I would make

24   about the access point is that but-for its Wi-Fi functionality,

25   an access point is nothing.  Without Wi-Fi, an access point is

1    a coaster or a paper weight.

2             Similarly with wireless radio modules.  These are

3    aftermarket devices that you might plug into an existing piece

4    of equipment.

5             Ms. Conway, if I'm going too fast, just queue me.

6             You might plug into an existing piece of equipment,

7    such as a wired router, to make it comply with your wireless

8    LAN.

9             And then, of course, we've got hybrid products, such

10   as some of those offered by Defendant SonicWALL where you

11   actually combine the functionality of another network device.

12   In the case of SonicWALL, a good example is a firewall with a

13   Wi-Fi access point.

14            One of the points I would make about this, and you

15   will see this a little later on in the economic analysis, is

16   that it gives us a very nice comparison or data point.  In the

17   case of SonicWALL especially, they offer versions of their

18   firewalls that are not wireless and they offer other versions

19   that do have wireless functionality.  And that gives us a nice

20   price delta for the purposes of comparison in determining a

21   rate, something that Larry Evans will testify to later on.

22            Turning to terminal devices, there are many more

23   representative products in this set.  I will go through them

24   just quickly.  A wireless dongle simply turns other devices

25   into a wireless-compliant device.  Wi-Fi printers.  Again,

1   another good example, Defendant HP makes many, many models of

2   printers that have a wireless version and a non-wireless

3   version.  It gives us a nice comparison for the purpose of

4   establishing a proxy or a value, the delta there for the

5   purposes of determining the royalty in the case.

6           Laptops today, you virtually can't buy a laptop on

7   the market that doesn't have Wi-Fi capability, and, yet, you

8   will see we're not assigning 100% importance to the Wi-Fi in

9   the laptops.

10          Tablets.  We talked a little bit about the example,

11  of the importance of Wi-Fi connectivity to the tablet.  And I

12  think the same is true with respect to laptops -- or tablets as

13  it is with laptops.  Virtually no tablets are sold on the

14  market without connectivity.

15          Inventory and tracking, much of this equipment on the

16  market is a follow-on to the early technology created by Norand

17  back in Cedar Rapids in the mid-1990s.

18          And then, finally, we've got miscellaneous terminals.

19  A simple example of this might be a wireless security camera.

20  And we're seeing more and more of those in the marketplace.

21          Now, let's briefly introduce Innovatio's experts.  I

22  have mentioned, I think, virtually all of their names so far.

23          Dr. David Teece is going to be testifying on economic

24  and RAND policy issues.  Dr. Ray Nettleton the Court is

25  familiar with.  He will be touching on the 802.11 technology,

1     the accused technologies, and certain of the standards issues.

2          Chris Bergey is a nine-year veteran of Broadcom.  He

3     no longer works there.  As I mentioned earlier, he's an

4     electrical engineer and worked as a marketing executive at

5     Broadcom, interfacing on a day-to-day basis with Broadcom's

6     customers concerning the very features, values, and benefits

7     that are at issue in this case right now, and he's going to

8     provide some very insightful testimony concerning that value.

9          Rick Bero will testify on the accounting issues.

10    Mr. Bero is going to crunch the numbers for us.  And then,

11    finally, Larry Evans will provide Innovatio's opinion

12    concerning an appropriate RAND rate in this case.

13          So where does the rubber hit the road here?  Let's

14    get to the amount.

15          Here is Innovatio's proposed RAND rate.  Innovatio

16    took a two-step process here.  First, it took a look at the

17    value of its four core technologies to Wi-Fi as a whole, and it

18    came up, as you'll hear testimony from Mr. Bergey and

19    Mr. Evans, came up with a 6% rate.

20          Then Innovatio didn't stop there.  Innovatio then

21    applied that 6% rate and apportioned it according to the

22    relative importance of 802 functionality to a particular Wi-Fi

23    device.  And we can look at some examples here.

24          On the -- in the left-hand column in green, you will

25    see the feature factor that Mr. Bergey determined.  And, again,

1  when I say "feature factor" here, we're talking about the

2  importance of Wi-Fi to that particular product set.  Access

3  points, of course, are nothing without it, so it's a very high

4  feature factor.

5          In the right-hand column, you will see Mr. Evans'

6  calculation of the appropriate royalty rate based on

7  Mr. Bergey's feature factor input.

8          Very similar for wireless modules.  The

9  multi-function router and firewall, SonicWALL is a really good

10  example of this.  You will see a much lower feature factor.

11  Why is that?  Because wireless in those products is in

12  everything.  You can get a non-wireless version of one of the

13  SonicWALL firewalls.

14          And now the feature factor and applicable resulting

15  RAND rates for other terminal devices.  Again, I would point

16  out, and I'm just repeating here, when it comes to printers,

17  Wi-Fi is important to a wireless printer, but it is not a

18  be-all/end-all feature.

19          One of the nice data points that Mr. Evans calculated

20  with respect to some of the accused HP printers is a $50

21  average price delta between a wired and a wireless version.  Or

22  I guess, more appropriately, I would say a non-wireless and a

23  wireless version of the same product.  They offer hundreds of

24  products that have the dual functionality.

25          And then with respect to laptops, Mr. Evans also

1    picked up on a few other data points.  One of them was using

2    the average sale price of a dongle, and he also considered an

3    amount that comes out as about twice the average delta of the

4    printers.  The feature factor, of course, as I mentioned

5    earlier, on laptops is much lower.  It's just the 10%.  And you

6    can see it has a corresponding dramatic effect on the proposed

7    RAND rate.

8                And we just finish out the list.  I won't go through

9    this in exhaustive detail.  But the point here is that you will

10   see with different product sets within the terminal device

11   family, you are going to have widely variant and disparate

12   feature factors applied and, therefore, resulting royalty

13   rates.  Mr. Bergey and Mr. Evans will elaborate on those

14   points, Your Honor.

15               Here's the footnote that we're getting to, and I

16   think to the point perhaps that Your Honor was making.  We've

17   got a couple of conditional red bullet points that I wanted to

18   emphasize.

19               There's been a lot of talk about Innovatio's proposed

20   use-based royalty or per location royalty.  That's conditional,

21   and it's conditioned on the assumption that there would not be

22   patent exhaustion with respect to the manufacturer defendants.

23               It is also conditioned on something that I have

24   discussed with my colleagues, and that is that there would not

25   be a payment by the manufacturer defendants for the network

1    operators' past infringement; that is, sales of accused

2    products that date back or reach back into the past.

3           And I don't think I need to discuss the per location

4    amount.  We're going to defer that to a later time.  I also

5    think that's pretty well covered in the briefing, Your Honor.

6           Now, one of the things that Mr. Evans did, of course,

7    in considering an appropriate RAND rate is he benchmarked.  He

8    went out into the marketplace and he looked -- he took a look

9    at comparable licenses.

10          There are a number of them here.  I think we list

11   five.  This is just an exemplary list.

12          A few of the points that I would make here.



17          MR. CHERNY:  I just want to note, Mr. McAndrews did

18   not -- these are our confidential documents, and they were not

19   identified that we were going to be addressing this on this --

20   if you will blank that, I would appreciate it.

21          MR. McANDREWS:  I sure will.  I sure will.  I am

22   sorry about that.

23          THE COURT:  Let's move that from the public display

24   to the more *in camera* display that is available to counsel.

25          MR. McANDREWS:  And that makes sense.  And that was

McAndrews - opening                    **38**

1    one of the points I didn't get to with our colleagues when we

2    went through the deck.

3                MR. CHERNY:   Thank you.

4                THE COURT:   Thank you.

5                MR. McANDREWS:   The points I want to make on this

6    particular slide are very general.  ███████████████████

7    ██████████████████████████████████████

8    ███████████████████████████████████

9    ████████████████████████████████████████

10   █████████████████████████

11       █████████████████████████████████████

12   ██████████████████████████████████

13   ████████████████████

14       ████████████████████████████████

15   ████████████████████████████████

16   ███████████████████████████

17   ██████████████████████████

18                So one of the other issues in dispute, Your Honor,

19   when you asked for supplemental input from the parties, is the

20   issue of the appropriate royalty base or the smallest salable

21   patent-practicing unit.  I tried to break that down into a

22   convenient acronym, but I got even more confused when I did

23   that.

24                So why in this case is the appropriate royalty base

25   the products or the systems and not the chip that our friends

Colleen M. Conway, Official Court Reporter

1    on the defense team are so focused on?  A couple of reasons.

2              Numerous of the asserted claims in the

3    patents-in-suit are directed, specifically directed to systems

4    or apparatuses that go far beyond the structure and function of

5    a Wi-Fi chip.

6              I would make the same point in a more broad -- or in

7    a broader sense with respect to some of the system claims.

8    You've got certain claims that would incorporate, in terms of

9    accused technology, one or more access points with a plurality

10   of different terminal devices.  Certainly in that context, as

11   in the first, it doesn't make any sense at all to jump down to

12   a single component of any one of those products when you're

13   looking at an appropriate royalty base.

14             As Your Honor mentioned in your opening comments this

15   morning, we get guidance from Chief Judge Rader in the

16   *LaserDynamics* case, and he introduces the concept of the

17   smallest salable patent-practicing unit.

18             Now, here are the slides where I will move through

19   mercifully quick.  These are -- I don't think the -- the

20   initial one doesn't include a schematic, but this is

21   illustrative of the point, Your Honor.

22             If I could step over, please?

23             THE COURT:  You may.

24             MR. McANDREWS:  In this instance, by my count, there

25   are at least seven discrete structural elements in the claim,

McAndrews - opening                                    **40**

1    and they are highlighted here in blue, purple, green, and red.

2    And I say that there are seven because you have dual wireless

3    radio adapters, so you've got two of each of those.

4              So out of a total of seven, the defendants' position

5    in terms of the smallest salable patent-practicing unit is that

6    it's just one of these components, the MAC processor here.

7    Clearly with respect to this claim -- and, for the record, this

8    is Plaintiff's Trial Exhibit 7 -- the smallest

9    patent-practicing unit cannot be the MAC processor.

10             Now I will blank the screen for this next slide.

11             THE COURT:  All right.

12             MR. McANDREWS:  This includes some of the internal

13   Cisco schematics.  It's the same claim, Your Honor, and the

14   same example --

15             THE COURT:  That's the '397 patent, as you indicated.

16             MR. McANDREWS:  This remains Example 1, which is the

17   '397 patent, Claim 1.  And this, again, is Plaintiff's Trial

18   Exhibit 7, citing Plaintiff's Trial Exhibits 894 and 895, which

19   are the internal Cisco documents.



20

21

22

23

24

25

1

2

3          Let me go back on with this.  I talk about system

4    claims.  And, very briefly, here's an example of a combination

5    or system claim where you're talking about, right off the bat

6    here in the second element, one or more base stations

7    communicating with plurality of roaming terminals.  And, yet,

8    under defendants' interpretation of the smallest salable

9    patent-practicing unit, we are jumping down just to the level

10   of the MAC Wi-Fi chip, disregarding all of the other claimed

11   structural and functional elements of the asserted claim.

12         Now, defendants' commentary on the smallest salable

13   patent-practicing unit is informative here.  Each of the

14   experts distance themselves from the specific definition

15   provided by Chief Judge Rader in *LaserDynamics*.

16         In the case of Dr. Lynde, he seizes on the smallest

17   salable unit tied to the 802.11 WLAN technology.  He doesn't

18   say anything there about an element-by-element analysis.  And

19   it would seem, from the name of the term itself, smallest

20   salable patent-practicing, when we hear "patent-practicing,"

21   you got to remember that that requires an element-by-element

22   consideration, certainly at the highest level.

23         Dr. Leonard similarly focuses on the "smallest

24   salable unit with a close relation to the patented features;"

25   not with a close relation to an element-by-element analysis,

1    just a close relation to the patented features.

2           Now, Dr. Shoemake has offered the opinion that the

3    IEEE working group would have rejected any proposal for a

4    license offered on a per product basis.  His opinion in that

5    regard, though, is directly contradicted by the IEEE's own

6    documentation.

7           And in this case, we're looking at Plaintiff's Trial

8    Exhibit 357.  This is the form Letter of Assurance that's

9    provided by the IEEE to submitters.  And in the first case,

10   we're focusing on the grant clause, again, provides for

11   "reasonable terms and conditions."  We don't see anything about

12   the old 1995 nominal cost language.  And, importantly, under

13   the grant provision, it gives the submitter the option to grant

14   a license or spell out a license as a percent "of product

15   price, flat fee, or per unit."  Percent of product price.  It

16   doesn't say anything about percent of chip price.  It doesn't

17   speak of percent of component price.  And in this regard, this

18   language is very, very consistent with the comparable licenses

19   that Mr. Evans considered, all of which were granted on a per

20   product basis, not a per chip, not a per component basis.

21          Now, we'll hear testimony from Dr. Teece concerning

22   the exemplary distribution chain.  This is self-evident, I

23   think, to the Court; that you've got the Wi-Fi chip

24   manufacturer on the far end of the chain, then the terminal

25   device or access point manufacturers, retailers or, in many

1    cases, of course, wholesalers when we're talking about

2    industrial implementations of this or enterprise-level

3    implementations, and then the end users, the companies that

4    actually implement Wi-Fi or even offer it to the public, as is

5    the case with many hotels, coffee shops, and whatnot.

6          There is a corresponding value chain, of course, that

7    follows or sits on top of the distribution chain.  And in this

8    case, simply you've got Cisco, or any of the other

9    manufacturers at one level of the value chain, selling you an

10   access point for an average sale price.  In the interim, you've

11   got businesses such as FedEx that rely heavily on the

12   technology and their global logistics and shipping operations.

13   And then, again, the higher end of the example is where you've

14   got certain customers actually utilizing this to generate

15   revenue, to bring in more -- to sell more sandwiches or coffee,

16   or making things convenient for hotel patrons.

17         A few of the next examples, again, these focus on

18   value to the network operator.  We're not talking right now --

19   we've deferred our discussion of the appropriate rate with

20   respect to them.  But the value to network operators, as

21   Dr. Teece will testify, still ought to be very relevant to the

22   inquiry concerning an appropriate rate with respect to the

23   manufacturer defendants.

24         This is just a simple example that I don't need to go

25   through, but it illustrates the point that network operators

**44**

1  derive great benefit and frequently revenue itself off of their

2  use of the infringing technologies.

3      Now, one of the suggestions or at least the overtones

4  of the defendants' argument seems to be that Innovatio had an

5  obligation to bring in or to sue or to approach chip

6  manufacturers for license.  That's not the case for a number of

7  reasons.  It's an issue that Judge Davis actually specifically

8  addressed -- Judge Davis did address it, and I will get to that

9  slide.  Here we go.

10      Judge Davis, of course, simply said that as the

11  master of its case, the plaintiff decides who it sues.  There's

12  no legal requirement that it sue everyone in the distribution

13  chain.

14      And I would point out in the context of this case, in

15  particular, Your Honor, Innovatio, in the first instance,

16  didn't sue the manufacturer defendants.  The manufacturer

17  defendants brought suits for declaratory judgment.  And

18  obviously it goes without saying there isn't a chip

19  manufacturer in suit.  We're going to hear the testimony from

20  Mr. Djavaherian from Broadcom, but they simply aren't in suit.

21  They haven't DJ'd Innovatio.  Innovatio, for its part, hasn't

22  sued a chip manufacturer.

23      There's discussion concerning the concept of holdup

24  in the briefing and the dialogue between the parties.

25  Dr. Teece is going to testify concerning an equally important

1  consideration and problem, and that, of course, is that of

2  reverse holdup.

3         The ITC recently picked up on this issue in one of

4  their opinions concerning *Apple* -- the *Apple* and *Samsung*

5  dispute.  They simply define it as circumstances where an

6  implementer of essential technology uses the technology without

7  compensating the patent owner.  And then although it's not

8  highlighted, it goes on to point out that it's frequently done

9  under the guise that the patent owner's offers to license

10  weren't fair, they weren't reasonable, they didn't comply with

11  RAND.

12         Now, in this case -- do you see any problem here,

13  counsel?  I don't think any of this is --

14         THE COURT:  Are you talking about slide 46?

15         MR. McANDREWS:  This is slide 46 --

16         MR. CHERNY:  No, Your Honor.

17         MR. McANDREWS:  -- Your Honor.

18         THE COURT:  All right.  Thank you, Mr. Cherny.

19         MR. McANDREWS:  In this instance, Your Honor -- and

20  we've got four of the representative manufacturer defendants --

21  they widely advertise, and it's no secret that they practice

22  the compliant technology.  And, of course, one of the disputed

23  issues in this case is whether or not that's covered by

24  Innovatio's hundreds of standard-essential claims.  We, of

25  course, contend that it is.  So there's no question that

1    they're practicing the compliant standard here.  They make that

2    clear.

3           Now, none of the manufacturer defendants in this case

4    has applied for a RAND license.  And we see language, it's a

5    re-occurring theme in the IEEE literature and the RAND

6    commentary, and that is submitters will make licenses available

7    to all applicants.

8           The second point, none of the manufacturers, with the

9    exception of one, has countered Innovatio's opening offer.  And

10   I think we've discussed this in court before.  Innovatio has

11   made an opening RAND offer.  It sent out the signal.  We're

12   waiting back for an echo.  We've gotten one, one from our

13   friends at SonicWALL.

14          And then the final point that I would make -- and

15   perhaps things will change come this next Monday.  But none of

16   the manufacturers have called up Innovatio, sat down and

17   engaged in legitimate negotiations or meaningful negotiations

18   concerning working out a RAND rate on a bilateral basis.  And I

19   know I made that point almost 18 months ago at the time, and I

20   think my colleague said, "Well, of course Cisco is willing to

21   sit down."  Perhaps Monday we get our opportunity to do just

22   that.

23          Now, patent pools are one of the subjects that are

24   discussed and will be discussed by the defendants' experts in

25   this case.  Dr. Teece is going to provide testimony concerning

1    the reasons that patent pool rates are informative in

2    connection with the RAND analysis here.

3              Similarly, we hear about the issue of royalty

4    stacking.  In this case, there is no evidence of a royalty

5    stack that creates a problem.

6              Now, each of the defendants' experts has admitted as

7    much.  Both Dr. Leonard and Dr. Lynde, during their

8    depositions, confirmed that they have not calculated a royalty

9    stack in connection with the facts of this case.

10             Now, having not done that, that would seem to render

11   their opinions in this regard theoretical.  In theory, of

12   course, is something that Judge Davis also picked up on in the

13   recent *Ericsson* case, Your Honor.  And what he said, very

14   briefly:  "The best word to describe Defendants' royalty

15   stacking argument is theoretical." So, too, in this case.  The

16   concept of there being a problem concerning a royalty stack is

17   purely theoretical.  It is not supported by any evidence of

18   record.

19             Now, Dr. Nettleton will provide testimony concerning

20   the unavailability of non-infringing alternatives, and that is

21   an issue that, to some degree, was covered during the

22   essentiality hearing.  We're going to hear a more robust

23   discussion between the parties on that here.

24             So the bottom line here, Your Honor, is that RAND

25   means reasonable.  It doesn't mean pennies per unit.  It

1  doesn't mean a license on a per chip basis.  It certainly

2  doesn't mean low.

3         Nothing about the defendants' proposed royalty range

4  is fair or reasonable.  Fractions of a penny up to 4 cents -- I

5  can't even say 4 cents and change.  4 cents and a fraction on

6  the high end.

7         Innovatio's families of technology are critical and

8  they are valuable to Wi-Fi.  The defendants, of course, have

9  universally implemented these technologies, smallest salable

10  unit here.  We're talking about products, not chips.  And to

11  comply with the purposes of RAND and the requirement of the

12  Patent Act, any royalty must be dollars and not cents in this

13  case.

14         Does Your Honor have any questions?

15         THE COURT:  Not at this point.  I appreciate the fine

16  presentation.

17         MR. McANDREWS:  Thank you, Your Honor.

18         THE COURT:  Thank you.  All right.  We will turn it

19  over to Mr. Cherny.

20         MR. CHERNY:  Thank you, Your Honor.  And I have

21  another notebook.

22         THE COURT:  All right.  I think what we'll do, if

23  it's okay with everybody, we will take a break after

24  Mr. Cherny's remarks.  In fact, I think we should do that

25  before we proceed with any further -- or any testimony.

1          MR. CHERNY:  That's fine, Your Honor.  May it please
2     the Court.
3          THE COURT:  Mr. Cherny, yes.
4          MR. CHERNY:  And after I go, I believe that some of
5     the other --
6          MR. McANDREWS:  Steve?
7          MR. CHERNY:  No, no.  I put that up there.
8          MR. McANDREWS:  I'm sorry.
9          MR. CHERNY:  Anyway -- thank you.  After I go, some
10    of the other defendants have short presentations, so --
11         THE COURT:  All right.  We can break after that.
12         MR. CHERNY:  Okay, Your Honor.
13     OPENING STATEMENT ON BEHALF OF DEFENDANTS CISCO, MOTOROLA,
14                     NETGEAR, AND OTHERS
15         MR. CHERNY:  Not surprisingly, we have a preset
16    presentation, much as Mr. McAndrews did, that I would like to
17    present, but I was struck, as I was listening to Mr. McAndrews'
18    presentation, about how much his presentation indicates about
19    why the governing legal principles that the Federal Circuit has
20    set down regarding standards and damages are important here,
21    and specifically apportionment, which, of course, the Court has
22    raised in its inquiry earlier in the case, a couple days ago,
23    and which is of critical importance.
24         Mr. McAndrews was confused because I put up the very
25    first slide of his presentation, and that is the ubiquitous

1    Wi-Fi symbol that we're all familiar with.  Norand did not

2    invent Wi-Fi.  Innovatio's patents did not invent Wi-Fi.  It is

3    for that reason alone that apportionment is key here.

4            Throughout Mr. McAndrews' presentation, we heard

5    about the value of Wi-Fi.  There is nobody in this court who's

6    ever going to say that Wi-Fi isn't wonderful.  But that's not

7    the inquiry here.  And what you heard precious little about --

8    in fact, I don't think anyone heard anything about -- was the

9    value of the patented features to Wi-Fi and specifically to the

10   standard that all these claims are essential to.

11           You saw a slide such as this.  We have a picture of a

12   Marriott.  Now, we heard about how valuable Wi-Fi is to the

13   Marriott.  That is wholly irrelevant.  What we have to focus on

14   here in a rigorous fashion and not at a very high level,

15   30,000-foot fashion is the value of the patented features at

16   issue in these patents which form a very, very small part of

17   the mosaic of claims and patents that are essential to 802.11.

18   And without doing that, we are inviting ourselves error.

19           This has become a key part, as the Court has seen, in

20   the cases, such as *LaserDynamics*, by the way, which was Judge

21   Rader, not Chief Judge Rader.  Chief Judge Rader, as you noted,

22   spoke sitting by designation, sitting in your chair, so to

23   speak.  Although, I think when he was doing it --

24           THE COURT:  But in Buffalo.

25           MR. CHERNY:  Well, in Buffalo.  And I think, although

**51**

1  sitting by designation, feeling as he was speaking on behalf of
2  a larger audience.

3          So it's not about Wi-Fi.  It is not about the value
4  of Wi-Fi to Marriott.  It is about the value of the patented
5  features.  And you are being invited in an attempt to broaden
6  out the value of these very, very narrow, focused patents to
7  give Innovatio a percentage of the value of Wi-Fi.  And if
8  there's anything that the cases show, that is error.

9          You saw a slide that Mr. McAndrews put up that Cisco
10 makes $10 billion.  And I guess the implication is that Cisco
11 makes a lot of money selling products.  And, therefore, if we
12 value the patented features accurately and somehow we don't
13 give a large amount of that to Innovatio, somehow something is
14 wrong.

15         Again, this is the reason why we apportion.  Cisco
16 sells many products with many thousands of technologies that
17 encompass many, many standards, and, therefore, it is wholly
18 irrelevant that Cisco on the whole is a very successful
19 company.  Innovatio doesn't, by virtue of that fact, get a
20 percentage of that.  It gets the value of the patented features
21 in the context of RAND.

22         And that takes me to my next slide and then I will
23 get to go, hopefully, on to my presentation and stop trying to
24 put Mr. McAndrews' presentation up on the ELMO.

25         Mr. McAndrews very clearly is trying to relate this

1    case to the normal case of reasonable royalty.  It is not.  The

2    reason we are here -- and now please switch to my

3    presentations, Will.

4              And I'd like to introduce to the Court -- I think you

5    have seen him before -- Mr. Will Thomas in the back who is

6    intimately more important than I am about making this happen.

7              THE COURT:  Well, we appreciate the flawless way he

8    has handled these matters.  So thank you.

9              MR. CHERNY:  As do I.

10             Here is the title of our presentation.  I was some

11   impression RAND is different.  Mr. McAndrews spent very little

12   time -- I don't even know if he mentioned the word standards or

13   the goals of standards or the problems in standards, but he did

14   at a certain time tried to liken this to the regular, old

15   reasonable royalty negotiation that we're all familiar with.

16   But that is not why we're here, and that's not why this Court

17   has convened this special hearing, nor why Judge Robart

18   convened his hearing in Washington, because there is a

19   recognition now that standards are different, RAND is

20   different.

21             So just because both have the word "reasonable" in

22   their work doesn't mean that we use the same analysis.  And so,

23   what I'd like to do is spend a little time, unlike

24   Mr. McAndrews, talking about the goals of standards and some of

25   the problems and some of what RAND was meant to address,

Case: 1:11-cv-09308 Document #: 990 Filed: 11/01/13 Page 53 of 165 PageID #:42736

1    because we are dealing with a very carefully constructed

2    construct called a standard that benefits us all; and that if

3    we deviate from the proper licensing structure that has been

4    rigorously applied, both in licensing and by courts, we

5    threaten the very structure that we all benefit from.

6            Why are we here?  As the Court knows, we went through

7    a process of determining how many of the claims that Innovatio

8    is asserting are, quote-unquote, essential to the standard, and

9    the Court has determined that they all are essential to the

10   standard.  That triggers now that they are all subject to a

11   RAND rate, not a reasonable royalty rate that would happen as a

12   result of a litigation between two competitors.

13           There is a duty owed here to the standard and the

14   standards community, and it is the duty that you heard nothing

15   about from Mr. McAndrews, because, from their perspective, this

16   is all about maximizing the return to people who purchased

17   patents as opposed to taking into account where these patents

18   and these features fall in this carefully constructed

19   construct.

20           I'm going to take you through four topics.  The first

21   is standards and RAND so we can actually have the context that

22   Innovatio studiously ignores.  We're then going to talk about

23   the standard at issue here and where Innovatio's asserted

24   patents actually fall within there, which is crucially

25   important to the apportionment that we have to do, and which

1    was conspicuously absent from Mr. McAndrews' presentation.

2              We're going to talk about how do we determine the

3    correct RAND rate here, not in generalities about why it is

4    that, you know, someone feels aggrieved that the number is

5    allegedly small, but trying analytically, through a number of

6    methodologies, to get to the right number, because we all know

7    that that's what the Court wants to do, is to come up with the

8    right number, not with a number that is based on an appeal to,

9    you know, "We deserve more."  And then we're going to go

10   through some of Innovatio's positions and show exactly how it

11   is these positions offend the notion of RAND and embrace the

12   problems that courts and others have identified with standards.

13             Okay.  Let's start with standards.  And I will go

14   through this quickly because I know the Court is well aware of

15   the value of standards in our life.  But Innovatio didn't

16   mention standards at all in its presentation, but that's why

17   we're here.

18             Standards allow technology to interoperate, and it

19   provides a huge benefit to manufacturers and to consumers.

20   That means, for example, in the context of wireless, we don't

21   have ten different ways to do wireless.

22             So, for example, when your granddaughter takes her

23   tablet -- okay?  I don't want to leave your granddaughter out

24   of my presentation, you know.

25             (Laughter.)

1      MR. CHERNY:  And she goes to Starbucks, she can talk
2   to the router at Starbucks, and --
3      THE COURT:  No, she's not yet at that age, but --
4   going to Starbucks without parental supervision, but --
5      MR. CHERNY:  I wasn't suggesting she was going by
6   herself.
7      THE COURT:  All right.
8      MR. CHERNY:  Although, I'm sure she's precocious.
9      Now, the point being is that all these things can
10  talk to each other, they're all interoperable, and that is a
11  huge benefit to the manufacturers, from the chipmaker on,
12  because they can -- they have a broader audience for their
13  products, and the consumers benefit greatly.  So, therefore,
14  your computer will work at any wireless place, and vice versa.
15     So, as the Department of Justice has noted:
16  "Standards make networks, such as the internet and wireless
17  telecommunications, more valuable by allowing products to
18  interoperate."
19     We all agree.  No one is going to dispute that.  But
20  the reason I raise this is because it is the value of standards
21  and the delicate nature of the construct that requires us to
22  act to protect that through a proper RAND analysis, not just
23  some vague notions of one individual contributor's alleged
24  desire to get paid more than everybody else.
25     And, in fact, as I'm sure you're familiar, Judge

1    Robart himself acknowledged, because he understood that the

2    core issue here is the value of standards, not about

3    Mr. Mahany's contributions, which no one is denigrating, but

4    they are one of many contributions in a standard amongst many

5    standards that go into these products.

6           Okay.  How does a standard take place?  There are

7    numerous members, almost all implementers, of technology who

8    get together and they submit their contributions.  And almost

9    never, if never, are there just one way of doing things.  You

10   have sophisticated companies, Cisco, Broadcom, all these

11   companies who submit their offerings, and they're all good

12   choices, almost always.  Because if you only have one choice,

13   you don't need the standards-setting organization to choose.

14   That's why the standards-setting organization is there.  It's

15   choosing in order less about, you know, going through the best,

16   but they're trying to pick amongst different choices so they

17   can come up with an interoperable set of products.  So that,

18   yes, yours might be good, yours might be good, but we need to

19   pick one so that we can all interoperate with each other.

20          And at the end of the day -- and you will see this

21   motif through my discussion -- you end up with this mosaic

22   called a standard which represents the contributions of tens

23   and hundreds of participants and is covered by thousands of

24   patents.

25          Because if we lose the concept of the mosaic here,

1   what there's a tendency to do, while we're in this room in the

2   litigation, is for the patentee to hyperfocus on their alleged

3   contribution to the earth, but nobody is here from all the

4   other contributors saying, "Here's all the things I

5   contributed.  Here's all the parts of the mosaic I

6   contributed."  And so what we'll hear is all about the value of

7   Wi-Fi and somehow why Innovatio is entitled to some portion of

8   the value of Wi-Fi in total as opposed to where they fit in the

9   mosaic of this standard.

10          So, as I discussed, the participants meet.  Numerous

11  sophisticated companies contribute ideas.  The proposals are

12  reviewed.  And then, after a long period of time, many years

13  often, a standard is assembled.

14          Now, you've heard me talk about the problems -- I

15  mean, the benefits of standards, but there are problems that

16  both this Court and others have recognized inherent in the fact

17  that we are coming together to cooperate to create this

18  standard.  One of them is called lock-in and holdup.

19          What is lock-in and holdup?  This is something that

20  Your Honor recognized in the last opinion and that Judge Robart

21  has recognized, and that pretty much everyone other than

22  perhaps Innovatio recognizes as a problem.

23          It is the fact that a priority, a number of people

24  say, "I'm willing to contribute my technology," but then, upon

25  the adoption of one amongst many, a huge amount of value is

1   created by the fact that everybody now has agreed to

2   standardize their technology, and they are locked in.

3              The example that we focus on is instructive, which is

4   the plug.  There are numerous standards within countries.  And

5   thank the Lord that within the country, we don't have different

6   types of plugs, because we'd be sitting there with adapters and

7   things wouldn't work together.  But each of these plugs works,

8   you know, in Europe, Asia.  None of them are any better or

9   worse, per se.  They're just -- but the point is to just pick

10  one.

11             And so, for purposes of this discussion, I have

12  assigned them a value of one cent.  I mean, it's not very

13  valuable.  Because if I don't pick one, I could just adopt the

14  other.  And that, as you will hear from Dr. Shoemake, is often

15  the case, that you are not picking one amongst a bunch of other

16  bad ones, but usually the standards-setting organization has

17  numerous choices that are all equally good, and the point is to

18  pick one for interoperability.

19             So here we have -- in our country, we've chosen the

20  ubiquitous three-prong plug.  And in my example, which I'm sure

21  the Court can figure out where I'm going, now it becomes a

22  standard.  And someone comes along the line and says, "I've got

23  a patent on the" -- "I contributed to that, and I've got a

24  patent on the plug.  Pay me $5."  And if there was nothing to

25  stop that, he could probably get the $5, because everybody in

1    the world or America would have adopted it, put it into their

2    house, and the cost of taking out all the sockets and getting

3    adapters and all that is prohibitive.

4              That is lock-in and holdup.  It is a real problem.

5    It is a primary problem that standards face, and it is one of

6    the reasons why RAND is different.  Because in the regular

7    patent case, you do not have this problem where it's either

8    locked in by virtue of the fact that we've bestowed upon you

9    agreement of the organization to choose your technology amongst

10   a number of submissions.

11             In the standard, we go back to the mosaic, there are

12   literally thousands of contributions covered by patents.  And

13   if you allow holdup, any one of those submissions potentially

14   could hold up somebody for the value of the standard.  That

15   can't happen.  If that happens, there will never be another

16   standard.  If people are allowed to -- no one is ever going to

17   agree -- Cisco is never going to agree to standardize something

18   from Alcatel-Lucent if it knows down the road Alcatel-Lucent is

19   going to say, "Oh, you've adopted our technology?  We've got a

20   patent on that.  Pay us."

21             Another problem in which Mr. McAndrews has described

22   as theoretical is royalty stacking.  It is not theoretical.  It

23   is a real problem.  It's been recognized by courts and by the

24   standards-setting institutions and that Mr. Shoemake -- or Dr.

25   Shoemake will discuss.

1         What is royalty stacking?  In fact, although

2   Mr. McAndrews describes this as theoretical, we take a look at

3   *Microsoft versus Motorola*, which is obviously a very relevant

4   case in the sense that Judge Robart was dealing with many of

5   the same issues as are before you, Your Honor, and dealing with

6   the same standard.  He said:  "The anti-stacking principle is

7   the primary constraint on the upper bound of RAND."  And then

8   he concluded a royal rate of 1.15% to 1.73 of the end product

9   price implicates such clear anti-stacking concerns.

10        What is stacking?  When we get together all these

11  implementers who are now trying to create an interoperable

12  product and get the benefits of interoperability and

13  standardization, they realize that with all of these thousands

14  of contributions, if the price of those contributions is so

15  much, such that everybody says, "Pay me $5.  Pay me $5,"

16  eventually that, on top of the cost of putting together the

17  product, plus the fact that there are numerous other standards

18  often in a product, will eventually so burden the product that

19  you will have a standardized product that costs $15,000, and

20  nobody's going to pay $15,000 for a laptop.  No one -- so what

21  they understand is that the value they get as an audience for

22  their products, that they have a wire audience to sell their

23  products to, and people like Broadcom derive the benefit,

24  they're now going to sell a million chips to people because now

25  everybody is going to need the same type of Wi-Fi as opposed to

1    only a small sliver.

2         Royalty stacking is not theoretical.  Now, Innovatio

3    says, "Well, there's no evidence that royalty stacking has

4    occurred yet," but the concern with royalty stacking is real.

5    And if people like Innovatio are allowed to, in a proceeding

6    like this, end up with a dollar figure that would never have

7    been adopted by people in the standard, because of their

8    concern for stacking, it will cause other people to say, "Wait

9    a second.  If you're going to get 6% of a whole product for

10   your contribution, then I need 6% for my contribution" --

11   because at some point, I can't have it that I'm only getting 3

12   cents and you get 6%.  And then at that point, the total

13   royalty burden will dwarf the amount.

14        I've given you an example of a laptop here, its $300

15   price with $150 in profit.  Now, remember, not only does the

16   laptop have material costs in it, it also has a number of

17   standards.  And I have simplified this on slide 18 to show four

18   standards.

19        The truth is there is evidence that shows that what

20   goes into a laptop are approximately 251 standards made up of

21   thousands of contributions, each of whom could easily say, "Pay

22   me," you know, and go in with a similar type of presentation as

23   Innovatio and say the value of a laptop to people is wonderful.

24   They could show Marriott and show someone behind a desk at the

25   Marriott with a laptop and say, "The laptop is very valuable to

1    the Marriott.  Give me 6%."  Think about it.  There are

2    literally thousands of contributions to multiple standards.

3    There's the H.264 standard, there's Ethernet, there's USB, and

4    there are literally hundreds of standards with thousands of

5    contributions.

6              Think about 6%, the number they're asking for as a

7    rate.  Think about how fast if everybody who contributed to the

8    standard asked even vaguely in the realm of what Innovatio is

9    asking for, how soon the laptop would become unaffordable and

10   the standard would break, because everybody would then say,

11   "I'm better off selling a non-standardized laptop for $500

12   myself and just doing my best with a more limited audience than

13   trying to sell one with a royalty burden of thousands and tens

14   of thousands of dollars."

15             This is the context that Innovatio did not talk about

16   during its opening.  This is the context, though, that makes

17   RAND different.

18             And here's the royalty.  First, someone says, "Okay.

19   Give me $30."  And $30 is actually the amount that

20   approximately that Innovatio is asking for on some of these

21   laptops.  So he raises his hands and says, "My contribution is

22   $30."  Okay.  Now you've dwarfed the component that actually

23   has the feature on it.  Then another couple people say, "Give

24   me $30," and you're up to -- you've gone -- the profit on the

25   computer is gone.  And then some more people say, "Give me

1   $30," because they all view their contributions exactly the way

2   Mr. McAndrews views the contributions of Norand.  They all view

3   themselves as valuable contributors to that technology.

4            And eventually, very shortly, a few tiles of the

5   mosaic have made the standard unpracticable.  We have lost the

6   value that we sought to get with standardization because

7   somebody has come in and started a trend by saying, "Give me

8   $30."  It's the mosaic.

9            How does -- how do we deal with that?  We deal with

10  that with RAND.  And what RAND is about is essentially a

11  priority.  Everybody contributes to the standard and

12  understands that we are creating something bigger than each

13  individual company could do by itself.  We create the

14  structure, and RAND says, but we all agree as a priority that

15  we are going to, A, not try to exclude anybody, B, we're going

16  to offer everybody the same rate, and it has to be reasonable

17  in the context of the standard, meaning we're not going to

18  allow each other to hold each other up because we standardized

19  your technology.  We're not going to let the stack go so high

20  that the standard now is more expense than it's worth.

21           So it's not just about somebody from a company

22  saying, "Well, my technology is worth something."  It's about

23  all these technologies and the value we've created by putting

24  them together and how we can lose that if we allow what

25  Innovatio wants to happen happen.

1       Now, failure to apportion, a key point, as we saw

2   from the slides from Mr. McAndrews attempting to get the value

3   of Wi-Fi or some portion of it, failure to apportion is key to

4   the Federal Circuit across all damages.  It is not unique to

5   standards, but it is uniquely a problem in the standards.

6   Because in order to get RAND, you have to figure out what are

7   you applying to, what will be reasonable.  So if you just pick

8   out a number and say, "Well, 2%, that doesn't sound very high,"

9   2% of what?

10       And so the reason we apportion is because the Court

11   has found we have to figure out, from the Supreme Court on

12   down, that it is important to identify the value of your

13   contribution.  And we do that by identifying the small salable

14   unit, which I will address in a little bit more detail later on

15   in response to the Court's inquiry, because the broader we go,

16   the more danger there is that you will then get the value of

17   other people's contributions or proprietary contributions and,

18   as a result, you will end up holding people up and the stack

19   will get too high.

20       And you're not entitled to get a percentage of Wi-Fi.

21   The amount of technology that goes into Wi-Fi is immense.

22   Innovatio is not entitled to it.  And so the reason the courts

23   have said you got to focus on the small salable unit as a

24   starting point is to curve the error that would occur from

25   saying, "Well, the value of Wi-Fi to Marriott is X."  How can

1   we possibly start with Marriott and then try to apportion down

2   from there?  That's why we have to start at the smallest

3   salable unit because that constrains the inquiry.  So that we

4   are not going to make the very error that the Federal Circuit

5   has repeatedly said we must not make.

6           So let's take a look at the standard here.

7   Mr. McAndrews briefly touched on it.  I'm going to spend a

8   little more time on it because it provides the context.

9           You had numerous sophisticated companies contribute

10  to the 802.11 standard.  These people all provided

11  contributions, many of which provided alternative contributions

12  to the ones that got standardized all across.  Years were taken

13  to standardize.  And the reason it takes years is that they

14  take this seriously.

15          And why is that relevant?  First of all, later

16  standards have to be backwards-compatible with earlier

17  standards.  So when you have 802.11n adopted, that still has to

18  work with 802.11a and b.  And so they take it seriously.  As

19  you're going along, there's inertia that builds up.

20          There was a suggestion at one of the depositions, I

21  think of Dr. Teece, that if the standard breaks as a result of

22  stacking, we could just adopt a new standard.  That is not the

23  case.

24          This process has a huge amount of inertia in it, such

25  that it has to be guarded all along the way.  Because if you

1    adopt a new standard, it won't work with all the people who

2    invested in 802.11a and b. So, as the standard progresses, we

3    still have to make sure it works with what happened before.

4    And this compounds the issue of both stacking and holdup and

5    why RAND is so important.

6           So here's our mosaic. There are 2,680 technical

7    sections in 802.11. You didn't hear that from Mr. McAndrews

8    because he doesn't want to talk about the other contributions

9    to the standard. He only wants to talk about Norand and

10   Mr. Mahany. But there are millions of people and there are

11   companies like Norand and tons of Norands and tons of

12   Mr. Mahanys out there who are contributing to make our mosaic.

13          The policy. Before you get something standardized,

14   you have to make the commitment to RAND, before. That informs

15   us that this is an *ex ante* inquiry. The whole point is that if

16   you do not agree to RAND before it's standardized, we are not

17   going to standardize your technology because we do not want to

18   be held up. We do not want you to contribute to the stack.

19          And here is one of the Letters of Assurance that

20   Broadcom gave willingly and in good faith, I hope, where they

21   said that they would provide their technology under reasonable

22   rates -- reasonable under RAND, not reasonable under some

23   appeal to §284 -- to an unrestricted number of applicants --

24   unrestricted -- on a non-discriminatory basis.

25          Now, in a normal patent case, you can discriminate.

1    In fact, that's one of the *Georgia-Pacific* factors that Judge

2    Robart presided.  You are allowed to discriminate.  You are

3    allowed to try to enjoin somebody.  You are allowed to talk

4    about people's, you know, different status in terms of are you

5    a competitor or not.  But with RAND, you give all that up,

6    because we are getting together in this cooperative endeavor to

7    create something that will benefit us all.  But you give

8    something up in that regard, and what you give up is the

9    ability to try to one on one hold up your competitor, hold up

10   another contributor, hold up an implementer.

11           Here's the timeline of these patents, again,

12   something you didn't hear.  First, they were with Norand, who

13   merged with Intermec, both of whom filed Letters of Assurance.

14   Then they went to Broadcom, and they were sold --

15   ▌▌▌▌▌▌▌▌▌▌▌▌▌▌.  And we'll get to this

16   later.  This goes to some of the confidential information.  But

17   the number --

Cherny - opening

1    ██████████████████.  It is not reasonable to believe

2    that these patents are now worth hundreds of millions of

3    dollars when these people were provided -- were pricing them

4    with knowledge of the system.

5            Broadcom held them for a number of years, and they

6    got the benefit of many, many of their chips being sold that

7    were standardized and that had their technology on those chips,

8    and they were interoperable, and they made a lot of money doing

9    it, and then they sold these patents near expiration to

10   Innovatio.  We'll talk about the price later as well.

11           And the reason I have put the confidential

12   information later as opposed to here, Your Honor, was actually

13   so that people could stay in the courtroom until the very end.

14   ████████████████████████████████████████████

15   ██████████████████████████████████████████████████

16   ████████████████████████████████████████████

17   ██████████████████████████████████████████████████

18   ██████████████████████████████████

19   ████████████████████████████████████████████

20   ████████████████████████████████████

21   ████████████████████████████████████████████

22   ████████████████████████████████████████████████

23   ██████████████████████████████████████████████████

24   ██████████████████████████████████████████████████

25   █████████████████████.

1    Where do Innovatio's patents fit?  You definitely

2    didn't see anything like this in Mr. McAndrews' presentation

3    because he doesn't want to give you the context of where they

4    fit.  He just wants to tell you that Wi-Fi is wonderful and

5    that, "We want our cut."  Okay.

6    There are thousands of contributions to Wi-Fi.  This

7    is one little piece I have blown up of the mosaic of many, many

8    technologies in the 802.11 standard.  And you have four small

9    parts of this mosaic that are technologies that are relevant to

10   Innovatio's patents.  And even with that, Innovatio's patents

11   are essential to subparts of these four parts.

12   And that's what the Court needs to understand when

13   valuing the patented features, not about Wi-Fi, not about

14   Marriott, not about how much money Cisco makes.  It is

15   understanding that these were very focused contributions to a

16   very small part of our mosaic where, as we are going to see,

17   there are numerous alternatives that could have been adopted as

18   well, had people understood at the time that there would be an

19   attempt to hold up the industry.

20   Innovatio's patents are 23 of over 3,000

21   standard-essential patents to the 802.11 standard.

22   Let's put them back in context because we need, as

23   the Court has commanded us to do, to figure out what is the

24   value of the features, the patented features, what is

25   reasonable in the context of the standard.  Not let's look at

1    them in isolation and let's look at Wi-Fi in general.

2         Now let's take a look how we determine RAND here

3    analytically.  It was conspicuously absent from Innovatio's

4    presentation, any analysis.  There was literally declarations

5    that Wi-Fi is worth X to Marriott; therefore, we should take --

6    I mean, I believe, if I could quote it, Mr. McAndrews said,

7    "Well, you know, a laptop, we feel that Wi-Fi is 10% of the

8    value of a laptop.  Give us 6% of that."  It's not about the

9    value of Wi-Fi to a laptop.  It's about the value of these

10   features.  Let's figure out the right way.

11        First of all, let me go through the witnesses that

12   you're going to hear.  It's obligatory.  We have to introduce

13   you to them because they're in the courtroom and they would

14   feel slighted if I don't tell you --

15        THE COURT:  I understand.

16        MR. CHERNY:  -- who they are.  Okay.  You have met

17   Mr. Shoemake.  Dr. Shoemake, I do not believe I'm exaggerating,

18   will probably be the most knowledgeable person in the room when

19   it comes to standards, wireless, 802.11.  He actually was there

20   when 802.11, various sections were adopted.  You met him

21   during, I believe, the hot-tubbing session we had.  And for

22   purposes of the record, that was the session during the

23   essentiality hearing where the judge took commentary from the

24   various experts about the process.

25        He is extremely knowledgeable, and he's going to

1    testify about RAND rules, why they were adopted, as someone who

2    participated in 802.11, to prevent holdup and stacking, how --

3    the cost of implementing alternatives.  Because if you're going

4    to charge me 6% of a laptop, or 3% of a laptop, and I could

5    implement an equally good alternative for two cents, there's no

6    chance I would ever agree to that.  And that's why we have to

7    go back to the hypothetical negotiation at the time and

8    determine what truly would be the value of Innovatio's alleged

9    contributions here.  That there are thousands of

10   standard-essential patents and he's going to help us apportion,

11   he's going to help us do what we need to do.

12          There's Professor Wicker, who you also met at the

13   last proceeding, again, an eminent scientist with impeccable

14   credentials in the area of wireless.  He's going to show you

15   just how minor the features that the patents are directed to

16   are, and he's going to talk about the numerous alternatives

17   that were available.

18          Because, remember, there were literally tens of

19   companies submitting very, very good alternatives, and the

20   point is to choose one for interoperability, not because

21   someone has declared, like a beauty contest, this is the most

22   beautiful choice.  It's just about choosing so that they can

23   interoperate.  And he's going to help us identify the smallest

24   salable units here, which is the Wi-Fi chip, because that is

25   what -- first of all, that is why all these patents are

1    essential to 802.11, because this all resides on the chip.

2            And, as we'll see in a little bit, yes, the claims

3    have other structure.  And, as this Court has recognized, you

4    can add other structure to a claim -- you could add a keyboard,

5    you could add a processor, you could add -- but they didn't

6    invent any of those things.  They don't get the value of that.

7            So it is a misstatement of the Federal Circuit's

8    doctrine to suggest that somehow they're requiring you to give

9    them the value of every element that they throw in.  Because at

10   that point, you are giving an incentive to say -- have my

11   independent claim, Claim 15, that says "sleep" mode, which

12   resides in the chip, and then say Claim 30 wherein the "sleep"

13   mode occurs in a hundred-thousand-dollar super computer.

14   Mr. McAndrews would say, "They're ignoring my

15   hundred-thousand-dollar super computer."  You know, "I need to

16   get a part of that."  But that's not what the invention is.

17   And so that's why we need to apportion down.

18           You'll see today Mr. Djavaherian who's going to

19   provide real-world objective context to the value of these

20   patents, because Broadcom owned them for ten years, and they

21   sold -- they bought them from Intermec and they sold them, and

22   they are a part of the standard.  And they understand a lot

23   better than Innovatio the value and constraints on this

24   property.

25           You're going to hear from Dr. Leonard, an eminent --

1    you have not been introduced to him unlike the other experts --

2    an eminent economist who has specialized in the analysis of

3    RAND and standardization and why RAND and standardization

4    require a little bit different analysis than just the regular,

5    old unmodified reasonable royalty analysis.

6              And you're going to hear from Dr. Lynde, who HP will

7    offer, who's actually one of the experts in front of Judge

8    Robart who he, as you read through the opinion, cites with

9    great approval.

10             So, now, let's get down to -- now I have satisfied

11   the egos of the experts and the witnesses, now let's move on to

12   how we're going to help you do what you need to do, and what

13   was conspicuously absent from Innovatio's presentation, which

14   is how do we do this in an analytical way, not in a

15   qualitative, you know, "I need to get paid" way.

16             First, we're going to apportion.  And this part of

17   the presentation is meant, in some respects, to respond to your

18   inquiry, Your Honor.

19             So we take a look at *LaserDynamics* from Judge Rader.

20   And it says:  "Thus, it is generally required that royalties be

21   based not on the entire product, but instead on the 'smallest

22   salable patent-practicing unit.'"

23             Why is that?  Why the stuff about the "smallest

24   salable patent-practicing unit"?  Because there's a realization

25   by the Federal Circuit that you can start anywhere in the

1    valuation process, but the farther out you go from the patented

2    feature, the more chance there is of error that's unacceptable

3    and of giving value for what you did not invent.

4            And so, take my pointer here, or my clicker.  Okay?

5    And say we have an invention that relates to, I don't know,

6    this button over here.  I mean, it's a fine button.  I'm sure

7    somebody one day will come into your courtroom and tell you

8    that they deserve the value of everything because of this

9    button.

10           But we have this button here.  Now, I could start off

11   by saying:  Well, I'm using it in this room.  Let's start

12   apportioning down.  I could even say -- I could even claim it

13   and say the use of this clicker in a courtroom to present

14   information to a Court, but that wouldn't mean anything,

15   because what we have to do is say:  Okay.  The invention really

16   resides in this button.

17           And why the Court mandates that we go to the smallest

18   salable unit is that if we start in the room, I've got to

19   apportion away those chairs and I've got to get rid of all

20   these things.  And when I'm doing this, there's a chance that

21   I'm going to give you a percentage of that phone.

22           But if we start here -- and the reason they go for a

23   salable unit, because this is something that has been priced.

24   So we know somewhat concretely what this thing is worth.  So we

25   say maybe this is $6, this clicker.  Let's -- but we don't

1    start -- stop there.  We start there.  And we say now we start

2    from $6 and I start apportioning down the value of the button

3    in there, the patented feature, and the most mistake I could

4    make, then, is constrained by the fact that I have started at

5    the $6 thing and not at the $60,000 courtroom.

6            Now, Mr. McAndrews took Dr. Leonard to task for his

7    wording of the standard.  The wording of the standard here in

8    terms of small salable unit comes from Judge Rader right there,

9    "smallest salable infringing unit with close relation to the

10   claimed invention."

11           It is an invitation to error to try to suggest to the

12   Court that smallest salable patented unit somehow means that

13   every element that I throw in there -- and whereas here the

14   other side's expert has agreed that it's all the MAC and the

15   PHY -- that somehow I put up a claim, I identify seven other

16   pieces that someone has thrown into a claim that he says are

17   structural, and that, therefore, that means we're not going to

18   go down to the smallest salable unit that actually has the

19   patented features, the parts that are essential to the standard

20   here.

21           Next slide.  Oh, that's me.  Now, in response to your

22   inquiry, we did some looking.  And I think we can get to the

23   heart of this in terms of the Federal Circuit's words on this

24   point.

25           The seminal case that led to much of this, other than

1   the Supreme Court's original *Garrettson* case, is the *Lucent*

2   case.  And when we look at the *Lucent* case, it clears it all

3   up.  Because the *Lucent* case, even though it doesn't use the

4   phrase coined by Judge Rader, every case since then has cited

5   *Lucent* as essentially the beginning of the smallest salable

6   unit doctrine.

7           In *Lucent*, you had this invention to a touchscreen

8   form entry system, but really the inventive aspect was these --

9   this ability to have a touch-sensitive screen where you had

10  these fields, that you could choose the fields.  It wasn't the

11  apparatus.  It was the software in the computer.  Because,

12  otherwise, if you gave someone the value of the hardware, you'd

13  have people over and over again re-getting the value of that

14  computer every time they added software.

15          Let's take a look at the claim.  You asked for a

16  method claim.  That's exactly what was at issue in *Lucent*, a

17  method for use in a computer.  Okay.  Mr. McAndrews would say

18  we don't want to ignore that valuable piece of hardware, a

19  computer, having a display.  We don't want to, you know, avoid

20  the display.  But these are not part of the invention.  These

21  are just almost the context of the invention.  And then you get

22  displaying a pre-defined tool associated with one of said

23  fields.  Now we have to actually figure out what the invention

24  is.

25          So it's not about how much hardware we can work into

1  the claim.  It's about identifying what really is the inventive

2  feature here and identifying that in the context of the accused

3  product so we can apportion correctly.

4          Here's *LaserDynamics* talking about *Lucent*.  So even

5  though *Lucent* didn't specifically say small salable unit, it is

6  the case that started it.

7          Judge Rader says:  "Our decision in *Lucent* is

8  illustrative.  There, the patent at issue involved a helpful

9  and convenient 'date picker' feature that was being used within

10 the grand scheme of Microsoft's Outlook email software.  We

11 held that because the patented feature was 'but a tiny feature

12 of one part of a much larger software program,' a royalty could

13 not be properly calculated based on the value of the entire

14 Outlook program because 'there was no evidence that anybody

15 anywhere at any time ever bought Outlook.'"

16         But what did they do in *Lucent*?  They got down and

17 started at Outlook and then started apportioning down from

18 there.  They didn't start apportioning down from the computer.

19 There's no attempt to say, "Well, you could value the display,

20 the computer."

21         *AVM versus Intel*, again, identifying *Lucent* as the

22 seminal case in this area.  Recently, Judge Andrews in Delaware

23 *Daubert*'ed an expert on this very point, and he said:  "The use

24 of a salable unit that is greater than the patented feature is

25 going to introduce *Uniloc* error when the patented feature is a

1    'date picker,'" obviously referring to *Lucent*, "whether the

2    salable unit is a computer loaded with 'Outlook' or simply

3    'Outlook.'"  We've got to get down to the date picker.  We are

4    not going to start at the computer.

5           "Further, as *LaserDynamics* holds, the difficulty in

6    determining a royalty base in a situation such as this one with

7    dynamic logic circuits is not a reason to accept an unreliable

8    method."  It may be difficult, but it requires us to get

9    together and pick where the actual inventive feature resides.

10          Now, we are lucky in that regard, because you will

11   see testimony from both Dr. Wicker and admissions from

12   Dr. Nettleton that this invention resides on the Wi-Fi chip,

13   which is not surprising.  Each of these claims is essential to

14   the Wi-Fi standard, all of which resides on the Wi-Fi chip.  So

15   regardless, if it is in different contexts, such as Wi-Fi using

16   a keyboard, Wi-Fi with a processor, Wi-Fi with something else,

17   it is on the Wi-Fi chip.

18          And here's the problem that we are so worried about.

19   You heard Mr. McAndrews ask you numerous times for the value of

20   a laptop.  He was very explicit about it.  There are 251-plus

21   standards in a laptop.  Put aside all the non-standardized

22   aspects that might be proprietary to someone like HP.

23   251-plus.  And if we start at the laptop by giving Innovatio

24   1.8% of a laptop, not only -- we are potentially giving them

25   1.8% of the Bluetooth, 1.8% of the trackpad, 1.8% of the

1    graphics card, and that is exactly the error the court has held

2    to be unacceptable, why we have to get down to the smallest

3    salable unit, why we cannot just say "laptop" and then say,

4    "Give me a percentage of that."

5              When you think about the fact that there are 251-plus

6    standards, all people who have patented -- with thousands of

7    contributors who have patents, who could all come in and say,

8    "Give me 1.8%" -- remember 251 standards, each with thousands

9    of contributors, 1.8, that puts it in context where 1.8% is

10   huge.  That's why if you're going to get 1.8%, you better have

11   invented the transistor.  All the technology is on the Wi-Fi

12   chip that is relevant here.

13             And, in fact, you don't just end with a salable unit.

14   You start with the smallest salable unit, as the *Dynetix* court

15   found recently in California.  That just starts you at -- we

16   have now cabined off the value down to my clicker.  Now let's

17   figure out what the value of the button is.

18             So, here, we have a Wi-Fi chip, a chip.  It's got

19   technology related to the input and the output.  It has

20   semiconductor technology.  It has interface logic.  It has

21   memory.  Each of these things, by the way, Innovatio could

22   certainly throw into a claim, but that they had nothing to do

23   with.  There's the RF contribution.  And then you have Wi-Fi.

24   And then you have residing on this chip where the 802.11

25   standard's physical manifestation exists.  And that's where we

1    have to go to -- and then within that, we have to figure out --

2    within that 3,000-patent construct, we have to figure out what

3    the value of Innovatio's contribution or, in this case, really

4    Norand's contribution, the patents that they hold.

5              Now, we've heard about the MAC and the PHY.  In fact,

6    at the last hearing, you heard over and over again all about

7    how this is all about the MAC and the PHY.  I think Mr. Schodde

8    told you this is all about the MAC and the PHY.  And Dr.

9    Nettleton was asked:

10             "You admit that most, if not all, of the PHY

11   functionality is on the Wi-Fi chip, right?

12             "Yes.

13             "In some instances, all the MAC functionality is

14   implemented on the Wi-Fi chip?"

15             He actually said:  "Most, if not all, yes."

16             It's all on the Wi-Fi chip.  There may be some tiny

17   insignificant thing elsewhere, but that's where this technology

18   resides.

19             Now, here's what we were talking about before, Claim

20   15.  That's the "sleep" mode, undoubtedly on the Wi-Fi chip.

21   Then you have Claim 30.  Claim 30 is the dependent claim,

22   narrower, certainly less, quote-unquote, valuable.  And now we

23   have "utilizing a processor."  They didn't invent the

24   processor.  But according to Mr. McAndrews, it says the

25   processor, he should get a portion of the processor.

1          It is exactly this type of thing as the reason why

2     the Court is so careful about asking for apportionment down to

3     the smallest salable unit.

4          Claim 82, "further comprising utilizing a keyboard."

5     They didn't invent a keyboard.  And, in fact, as you identified

6     in the last go-round, much of this basic technology that is

7     being used is in conjunction with the invention.  Because when

8     we claim we have to provide a context at times, it is not

9     itself the value of the patented feature.  And that's why this

10    is no different than *Lucent*, where they couldn't get the value

11    of the display and the value of the computer, and even the

12    value of all of Outlook.  They got the value of the date

13    picker.

14         So we start out and we figure out where to start.

15    Now, we have to look at where do Innovatio's patents reside in

16    that.

17         It is undisputed there are thousands of patents

18    relevant to 802.11 that are essential.  You will hear testimony

19    about PA Consulting who regularly does this analysis, who said,

20    from their estimation, 3,106.  Another company, Sunlight,

21    estimates 4,000.  Mr. Evans, Innovatio's expert, is at least

22    willing to acknowledge a thousand or more standard-essential

23    patents.  Remember, they only have 23.

24         And Judge Robart, on the same standard, thousands of

25    802.11 standard-essential patents, including the patents at

 1    issue in his case, which, as we're going to go later on, are a

 2    pretty nice benchmark.  And you know something?  I bet you

 3    that, you know, the patentee there probably said, "Ours are

 4    worth a lot."  And, in fact, we know they did.  And guess what?

 5    They were held to exactly the same ranges we're talking here,

 6    because we're all part of this construct, because we have to

 7    put it in context.

 8              And here's the context.  If you gave everybody the

 9    value that Innovatio is asking for in the standard, the price

10    of things, this is where the royalty stack is real.  So the

11    fact that a priority to date, other people haven't gotten this

12    and haven't been able to burden the standard is not an

13    invitation for Innovatio to say, "Well, let me begin the

14    stack."

15              And right now, we actually have across this land

16    numerous companies who are asserting patents, each of them in a

17    courtroom trying to do exactly what the standard was meant to

18    stop, which is they're trying to stack it up in ways that are

19    wholly disproportional to the role they play in terms of the

20    value of the patented feature to the standard.

21              Dr. Leonard will go through and he'll say, "Look,

22    average Wi-Fi chip price over 2000-2015 was $4."  Actually,

23    that's pretty high.  Nowadays, a chip costs about a dollar.

24    The profit, 48 cents.  Taking a look at the -- you know, the

25    share of Innovatio's patents to the whole, whether you pick

1    3,000, 4,000, you multiply that and you get .37 cents to .59

2    cents, just accepting that all the other people made

3    contributions.  That would be if you treat them all equal,

4    which, by the way, the evidence is going to show, quite

5    frankly, these are less than equal.  But then he gives them the

6    benefit of the doubt and he says, "You know something?  Let me

7    value this in a way that actually gives them the benefit of the

8    doubt," and says, "I'm going to assume that these are in the

9    top 50%.  I'll even assume that they might be in the top 20% of

10   patents.  I'll even go for the top 10%."  And he then uses that

11   to get an approximate range that's relevant.  And even at that

12   level, if they're in the top 10% of patents, standard-essential

13   patents, the most they could get is 3.09 cents because it's

14   part of a construct.  It doesn't exist in isolation.

15           And by doing this type of analysis, this rigorous

16   analysis, we end up with a royalty that is properly apportioned

17   and that is non-discriminatory.  It doesn't say I get a portion

18   of the chip, gives me this, or I get a different price if I

19   apply it to the laptop that happens to have the chip.  It's all

20   the same.  But going to the smallest salable unit and then

21   applying this type of logic, we get a rate that's consistent

22   from the chip user to the chipmaker to the ultimate product

23   maker.

24           *Ex ante* alternatives, a very, very powerful analysis

25   and, in many ways, actually avoids even the issue of the

**Cherny - opening**                                      **84**

1    smallest salable unit.

2          What are *ex ante* alternatives?  You remember when we

3    talked about RAND, it's a bargain you strike *ex ante*.  You say,

4    "Before we standardize you, I'm going to give RAND."  Why is

5    that?  Because we have options to pick other people at that

6    time.

7          Now, if it turns out that you're coming up and

8    saying, "I want to get a holdup value because I've been

9    standardized," we go back and take a look at what would it

10   cost -- if we went to back to the negotiation, if I could go

11   back and make another choice, how much would it cost me to pick

12   one of the other alternatives?  I would never pay more than it

13   would cost me to pick one of these five alternatives proposed

14   by sophisticated companies to do the exact same thing in this

15   very limited area of the standard.

16         They say this is complicated.  This is exactly the

17   analysis that's in every hypothetical negotiation that's done

18   across the land.  We go back and say, "Well, you're telling me

19   that I would pay you a dollar."  Yeah, but I could switch for

20   five cents.  I would never pay you a dollar at the hypothetical

21   negotiation if I had this alternative.  In the context of

22   standards, it's actually more applicable because we're not

23   positing alternatives.  There are alternatives.  People have

24   submitted alternatives because there are all these

25   possibilities out there, and we're just choosing for

1    interoperability.

2           This is particularly important.  Here's Dr. Nettleton

3    in his deposition:

4           "You agree at the time of Wi-Fi standardization,

5    there were a number of alternatives available to the patented

6    technology, right?

7           "Yes."

8           You are going to hear that from Dr. Wicker.  And each

9    of these people would have been happy to have their

10   contributions standardized.  And each one of them who wasn't

11   got nothing.  And each of them would have been happy at that

12   point to say, "Look, I'm happy to take the RAND rate if you

13   pick me," as opposed to nothing.  And each of these are an

14   alternative that someone says, "Pay me $28," they would have

15   said, "Well, we would have taken a typical RAND rate of," you

16   know, 2.6 cents or .8 cents because it's being multiplied times

17   millions of units of sales.

18          You are going to hear Dr. Wicker.  And, Your Honor, I

19   appreciate your patience.  You know, I'm trying to be very

20   rigorous in going through this.  I only have a short period

21   more to go.

22          But you are going to hear Dr. Wicker who's going to

23   identify rigorously the alternatives that correspond to

24   Dr. Nettleton's admission, which is that there were numerous

25   alternatives for the patented technology, each one of them, any

1   one of them who would have been happy to have their technology

2   standardized, okay, but who ended up not being standardized

3   and, as a result, they don't get anything.

4           And so Dr. Leonard goes through and says, "How much

5   would it cost if I need to switch over back when?  If I was

6   being held up, what would I" -- "what would be my choice for

7   the holdup?"  And it's about 26 cents -- 2 cents a unit.  Not

8   26, .26 cents.  If I said 26 again, my clients are going to

9   jump over and kill me.  Okay?  .26 cents a unit.  That's

10  reality.  This is the kind of analysis that you're going to see

11  that people do all the time and that everybody acknowledges is

12  the most relevant because it doesn't even require you to focus

13  on the base because it's base independent.  Whether it's on the

14  chip or whether it's on the product, it's the same cost that's

15  in terms of what would we have paid to do an alternative.

16          And here's a nice graphic that shows you that here

17  we're being held up for $28.73, which is a real number -- it's

18  not a made-up number -- for a product.  And my alternative,

19  going back, I said:  Wait a second.  Had I known that back

20  then, I would have just adopted these guys for .26 cents.  Why

21  would I ever have paid any more?  I would have taken a

22  different path.

23          Okay.  Then, of course, I know the Court is aware of

24  Judge Robart's analysis, which actually, in some respects,

25  tries to characterize all the things we just talked about and

1   tries to weed out all the stuff that's being -- Innovatio tries

2   to consider.  It tries to weed out holdup value.  It weeds out

3   the fact that someone's a competitor.  It weeds out the fact

4   that you may have a policy.  You know -- and by the time he

5   goes through the factors, in many ways, he's trying to create a

6   legal standard to capture the economics of what I have just

7   discussed, from the smallest salable unit down up to how do you

8   do a RAND rate.

9           And when we look at his benchmark factors -- you

10  heard Mr. McAndrews, with great disdain -- I could talk about

11  the numbers that were offered here by us in terms of our

12  identification, and you look at what Judge Robart rigorously

13  came out with, for patents in the exact same standard -- it

14  came out to be .8 to 3.47 cents -- I think that's pretty

15  probative.

16          I mean, it's easy when you're not providing the

17  context, and it's easy when you're not providing the fact that

18  this is over millions and millions of devices to say .8.

19  That's laughable.  Judge Robart didn't find it laughable

20  because it's real.  It's based on the fact that you have

21  thousands of contributors to a standard who aren't -- we cannot

22  allow them to be held up and we cannot allow for a stack.

23          So we follow these rigorous analyses.  We end up

24  all -- and always in the same ballpark, not identical, but

25  every one of them comes out around the same area, and that's

1    pretty good evidence that we're probably right.

2              Okay.  Now, let's take a quick breeze through

3    Innovatio's positions.  What's wrong with what they're trying

4    to do?

5              You're going to hear from Mr. Bergey.  Mr. Bergey is

6    the fellow who does their feature factor analysis, which is

7    essentially just a hand wave where he says, here's the value of

8    Wi-Fi to a laptop.  ███████████████████████████████████

9    ██████████████, and so I will then take that and I will give

10   that to Innovatio and give you part of the value.

11             And he was asked:  "Did you actually offer an opinion

12   as to whether the difference in price or apportioned value

13   between different access points," meaning that he actually

14   takes different access points and because the end price of the

15   different access points is different -- so, for example, there

16   might be a hundred-dollar access point and a $20 access point.

17   And since he applies the same feature factor to both, he ends

18   up with a different price.  Okay?  So, for example, he says 95%

19   of value is Wi-Fi.  He then ends up with one price for the $20

20   access point and one price for the hundred-dollar access point.

21   He says -- he was asked:  "Did you do any attempt to apportion

22   what difference in the value comes from the actual patented

23   features?"  Meaning that does this -- oops.  There we go.  You

24   know, what part of that comes from the patented features?  "No,

25   I did not."

1        *AVM* confirms.  What we have here?  He's embracing

2    *Uniloc* error because he didn't apportion it out.  He didn't --

3    he just said you get some percentage of the laptop, you get

4    some percentage of the access point, and these things all cost

5    different things.

6        He does this vague notion where he says -- he starts

7    off with a 6% base royalty.  That's a big part of the problem.

8    You know how he gets that 6%?  He takes the royalty that came

9    out of the *Symbol/Proxim* case, which was the actual litigation

10   between competitors, which was done under an unmodified

11   reasonable royalty analysis and that Judge Robart explicitly

12   threw out because it was not RAND.  It is in his opinion.  He

13   says, "Let me start with 6%."  And then he says, "Okay.  I'm

14   going to tell you that I think that Wi-Fi is worth 30% of the

15   tablet."  And so he comes up with 1.8%.  It just goes into the

16   black box of Mr. Bergey's feature factor and comes out.

17       He never says anything about the value of Innovatio's

18   technology or that -- you know, the 2900 other patents.  It's

19   just 1.8%.  So at the end of the day, you get 1.8% of a tablet,

20   5.7% of an access point.

21       Now, remember, in his prior technology -- in his

22   prior testimony where he says the access points have different

23   prices, as they do, Innovatio gets the benefit of that, even

24   though there's no attempt to figure out how Innovatio in any

25   way relates the difference between a $20 access point or a

1    hundred-dollar access point.

2          And, in fact, this is exactly the type of analysis

3    that *LaserDynamics* criticizes, where they said that Mr. Murtha,

4    the expert there, using vague qualitative notions of the

5    relative importance of the ODD technology.  I submit that we

6    have vague qualitative notions from Mr. Bergey of the value of

7    Wi-Fi, and then he just does that, comes up with these numbers

8    and says, "Now, give me that percentage of the overall

9    product."  But that's wrong.  That leads to error.

10         And here's how we know.  This is what we -- remember

11   I pointed out his testimony about how he didn't in any way

12   attribute the difference to the patented features?  Here are

13   two HP accused laptops.  They are the same model number, 8770w.

14   The only differences are, for example, a different graphics

15   card, a different processor, a different display.  It's the

16   exact same Wi-Fi chip, the exact same one.  Okay?

17         Now, HP sells one for 2,839, sells the other for

18   $1729 because there's other technology in there, such as the

19   display and the graphics card, et cetera.

20         Mr. Bergey says that Innovatio should be paid $16.97

21   on the first, $10.37 on the second.  You now have a tangible

22   example of the problem when people don't apportion.

23         So, now, there is -- and there's -- and he does not

24   claim that somehow any of the value -- the difference between

25   2839 and 1729, or the 10 to 16, results from Innovatio's

1    contributions or their patented features in any way.

2              And, in fact, when you think about 16.97, think about

3    my prior slide that there are 251 standards embodied in a

4    laptop with thousands and thousands of contributions.  Think

5    about what 1697, how if everybody started asking for that, how

6    we wouldn't have any laptops, certainly not standardized ones.

7              There's another important admission by Mr. Bergey.

8    "Did you do any analysis of the importance of the patented

9    features in relation to any other features in 802.11?

10             "I did not."

11             Why is that relevant?  If you're going to come in and

12   say that you deserve $16.97, which is wholly disproportional

13   when you think about the fact that there's 3,000

14   standard-essential patents, you better do some analysis

15   explaining why it is that your patented feature somehow

16   deserves so much more than everybody else's.  It's the mosaic

17   again.  He did not.

18             Remember when we did the mosaic and we saw how narrow

19   these four little areas were and their contributions were, and

20   somehow that leads on a laptop to $16.97.

21             Dr. Nettleton, in his report, talks about how he felt

22   that Innovatio's patents were as valuable or more valuable than

23   the legendary Qualcomm patents.  He says that.  And his

24   testimony, he was asked:  "Isn't it true that you didn't

25   actually review any of the Qualcomm patents?"  It's very easy

1    to say I believe our stuff is as valuable as the legendary

2    Qualcomm patents.  That's a great standard to start with.  And

3    he said:  "That's true.  I didn't actually look at any of the

4    Qualcomm patents."  And that led to one of the most amazing

5    admissions here.

6            "Okay.  And so you don't have to agree with me, Dr.

7    Nettleton, that your conclusion that the Innovatio patents are

8    of at least equal to or greater importance to the standard, to

9    the 802.11 standard as the Qualcomm patents literally has no

10   defensible basis.

11           "You could say that."

12           That is emblematic of the non-rigorous analysis that

13   we have here, where people just come in and say things like

14   Wi-Fi -- you know, we get 6% of Wi-Fi or of a laptop.  Anyway,

15   these patents are as valuable as the Qualcomm patents without

16   ever looking at the Qualcomm patents or without ever looking at

17   any of the other patents in the mosaic.

18           In fact, we have actual evidence that they are worth

19   less.  Innovatio represented to you that 95% of Innovatio's

20   asserted claims cover optional features, 95%.  Mr. Bergey did

21   admit on deposition that "optional features are less valuable."

22   That's because they're optional.  The holdup value certainly is

23   less when you have an option as opposed to when it's mandatory.

24           And, in fact, Judge Robart acknowledged that when

25   apportionment is not used by the implementer, it may have

1    little value to the implementer.

2            If you take a look here, here are some of the

3    patented features, how often they are used.  As you can see

4    from our very graphic, someone being hit by lightning,

5    unfortunately, they happen very, very rarely.  These patents

6    are, if anything, worth less -- we actually gave them the

7    benefit of the doubt in Dr. Leonard's analysis of putting them

8    in the top 50%.  But 95% of these go to optional features, by

9    their own admission.

10           They haven't satisfied the entire market value rule,

11   which is the only thing that would allow them to get up to the

12   entire product.  Because in the entire market value rule, you

13   have to say that somehow -- if you want to get away from the

14   smallest salable unit, you got to justify that the demand for

15   the product is driven by your feature.  And, in fact, Judge

16   Andrews *Daubert*'ed on that very point.  And he said:  "Assuming

17   for the sake of argument that dynamic logic circuits are the

18   single most important part of Intel's microprocessors" -- he's

19   willing to say, "I'll give" -- "I'll take the most important

20   part of the microprocessor," it is still a long haul to

21   conclude that they drive demand for the entire microprocessor.

22   So, therefore, you are *Daubert*'ed because you did not go to the

23   smallest salable unit.

24           There is no evidence that anybody goes into a Best

25   Buy and buys a laptop and says, "I'll take up the cost of the

1   Innovatio channel access." That's what they'd have to prove to

2   get the whole laptop. And *LaserDynamics* says: "Proof that

3   consumers would not want a laptop without such features is not

4   tantamount to proof that any one of those features alone drives

5   the market for laptop computers."

6           You want to get the value of a laptop, you don't want

7   to be on the smallest salable unit, you don't want to be on the

8   chip where your technology resides, prove that no one is going

9   in there and saying -- people are going in there and saying,

10  "I'm not buying a laptop unless it has Innovatio channel

11  access," as opposed to any other things in the standard or any

12  of the alternatives.

13          Now, this is particularly probative. We asked their

14  licensing expert, Mr. Evans, who was actually the same expert

15  in Judge Andrews' court in the *AVM* case, we said: Is it

16  okay -- you know, patent holdup allows someone to get the value

17  due to the fact that the patented features are standardized.

18  And he said: Even without FRAND, the value of the technology

19  should not be limited to its incremental value. If you are not

20  limiting to its incremental value, you're holding up.

21          But we don't have to rely only on Mr. Evans.

22  Dr. Teece that you heard about was asked: "In your opinion, in

23  connection with 802.11, there may be circumstances in which a

24  RAND royalty could include the value of a patented feature due

25  to its standardization." Yeah, if it's consistent with the

1   balancing of interests, it could.

2          Uh-uh.  You gave that up.  When the patents were LOA,

3   you gave that up.  And that's exactly what Judge Robart said,

4   which is:  We will "not consider the value associated with

5   incorporation of the patented technology."

6          You have here overt holdup, and that's exactly why

7   this Court has to go back and make sure we give a RAND royalty,

8   not a royalty that reflects the value of standardization.

9          We heard about the fact of stacking.  I don't need to

10  dwell on it anymore because I think the Court understands all

11  the things that goes into the stack here.  It is not

12  theoretical.  And here are some of the many people who are

13  trying in the present day to contribute to the stack.  Okay?

14         That's a big snowball.  And, thankfully, it's not

15  about to hit the courthouse.  Okay?  But you would think --

16         THE COURT:  Who came up with the snowball there?

17     (Laughter.)

18         MR. CHERNY:  Who came up with the snowball?  There,

19  that fellow, Tim Majors back there.

20         THE COURT:  All right.

21         MR. CHERNY:  Okay.  So you would think with all the

22  negative press about royalty stacking that Innovatio would

23  actually distance themselves from royalty stacking.  You would

24  think that -- they say it's theoretical.  It's not theoretical.

25  Look what Dr. Teece says:

1     "Once royalty stacking occurs, you believe you can

2  create a new standard at that point; that's what you need to do

3  is create a new standard?"

4     Now, we know that that's not possible because it took

5  ten years to get to the present -- or now 15 years.  And

6  here's -- this is probative.

7     "Let's make it clear.  Let's distinguish between good

8  stacking and bad stacking.  You know, my fundamental premise

9  here is that stacking is actually usually something good."

10     Judge Robart disagrees.  He says that "the

11  anti-stacking principle is the primary constraint on the upper

12  bound of RAND."

13     You have them saying that we embrace holdup, we

14  embrace stacking, because it's not surprising.  Because from

15  their perspective, they bought patents, okay, and all they want

16  to do is maximize the value for what they purchased, and they

17  don't want to think about the context of these patents where

18  we're dedicated, in the sense of the Letters of Assurance,

19  where everybody in the standard assured each other we're going

20  to play by the rules and we're going to set the value according

21  to RAND.

22     And here's what happens when the stack goes up.

23  There's 92 -- this is just for Wi-Fi.  And this is actually not

24  even at the chip level.  Even if it was the access point, it

25  would quickly go past if you gave them exactly what they're

**Cherny - opening**                                      **97**

1   asking for, 5.7%.  That's explicit, on a hundred dollars.

2   Okay?  If everybody -- and that's, again -- that's even -- not

3   even using the smallest salable unit.  That's using the access

4   point.  You would quickly get to a $524 burden on that.

5   Remember, they didn't do any analysis to explain why theirs

6   somehow is better than anybody else's in those 92 contributors.

7   ███████████████████████████████████████

8   ███████████████████████████████████████

9   ███████████████████████████████████████

10  ███████████████████████████████████████

11  ███████████████████████████████████████

12  ███████████████████████████████████████

13  ███████████████████████████████████████

14  ███████████████████████.

15          Judge Robart found it not comparable.  You didn't

16  hear Mr. McAndrews tell you that.  He just told you, you know,

17  go with this.  This is a comparable license.  It is not

18  comparable.  It is not a RAND license.

19          They cite other non-RAND licenses.  And what's even

20  notable is even those, the rates, the effective rate per unit

21  is much closer to us than them.  They cite to Judge Davis'

22  *Ericsson*.  In there, 15 cents a unit.  ██████████████████

23  ████████████████████████████████████████████████████,

24  amazing where they actually cite to Motorola's offer to

25  Microsoft, which was rejected and which now is held to be

1    breach of a contract by Judge Robart and by the jury.

2              But the actual amount wasn't 2.25%.  It was .8 to

3    3.471 cents.

4              They say that -- remember, because they weren't --

5    they didn't own the patents at the relevant time.  They say

6    that the people owned the patents would have extracted that

7    value in a hypothetical negotiation.  Now, of course, we know

8    they sold it for far, far less, so it's wholly unbelievable.

9              But we actually have Broadcom in the modern day

10   writing to the FTC decrying the problem of holdup.  There's no

11   chance that Broadcom would be a participant to holdup.

12             Now, at this point, I'd like to ask our colleagues

13   from John Marshall to leave.

14             THE COURT:  All right.

15             MR. CHERNY:  I have only got like four more slides.

16             THE COURT:  You are welcome to come back, but I think

17   we will take a break after Mr. Cherny is concluded.  So if you

18   want to hang around the courthouse, we'll take a break and then

19   you'll know you could come back.

20             PROFESSOR YUAN:  Sure.

21             THE COURT:  Although, I understand that you're

22   seeking to have exclusion in connection --

23             MR. CHERNY:  With Djavaherian.

24             THE COURT:  -- with the first witness.

25             MR. CHERNY:  Yes.

1              THE COURT:  All right.  So I leave it up to you,

2      Professor.

3              PROFESSOR YUAN:  Sure.

4              THE COURT:  Thank you.

5              PROFESSOR YUAN:  Thank you.

6              THE COURT:  Thank you, all, for coming.  Appreciate

7      it.

8          (Members of audience exited courtroom.)

9              MR. CHERNY:  I'm told there are also people from

10     Ericsson in the courtroom.  If that's the case, I'd ask them to

11     leave as well.

12             I only have three more slides, I think, Your Honor,

13     so --

14             THE COURT:  Well, let me just make sure, did the

15     Ericsson people exclude you in Judge Davis' courtroom?

16             MR. CHERNY:  I do not know.

17             THE COURT:  No.  I'm joking.  That's all right.

18             MR. CHERNY:  Okay.

19         (Laughter.)

20             MR. CHERNY:  People exclude me all the time for

21     reasons that have nothing to do with protective orders.

22             THE COURT:  Okay.

23             MR. CHERNY:  Okay.  Let's go to the next slide.

24         **(CAUTION:  Confidential pursuant to protective order:)**

25         ████████████████████████████████████████████████

Cherny - opening

Cherny - opening

Cherny - opening

Cherny - opening

**103**

1   ████████████████████████████████████████████████.

2              Thank you, Your Honor.

3              THE COURT:  All right.  I think we will take a break

4   at this point.  Let my court reporter -- let her fingers rest

5   for a moment.

6              MR. CHERNY:  I apologize.

7              THE COURT:  All right.  We will stand in recess for

8   ten minutes and then I will hear from other counsel.

9              Let me go off the record on scheduling.

10             (Discussion held off the record.  Recess.)

11             THE COURT:  All right.  We are ready to proceed with

12  further opening remarks.

13             Mr. Anderson, you may proceed.

14             MR. ANDERSON:  Yes.  Thank you, Your Honor.  May it

15  please the Court.

16    OPENING STATEMENT ON BEHALF OF DEFENDANTS SONICWALL AND HP

17             MR. ANDERSON:  I represent SonicWALL, as you know,

18  but I've been asked to make basically three points on behalf of

19  both SonicWALL and the Defendant Hewlett-Packard, HP.

20             THE COURT:  All right.

21             MR. ANDERSON:  And they've contributed to remarks.

22  I'm not going to rehash ground that has already been covered,

23  but I want to briefly address three points.

24             And the first is I'd like to elaborate about the

25  accused SonicWALL and HP products here.  Those are the accused

Anderson - opening                    **105**

1   products.

2           THE COURT:  All right.

3           MR. ANDERSON:  And let me start with SonicWALL.

4           SonicWALL, Your Honor, is a firewall company.  And

5   the term "firewall" in the computing world refers to a

6   software- and hardware-based network security system, and this

7   security system controls the incoming and outgoing network

8   traffic by basically looking at each and every data packet.

9           And the security system has a set of software-based

10  rules, and these rules tell the system either allow the data

11  packet to come into the system or allow the data packet to

12  leave.  In short, it is a firewall between a trusted network, a

13  secure internal network and some other external network like

14  the internet that is not necessarily secure or trusted.  And

15  I'm sure that this courthouse and most of the companies

16  represented in this courtroom use some kind of firewall.

17          And I wanted to share with you -- I'll give you a

18  preview of some of the testimony by SonicWALL's John Gmeunder.

19  It's G-m-e-u-n-d-e-r.  He is the vice president of engineering.

20  And he testified about what a firewall is and what the

21  SonicWALL company does.  And I've got his testimony up here on

22  the screen.  And I'm not going to read it.  But this question

23  was asked by Innovatio's lawyer at Mr. Gmeunder's deposition.

24  He was asked why choose a SonicWALL wireless product, and

25  Gmeunder answers that for SonicWALL, it's firewall, it's

1    security.  And then he goes on to explain what the security

2    system does, as I've explained here today, that it is basically

3    making a decision whether packets, individual data packets are

4    allowed to enter the system or exit the system.

5             And here, on the second slide, Mr. Gmeunder says --

6    "What's the purpose of a wireless option for a customer's

7    firewall?"

8             He says it's "just another form of conductivity,

9    802.11 conductivity."  And, in fact, SonicWALL sells both wired

10   and wireless firewalls.  And when it comes with the wireless

11   feature, it's just an added chip or module that allows

12   conductivity wirelessly.

13            And with that context or background about what a

14   firewall system is, you have heard from Innovatio's lawyer that

15   they want to assess a royalty on 20 to 50% of the value of a

16   firewall.  Their expert says that 20 to 50% is the feature

17   factor of a firewall.  And we believe the evidence will show

18   that that is not a factually-based assertion.

19            And, of course, even if it were somehow true that 20

20   to 50% of a wireless firewall was attributable to Wi-Fi

21   technology, which it's not, the point that Mr. Cherny made

22   earlier this morning is right on point, namely, that Innovatio,

23   of course, did not invent wireless.

24            So I wanted to point out that these firewalls are

25   complex hardware and network security systems.  Wireless is

1    just one method of conductivity.  And the apportionment

2    approach that Innovatio takes here is not any kind of an

3    apportionment approach that has been sanctioned by any of the

4    courts' precedence in the area.

5              And the same point could be made about

6    Hewlett-Packard.  That's a very diverse technology company that

7    makes laptops, desktops, computers, desktops, laptops, and also

8    printers.  And I want to just take printers for example.

9              Some printers do have wireless conductivity, and

10   Innovatio is accusing those.  And Innovatio is asserting a

11   feature factor of up to 20% of a printer's value.  They say

12   that up to 20% of a wireless printer is accounted for by 802.11

13   technology, and they would assess their royalty, their tax on

14   up to 20% of the price of a wireless HP computer.  And, of

15   course, these HP printers, like HP laptops and HP desktops,

16   contain a vast universe of technology, much of which is

17   patented by many, many others, but none of which is patented by

18   Innovatio.

19             So let me move on to my second point, and this second

20   point is just a little bit more preview about a witness that --

21   Dr. Matthew Lynde.  He spells it L-y-n-d-e, but it's pronounced

22   Lynde.  And he will be called by SonicWALL and HP.  And

23   Dr. Lynde is a Ph.D. economist.  And you will recall, Your

24   Honor, that Dr. Lynde did testify in the *Microsoft/Motorola*

25   trial with Judge Robart, and Dr. Lynde's testimony is credited

1    by Judge Robart.

2           And a particular fact about which Dr. Lynde is going

3    to testify that I wanted to highlight is his testimony about

4    the Via licensing pool.  That's V-i-a, V-i-a licensing.  It was

5    a licensing pool formed early in the life of 802.11.  It was

6    formed at a time before there was a huge capital investment by

7    the major players in Wi-Fi technology.

8           And, basically, several holders of standard-essential

9    802.11 patents formed this patent pool and they agreed among

10   themselves as to what a RAND royalty would look like.  And

11   although no patent pool or any other benchmark is ever perfect,

12   this is a benchmark that Dr. Lynde thought was a good

13   benchmark.

14          And I've put up on the screen paragraphs 554 and 562

15   from Judge Robart's findings of fact in the *Microsoft/Motorola*

16   case, and here you see Judge Robart agreeing "that the Via

17   Licensing 802.11 patent pool is an indicator of a RAND royalty

18   rate for Motorola's 802.11 standard-essential patent" -- or

19   "standard-essential patent portfolio."

20          So I just wanted to preview that we're going to

21   present through Dr. Lynde some of the same testimony that Judge

22   Robart heard about the value of patent licensing pools and

23   particularly about the value of the Via licensing pool, 802 --

24   their 802.11 patent licensing pool.

25          And the final point I want to make -- and I realize

1    that time is of the essence here, so I'm going to move through

2    this -- I want to -- we wanted to comment -- we, SonicWALL and

3    HP, want to comment on a statement that we saw in Innovatio's

4    trial brief that we believe is inaccurate.

5              And I've quoted the statement here, which it appears

6    in Innovatio's trial brief at page 22.  And, as we understand

7    this argument, which appears several times in Innovatio's trial

8    brief, Innovatio is arguing that because the patents have been

9    found by this Court to be essential to the 802.11 standard,

10   that the Court should not consider, in setting a RAND royalty

11   rate, whether there were technically feasible alternatives

12   available to the standards-setting organization, and we would

13   respectfully suggest that that is incorrect.

14             And here you can see Innovatio stating that because

15   the Court held that Innovatio's 23 patents are, in fact,

16   essential as a matter of law, and then they say parenthetically

17   "which provides further confirmation that there were no

18   commercially or technically feasible alternatives at the time

19   the standard was adopted," and we would suggest that that

20   doesn't confirm any such thing.

21             To be sure, the IEEE definition of a

22   standard-essential patent claim, which I've put up on a slide

23   here, that definition, under that definition, there can be no

24   commercially and technically feasible non-infringing

25   alternative in order to qualify as a standard-essential patent

1    under the IEEE standard.  But that is a wholly different

2    question from whether the standard -- whether at a time before

3    the standard was implemented, the standards-making body had

4    technology options to choose from before incorporating one of

5    those options in the standard.  I think that was the point that

6    Mr. Cherny made with his slides about the tollgate and the car

7    going around the circle and reemerging.

8              And that, I would respect -- I would respectfully

9    suggest, is the correct analysis; namely, you have to look *ex*

10   *ante* before the standard was adopted to determine whether or

11   not the standards-making organization had available to it

12   reasonable technically feasible alternatives from which to make

13   a choice.

14             And the proposition that Innovatio appears to be

15   making in its brief, namely, that because the Court held that

16   their patents were standard-essential, there were no --

17   therefore, there can be no commercially and technically

18   feasible non-infringing alternative, I think is just an

19   incorrect proposition.

20             So, in short, the correct inquiry looks *ex ante* at

21   whether or not there were alternatives available to the

22   standards-making authority, and the evidence will show here

23   that there were substantial and meaningful and commercially and

24   technically feasible alternatives.

25             That completes my remarks.  Thank you, Your Honor.

1          THE COURT:  All right.  Well, thank you very much.

2          All right.  Any further comments by way of opening

3     statement?

4          MR. McANDREWS:  No.  I think Mr. Cherny covered an

5     awful lot of ground, Your Honor.  I think some of the

6     statements, in Innovatio's view, were taken a bit out of

7     context.  We will meet that with a robust rebuttal through

8     witness testimony and then, of course, during closing.

9          THE COURT:  Yeah.  Now you know the roadmap.

10    Unfortunately, there's no rebuttal argument to opening

11    statements.

12         MR. McANDREWS:  Right.

13         THE COURT:  But I, of course, haven't heard any

14    evidence from the witness stand yet, and we're ready to proceed

15    with that.

16         MR. CHERNY:  Thank you, Your Honor.

17         THE COURT:  All right.  If you want to call your

18    first witness out of order, we'll see if we can get him on and

19    off the witness stand by his witching hour of 1:00 o'clock.

20         MR. ALPER:  Thank you, Your Honor.

21         We call David Djavaherian.

22         THE COURT:  Raise your right hand.

23       (Witness duly sworn.)

24         THE COURT:  All right.  Please be seated.

25         THE WITNESS:  Thank you.

Djavaherian - direct by Alper          **112**

1      THE COURT:  Direct examination.  You may proceed.

2      MR. ALPER:  Thank you, Your Honor.

3      DAVID DJAVAHERIAN, DEFENDANTS' WITNESS, SWORN

4                DIRECT EXAMINATION

5  BY MR. ALPER:

6  **Q.**  Will you please introduce yourself.

7  **A.**  Yes.  My name is Dave Djavaherian.

8  **Q.**  Where are you currently employed, Mr. Djavaherian?

9      THE COURT:  We will just make sure we got the correct

10  spelling.  It was spelled by your counsel, and I am sure she

11  spelled it correctly, but let's just make sure.

12      THE WITNESS:  Sure.  For the record, it's D, as in

13  David, j-a-v, as in Victor, a-h-e-r-i-a-n.

14      THE COURT:  And you pronounce it again?

15      THE WITNESS:  Djavaherian.

16      THE COURT:  Djavaherian.

17  BY MR. ALPER:

18  **Q.**  Mr. Djavaherian, where are you currently employed?

19  **A.**  Broadcom Corporation.

20  **Q.**  How long have you been employed at Broadcom?

21  **A.**  Just over three years.

22  **Q.**  Could you please go briefly through your employment history

23  prior to joining Broadcom.

24  **A.**  Sure.  I came out of law school and went to a law firm

25  named Irell & Manella and was a litigator there, practiced IP

1    litigation, did some transactional work.

2              In about 2007, I joined a semiconductor company in

3    the bay area, was there for about three years, and then in

4    2010, I joined Broadcom.

5    **Q.** And where did you go to law school?

6              MS. TESSAR:  I'm sorry to interrupt.  But I just

7    wanted to interject, because I think there have been a lot of

8    people in and out of the courtroom, and there may be someone

9    here from Qualcomm who's not a party.  And so I want to make

10   sure on the record that we're clear that this testimony is

11   sealed and that only outside counsel for the parties, in-house

12   counsel for the parties and other people authorized under the

13   protective order are permitted in the courtroom now.

14             THE COURT:  All right.  Well, when we get to those

15   parts -- his background and experience, it seems to me, to be

16   something that can be available to the public.  When we get to

17   those parts, why don't you point it out.

18             MS. TESSAR:  Perfect.

19             THE COURT:  And, Mr. Alper, maybe you've segregated

20   those parts in your testimony as well.

21             MR. ALPER:  I have, Your Honor.

22             THE COURT:  I hesitate to put an entire witness'

23   testimony under seal.

24             MS. TESSAR:  Absolutely agreed.  I just thought you

25   had said earlier to have everybody out.  Sorry for the

1    interruption.

2              THE COURT:  Well, if you want to scan the room to see

3    if -- who would be the objectionable people?

4              MS. TESSAR:  Anyone who's not under the protective

5    order.  Someone just passed me a note saying there was someone

6    from Qualcomm here, but I don't know who it is.

7              THE COURT:  I'm sorry.  You did what now?

8              MS. TESSAR:  Someone passed me a note saying there's

9    someone from Qualcomm here, but I don't know who it is.

10             THE COURT:  Is there anyone here from Qualcomm?

11   Anyone in the courtroom?  You're now ordered to raise your hand

12   if you're Qualcomm on pain of contempt.

13             MS. TESSAR:  So it should be that everyone in the

14   room would be under the protective order, then.  Thank you.

15             THE COURT:  No one has raised their hand.

16             Let me just say anyone who remains in the courtroom

17   for the remainder of this testimony will be held to be under

18   the protective order that was entered in this case with regard

19   to parties and counsel.

20             All right.  Someone has left the courtroom now

21   voluntarily without identifying himself, and we'll proceed with

22   further testimony.

23             We'll consider this -- just for purposes of moving

24   through it efficiently, we'll consider it under seal.  And if

25   there's a request for public disclosure beyond counsel of

Djavaherian - direct by Alper                    **115**

1   record, which includes counsel for Broadcom, then you'll have

2   to make a motion before me and we'll address it on notice.

3   Okay?

4              MR. ALPER:  Thank you, Your Honor.

5              THE COURT:  All right.  You may proceed.

6              So you joined Broadcom in 2010?

7              THE WITNESS:  Yes.

8              THE COURT:  What month?

9              THE WITNESS:  I believe it was July or August.

10             THE COURT:  All right.  You may proceed.

11             MR. ALPER:  Thank you, Your Honor.

12  ▮

13  BY MR. ALPER:

14  **Q.**  Mr. Djavaherian, where did you go to law school?

15  **A.**  I went to the University of California at Berkeley.

16  **Q.**  Let's talk about Broadcom and your work at Broadcom.

17             What are your responsibilities there?

18  **A.**  So I have a variety of responsibilities.  I'm in the legal

19  department.  I'm an attorney.  I handle various litigation and

20  licensing-related issues and negotiations.  I handle various IP

21  matters.

22             Recently, I've been spending a lot of time handling

23  IP policy matters relating to standards-setting organizations

24  and acting as Broadcom's delegate to some of the organizations

25  that are dealing with RAND issues.

Djavaherian - direct by Alper                    **116**

1   **Q.** And I think you just covered this somewhat, but just to be

2   absolutely clear, in connection with your job, do you have

3   responsibilities relating to standardized technologies?

4   **A.** Yes.

5   **Q.** ████████████████████████?

6   **A.** ██████████████████████████████████████

7   █████████████████████████████████████████████

8   █████████████████████████████████████████████

9   ██████████████████████████████████████████████

10  █████████████████████████████████████████████

11  █████████████████████████████████████████████

12  ██████████

13        █████████████████████████████████████████

14  ██████████████████████████████████████████████

15  ████████████████████████████████████████████

16  █████████████████████████████████████

17  ████████████████████████████████████████████

18  ████████████████████.

19  **Q.** And I understand the reason that you need to leave early

20  today relates to a meeting for a standards-setting

21  organization?

22  **A.** Yes, it does. And I thank the Court for allowing me to be

23  taken out of order.

24        I am missing the first day of a three-day meeting at

25  ETSI, which is a French organization that sets the standards

1  relating to cellular communications technology, such as LTE or

2  3G and various other technologies, and flying out there tonight

3  to make the meeting for tomorrow.

4       And then after that, there's a meeting in Geneva with

5  the International Telecommunications Union, which is a

6  subsidiary of the UN, where we're also going to be debating

7  standards policy for standards that the ITU oversees.

8  **Q.** ███████████████████████████████

9  ███████████████████

10     ██████████████████████████

11 **A.** ███

12 **Q.** █████████████

13 **A.** █████████████████████████.

14 **Q.**  Okay.  Well, I'm going to turn back to that in a moment,

15 but before that, I'd like to ask you a little bit about

16 Broadcom's business and Broadcom's products.

17      So let me begin by asking you, what is Broadcom's

18 business?

19 **A.**  So Broadcom is a semiconductor company.  We specialize in

20 communications semiconductors, so anything from 802.11, as

21 we've been discussing today, to Bluetooth to NFC technologies.

22 We're involved in Ethernet communications, involved in various

23 infrastructure-type technologies, like switches, cable set-top

24 boxes, and the sort of -- the communications technologies that

25 are involved there.

1    So basically, you know, our motto is connecting

2  everything, and basically we play in a variety of markets, all

3  involving computers or electronic devices talking to each other

4  and communicating with each other, and that's why it's

5  communications semiconductors.

6  **Q.**  Does Broadcom sell 802.11 products?

7  **A.**  Yes.

8  **Q.**  And when we talk about 802.11, your -- that's the 802.11

9  standard.  You have familiarity with that?

10 **A.**  Yes, I do.

11 **Q.**  Okay.  And what are the types of products that Broadcom

12 sells that have 802.11 functionality?

13 **A.**  So, as I said, Broadcom's a semiconductor company, meaning

14 we sell chips, so we design and market and sell semiconductor

15 chips to customers who then, you know, put them into various,

16 you know, devices that then sell them to the public.

17 **Q.**  When it comes to 802.11 products, where does the

18 functionality that is described in the 802.11 standards go?

19    MR. SCHARFF:  Objection, Your Honor, lack of

20 foundation.  He's an attorney for Broadcom, not a technical,

21 you know, engineer.

22    THE COURT:  Response?

23    MR. ALPER:  I can establish some foundation, Your

24 Honor.

25    THE COURT:  All right.  Please do.

Djavaherian - direct by Alper                    **119**

1    BY MR. ALPER:

2    **Q.**  Are you familiar with Broadcom's 802.11 chip products?

3    **A.**  Yes, generally.

4    **Q.**  And are you familiar with -- you attend standards-setting

5    organization meetings relating to 802.11 standard -- or

6    relating to IPR policies for the standards?

7    **A.**  Yeah.  I've attended meetings for various organizations,

8    and IEEE, which sets the 802.11 standard, has been recently

9    involved in reviewing and revising its IPR policy.

10   **Q.**  And you have experience with licensing the 802.11 chips?

11   **A.**  Licensing negotiations and participating in those, yes.

12   **Q.**  And in the course of that experience, have you become

13   familiar with the technologies relating to 802.11 and

14   Broadcom's products?

15   **A.**  Yes, I mean, to a degree.  I'm not an engineer, but

16   certainly to the degree that I need to.

17   **Q.**  And what is your understanding of where the 802.11

18   standards can be found with respect to 802.11 products?

19                MR. SCHARFF:  Your Honor, we're going to maintain our

20   objection.

21                THE COURT:  Okay.

22                MR. SCHARFF:  We believe that the foundation and his

23   understanding in standards doesn't give him adequate

24   qualification to talk about functionality in a chip.

25                THE COURT:  All right.  I am going to take your

Djavaherian - direct by Alper                    **120**

1   objection under advisement and listen to the testimony, and I

2   will make a determination.

3           MR. SCHARFF:  Thank you, Your Honor.

4           THE COURT:  I don't know that this testimony will be

5   -- on this point will be dispositive anyway, but let's proceed.

6   BY THE WITNESS:

7   **A.**  So my understanding is that the 802.11 technology is

8   implemented at the chip level.

9   BY MR. ALPER:

10  **Q.**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Djavaherian - direct by Alper                    **121**

Djavaherian - direct by Alper

Djavaherian - direct by Alper                    **123**



18          THE COURT:  Okay.

19    BY MR. ALPER:

20    **Q.**  Now, Mr. Djavaherian, in the course of your

21    responsibilities at Broadcom, have you become familiar with the

22    market for these Wi-Fi chips?

23    **A.**  Generally, yes.

24    **Q.**  All right.  And based on your work, what is your

25    understanding of the size of the market for Wi-Fi chips?

1     **A.**  It's enormous.  So Wi-Fi has been, as I think everyone

2     knows, as a matter of common knowledge, hugely successful, and

3     Broadcom and a few other chip manufacturers are sort of the

4     primary market participants in the 802.11 market, selling chips

5     to a lot of customers who then put those chips to various uses.



**Djavaherian - direct by Alper**          **125**



MR. SCHARFF:  Objection, Your Honor, same lack of
foundation.  He's not a marketing person.  He's an attorney.

THE COURT:  All right.  Lay further foundation for
the witness' knowledge on this point.

MR. ALPER:  Sure.

BY MR. ALPER:

Q.

Djavaherian - direct by Alper

**126**

Djavaherian - direct by Alper          **127**



18   **Q.**  Okay.  Now, the defendants in this case -- you were here

19   during the opening, right?

20   **A.**  I was.

21   **Q.**  And the defendants in this matter are contending that the

22   RAND royalty for the Wi-Fi chips -- or the Wi-Fi products at

23   issue here should be less than a cent.  Did you see that?

24   **A.**  I did.

25   **Q.**

Djavaherian - direct by Alper          **128**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

19   **Q.**  I'd like to now turn to the acquisition and sale of the

20   patents that are at issue by Broadcom.

21          MR. ALPER:  And I think we handled the

22   confidentiality issue.  This would be the segment where I would

23   get into some confidential information, but I just want to

24   pause for a moment.

25          THE COURT:  All right.  Is there anyone in the

1    courtroom that you believe should be excluded?  Any party?  Is

2    there anyone that any party believes should be excluded?

3            And if you want to ask people you don't personally

4    know who they are and what they're doing, you certainly may.

5            MS. TESSAR:  I think as long as everyone who's here

6    by remaining seated commits that they are outside counsel to

7    the parties or in-house counsel and allowed under the

8    protective order.

9            THE COURT:  All right.  Like a RAND obligation, you

10   folks are now required to maintain the confidentiality.  And if

11   you don't desire to do that, please step out of the courtroom.

12           All right.  One individual has left the courtroom.

13   Another individual went back and talked to someone, but -- all

14   right.  Everyone else now is bound to the confidentiality

15   agreement.  And if it is later shown that you have violated

16   that agreement, there is a possibility you could be held in

17   contempt.  You are ordered to now maintain that

18   confidentiality.

19           MS. TESSAR:  Thank you, Your Honor.

20           THE COURT:  All right.  Okay.  You may proceed.

21           MR. ALPER:  Thank you, Your Honor.

22   BY MR. ALPER:

23   Q.

24

25

**130**

Djavaherian - direct by Alper

Djavaherian - direct by Alper

**131**

Djavaherian - direct by Alper

Djavaherian - direct by Alper

**133**

Djavaherian - direct by Alper

Djavaherian - direct by Alper

135

Djavaherian - direct by Alper                    **136**

Djavaherian - direct by Alper                 **137**

Djavaherian - direct by Alper                    **138**

1

2

3

4    **Q.**  Okay.

5           MR. SCHARFF:  I'd just like to ask how long, counsel,

6    you think you are keep going?  I just want to make sure I have

7    enough time to cross.

8           MR. ALPER:  Sure.  Let's see.  How about another ten

9    minutes or less?

10          MR. SCHARFF:  I was actually anticipating --

11          THE COURT:  What time is your actual witching hour?

12          THE WITNESS:  So my flight is on Lufthansa at 3:45.

13          THE COURT:  At O'Hare?

14          THE WITNESS:  At O'Hare.  So I need to be there --

15    it's an international flight.  So an hour, hour and a half

16    ahead of time.  So I probably can go a little past 1:00.  I

17    don't know what traffic is like.

18          THE COURT:  Midday on a Monday, good weather, not

19    sure.

20       (Laughter.)

21          THE COURT:  All right.  Well, let's see if we can get

22    it done.

23          MR. SCHARFF:  Your Honor --

24          THE WITNESS:  I appreciate the Court's efforts in

25    trying to get me off.

Djavaherian - direct by Alper                    **140**

1          MR. SCHARFF:  I anticipate probably about 20, 25

2    minutes for cross.

3          THE COURT:  Well, let's try to get to the essence of

4    what it is that both sides desire to elicit from this witness.

5          MR. ALPER:  Okay.  I will rapidly go through the

6    remainder of the questions.

7          THE COURT:  All right.



1

2

3

4          THE COURT:  All right.

5     BY MR. ALPER:

6     **Q.**  I'm going to turn to my final subject --

7          THE COURT:  All right.

8     BY MR. ALPER:

9     **Q.**  -- which goes back to your experience and the work that

10    you're doing in connection with RAND and standards-setting

11    organizations.

12          Now, Broadcom is an active participant in

13    standards-setting organizations like the IEEE; is that right?

14    **A.**  Yes.

15    **Q.**  Has Broadcom been an active participant of the development

16    of the 802.11 standards?

17    **A.**  Yes, very active.  We chaired many of the committees that

18    led to the development of, for instance, 802.11n.

19

20

21                                                    .  You

22    know, we're -- 802.11 is an important market for us, and we

23    spend a lot of time on it.

24    **Q.**  Now, has Broadcom ever taken public positions regarding

25    RAND licensing?

1    **A.** Yes.

2    **Q.** I'm going to show you what we've marked as DTX 668, and

3    I'll stay zoomed out for just a moment so you can see the whole

4    thing, and --

5              THE COURT:  Just as we did with the prior exhibit,

6    unless there is an objection, it will be considered un -- that

7    there is no objection, and we'll proceed with it being admitted

8    in evidence.

9              MR. SCHARFF:  There's no objection, Your Honor.

10             THE COURT:  You may proceed.  So we'll just --

11   silence is confirmation that it's admissible.  You may proceed.

12             MR. ALPER:  Thank you, Your Honor.

13   BY MR. ALPER:

14   **Q.** What is Exhibit 668?

15   **A.** So this is a submission that Broadcom made in 2011 to the

16   FTC in response to an FTC request for comments on patents

17   standards issues.

18   **Q.** Okay.  And so Broadcom made this submission in response to

19   the Federal Trade Commission's request for positions on IP

20   licensing and RAND and so forth?

21   **A.** Yes.

22   **Q.** Okay.  I'm going to ask you a few questions about a couple

23   of pieces of this and then we'll finish up.

24             So one sentence down here that I want to draw your

25   attention to says:  "In summary, Broadcom believes that many

1    companies that have invented the technology incorporated into

2    standards continue to feel the effects of patent holdup

3    directly."

4              And it goes on to say:  "Just as important, patent

5    holdup means higher prices and fewer choices for the many

6    millions of consumers of standards-based products."

7              And then you go into a section that says Patent

8    Holdup is a Real Concern.  And my question for you is, why is

9    patent holdup a real concern for Broadcom?

10   **A.**  So Broadcom, as I was saying earlier, participates in lots

11   of markets and is involved in the sale of lots of chips that

12   are subject to all sorts of different standards bodies.

13             We have seen, I think, a proliferation of patent

14   litigation directed, you know, both at our company as well as

15   our customers, and we've seen a proliferation of claims by

16   patentholders seeking very high royalties or seeking

17   injunctions as a way to get very high royalties.  And so, just

18   in general, I think that as a producer in the market with

19   the -- with sort of the economics that I was referring to

20   earlier, in terms of profit margins and such, you know, we

21   think standards need to be, you know, respected and that the

22   RAND commitment needs to be respected, and it's a threat to

23   sort of our business and our ability to invest in R&D and our

24   ability to sell our products at a fair price when, you know, we

25   have multiple patent assertions by multiple entities all

1   seeking very, very high rates that, in our view, don't comply

2   with RAND.

3   **Q.**  Is Broadcom concerned that if RAND royalties are too low,

4   companies will be disincentivized to invest in the research and

5   development of standardized technologies?

6   **A.**  So, you know, RAND means reasonable, and setting that rate

7   is an effort to figure out what a reasonable and

8   non-discriminatory rate is.  We think that if the proper RAND

9   principles are applied, principles involving, you know,

10  proportionality and principles involving royalty stacking and

11  avoiding some of those concerns that have been expressed in

12  academic literature and by the administrative agencies and by

13  the anti-trust authorities, that a RAND rate, you know, won't

14  be too low and that the standard will be allowed to prosper.

15          I don't think we've been focused on concerns that

16  RAND rates are being set at a number that's too low.  I think

17  we've seen the opposite problem.

18  **Q.**  Okay.  I'm going to direct you to another piece of this

19  submission to the FTC, and here on page 3 --

20          THE COURT:  Same exhibit, DTX 668?

21          MR. ALPER:  Yes, 668.

22  BY MR. ALPER:

23  **Q.**  On page 3, Broadcom says:  "Finally, in 2003, CSIRO

24  initiated a licensing campaign in which, if adopted by every

25  patentholder that had provided a RAND assurance, would have

1    added more than $100 to each WLAN product."

2        Can you explain to us the principles that are being

3    addressed in that sentence?

4    **A.** So this sentence relates to the issue that I referred to a

5    moment ago of royalty stacking.  So, you know, the concern is

6    that if you don't take into account the whole gambit of patents

7    that may potentially apply to a particular standard, in setting

8    the rate of any patent within that standard, you can end up

9    with a situation where the aggregate royalty stack is much,

10   much higher than would seem to be reasonable and much, much

11   higher than would be required for the standard to be successful

12   and to allow companies to invest in, you know, exploitation of

13   the standard.

14   **Q.** All right.  And lastly -- well, actually, let me ask you

15   this.  Is royalty stacking a theoretical concern to Broadcom?

16   **A.** It's both theoretical and practical, I guess.  I mean, I

17   think that royalty stacking is both something that we have, you

18   know, seen talked about in academic literature and by the

19   agencies.  It's also something that we've seen, you know, sort

20   of in practice, for instance, in 802.11 where, you know, you've

21   got -- we've seen multiple non-practicing entities -- you know,

22   like CSIRO was mentioned earlier in this document.  There's a

23   company called WiLAN that's been going after 802.11.  Mosaid

24   has been going after 802.11.  There are various operating

25   companies that are not in the 802.11 space, that are in

1  different spaces that have tried to apply some of their patents

2  and seek very high royalties in connection with 802.11.

3        There's a patent pool that's being developed, called

4  Via licensing, that relates to 802.11.  So there -- you know,

5  beyond that, there are -- you know, again, we see a lot of

6  this, not just via direction assertions against Broadcom, but

7  via assertions against our customers, and, you know, there are,

8  you know, easily more than ten and maybe dozens of other

9  assertions that we've seen in the Wi-Fi space directed to

10 802.11.

11 **Q.**  Okay.  I'm going to lastly direct you to one other area of

12 this.  And I'm not going to get into the details here, but I'm

13 just going to focus on one -- two words at the beginning of

14 section *ex ante* and ask you this question.

15        THE COURT:  What page is that again?

16        MR. ALPER:  I'm sorry.  This is page 4 of Exhibit

17 668.

18        THE COURT:  Thank you.

19 BY MR. ALPER:

20 **Q.**  Section B talks about -- uses the word *ex ante*, and my

21 question for you, Mr. Djavaherian, is what does *ex ante* mean in

22 connection with RAND licensing?

23        MR. SCHARFF:  Objection to the extent it calls for an

24 expert conclusion.

25        THE COURT:  Well, I will take his understanding,

1   provide his understanding, and I will consider your objection.

2   BY THE WITNESS:

3   **A.** So *ex ante* is a principle that we've talked about a lot in

4   these SSO meetings that I've been going to and that's addressed

5   in, you know, a lot of the literature, you know, regarding

6   RAND, and that I've used in sort of -- in those contexts and in

7   sort of Broadcom's submissions regarding RAND licensing.

8           The idea, basically, is you can't -- in determining

9   RAND or a RAND rate, you can't include value that's

10  attributable to the fact of standardization.  So you need to

11  look, when you're assessing a RAND royalty, at the inherent

12  value of the technology as compared to other alternatives that

13  would be available to, you know, implement a similar or -- you

14  know, I don't want to say the same standard because it would be

15  written slightly different, but implement that same idea of a

16  standard.  So 802.11 with a slight tweak to accommodate one

17  approach rather than another.

18          And the reason for that is, you know, once you have a

19  standard set -- you know, before standard setting, you have

20  lots of options, you have lots of ways to do things, and once

21  you have a standard set, you have a lock-in, and that allows

22  for a degree of leverage that has been referred to as, you

23  know, holdup leverage or other things that can be exploited to

24  seek royalty rates that are much higher than RAND.

25          MR. ALPER:  All right.  Thank you very much,

1    Mr. Djavaherian.  No further questions.

2            THE COURT:  All right.  Cross-examination.

3            MR. SCHARFF:  Thank you, Your Honor.

4            THE COURT:  While counsel is coming up, was Professor

5    Lemley at Berkeley when you were there?

6            THE WITNESS:  He got there shortly -- like I think a

7    year after I left, but I had worked with Professor Lemley.

8            THE COURT:  Okay.

9            THE WITNESS:  He sends me all his articles that he

10   writes in a little care package every once in a while.

11           THE COURT:  You have read the article where he says

12   there should be some means to evaluate the RAND rate through

13   arbitration, similar to baseball arbitration?

14           THE WITNESS:  Yeah.  I mean, he -- Mark Lemley is a

15   very prolific writer.

16           THE COURT:  Yes, he is.

17           THE WITNESS:  So I don't know that I can recall that

18   specific article, but --

19           THE COURT:  Okay.

20           THE WITNESS:  But there have been lots of, you know,

21   proposals.  For arbitration, in particular, the focus has been

22   on voluntary arbitration as opposed to any sort of mandatory

23   approach, but certainly I think there are lots of approaches

24   that might be better than what we are currently doing to set

25   RAND rates.

Djavaherian - cross by Scharff                    **149**

1       THE COURT:  Better than this?  All right.

2       MR. SCHARFF:  Your Honor, may I approach?  I have a

3   binder of the exhibits that I can use.

4       THE COURT:  You certainly may.

5       MR. SCHARFF:  Thank you.

6       THE COURT:  Thank you.

7       THE WITNESS:  Thank you.

8       MR. SCHARFF:  I have a copy for the Court.

9       THE COURT:  Thank you.  If you've got one for Mr.

10  Thies, that would be helpful.  Thank you.

11      You may proceed.

12      MR. SCHARFF:  Thank you, Your Honor.

13                   CROSS-EXAMINATION

14  BY MR. SCHARFF:

15  **Q.**  Good afternoon, Mr. Djavaherian.

16  **A.**  Good afternoon.

17  **Q.**  Now, you're here voluntarily, not subject to any subpoena

18  from any of the manufacturer defendants; is that correct?

19  **A.**  I'm not subject to a subpoena from any of the manufacturer

20  defendants.

21  **Q.**  ████████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ██  ████

24  ██  ████████████████████████████████████████████████

25  ██  ████████████████

Djavaherian - cross by Scharff

**150**

Djavaherian - cross by Scharff                    **151**

Djavaherian - cross by Scharff                152

**153**

Djavaherian - cross by Scharff

Djavaherian - cross by Scharff                    **154**

Djavaherian - cross by Scharff            **155**

Djavaherian - cross by Scharff

**156**

Djavaherian - cross by Scharff          **157**

Djavaherian - cross by Scharff                    **158**

**159**

Djavaherian - cross by Scharff

Djavaherian - redirect by Alper          **160**

3              REDIRECT EXAMINATION

4    BY MR. ALPER:

5    **Q.**

Djavaherian - redirect by Alper          **161**

Djavaherian - redirect by Alper                    **162**

Djavaherian - redirect by Alper                163

Djavaherian - redirect by Alper                    **164**

20        (Discussion held off the record.   Recess.)

1          C E R T I F I C A T E

2

3

4

5              I, Colleen M. Conway, do hereby certify that the

6    foregoing is a complete, true, and accurate transcript of the

7    Trial proceedings, Volume 1, Pages 1-164, had in the

8    above-entitled case before the HONORABLE JAMES F. HOLDERMAN,

9    one of the Judges of said Court, at Chicago, Illinois, on

10   September 9, 2013.

11

12

13      _/s/ Colleen M. Conway, CSR,RMR,CRR_      _09/09/13_

14           Official Court Reporter               Date
             United States District Court
15           Northern District of Illinois
                  Eastern Division
16

17

18

19

20

21

22

23

24

25